FILED

2004 MAR 31  P 2: 26

U.S. DISTRICT COURT
BRIDGEPORT, CONN.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DONALD WAINRIGHT, ET AL., | : |
| Plaintiffs, | : CIVIL ACTION NO. |
| v. | : 3:01-CV-02158 (WWE) |
| OSM COMMUNICATIONS, INC., ET AL., | : |
| Defendants. | : MARCH 31, 2004 |

## JOINT MEMORANDUM OF DEFENDANTS ISRAEL H. POLANSKY AND ANNE POLANSKY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, WITH APPENDIX

Introduction

This is an action brought by two former employees of OSM Communications, Inc. ("OSM") Donald Wainright and Deborah A. Russo-Williams and by Donald Wainright's wife, Janet Wainright. Their claims against the defendants Israel H. Polansky and Anne Polansky are based upon plaintiffs' claims for salary, severance, and other benefits claimed to be owed to them by reason of the employment of Donald Wainright and Deborah A. Russo-Williams by OSM. Defendants Israel H. Polansky and Anne Polansky have moved for summary judgment. Their motions are supported by their affidavits and by excerpts of plaintiffs' depositions.

The Causes of Action

In their first cause of action plaintiffs claim that these defendants are liable for OSM's alleged breach of contract because "OSM is an alter-ego and mere instrumentality" of these defendants. (Complaint p. 17)

The second cause of action is a claimed violation of Connecticut General Statutes relating to the failure of OSM to pay wages to Mr. Wainright and Ms. Russo-Williams and that these defendants are liable for any damages under that section because "OSM is an alter-ego and mere instrumentality" of these defendants. (Complaint p. 18)

The third cause of action against Israel H. Polansky is founded upon the allegations that Israel H. Polansky personally guaranteed OSM's obligations to pay Mr. Wainright his wages, bonus and moving expense reimbursement as an inducement to accepting employment at OSM and that Mr. Polansky likewise guaranteed OSM's performance of its obligations to Ms. Russo-Williams both as an inducement to her accepting employment with OSM and as an inducement for her to remain an employee of OSM. (Complaint p. 19)

The fourth cause of action alleges Israel H. Polansky induced Mr. Wainright to accept employment with OSM by falsely representing OSM's financial condition and falsely claiming to act as a guarantor of OSM's obligations to Mr. Wainright and that Mr. Polansky made like representations to Ms. Russo-Williams to induce her to accept employment with OSM and to continue employment with OSM. (Complaint p. 21)

The fifth cause of action claims that Israel H. Polansky falsely represented that he would reimburse Mr. Wainright for relocation expenses and he is therefore liable for OSM's alleged failure to reimburse repay expenses to both Mr. Wainright and his wife Janet Wainright. (Complaint p. 23)

The claims against Israel H. Polansky are therefore based entirely upon three premises:

  A. The plaintiffs were induced to become employees of OSM through the fraudulent representations of Israel H. Polansky concerning OSM's financial viability and Israel H. Polansky's willingness to personally guaranty that OSM would meet its obligations to plaintiffs;

  B. OSM is nothing more than an alter ego and instrumentality of Israel H. Polansky.

  C. In June of 1998 Israel H. Polansky promised Ms. Russo-Williams that he would personally guaranty OSM's financial obligations.

 The claims against Anne Polansky are therefore based entirely upon two premises:

  A. OSM is nothing more than an alter ego and instrumentality of Anne Polansky.

  B. Money was drained from OSM and property was purchased through and placed in Anne Polansky's name to shield assets from OSM creditors.

Facts

 In 1996 OSM purchased the assets which had once belonged to a company called In-Store Advertising, Inc. Those assets included electronic signs which had been installed in supermarkets advertising on those signs would be sold to consumer product companies and placed on the signs via computer over telephone lines. It was OSM's objective to secure outside investment capital to fund the marketing of such advertising and the telecommunications

network. (Israel H. Polansky Affidavit, hereinafter "IHP," ¶¶ 3-5) Israel H. Polansky invested sufficient sums for OSM to acquire those assets and May of 1996.

The complaint alleges the plaintiffs Donald Wainright ("Wainright") and Deborah A. Russo-Williams ("Russo-Williams") were employees of OSM from 1996 through late 2000.

### Israel H. Polansky

Israel H. Polansky's role at OSM was limited. In the first place, OSM was located in New York City and Israel Polansky lived in Newton, Massachusetts with his wife. In May of 1996 he was 86 years old and his primary function came to care for his then 84 year old wife. She required and continues to require his constant attention and presence in their home in Newton, Massachusetts. Her movement is severely restricted by reason of her arthritis. She suffers from severe diverticulitis, has constant headaches, and rarely has day without pain. Her condition along with Israel Polansky's age, compelled him to retire from business in June of 1997. As a consequence of all of this he rarely traveled to New York City or OSM. (IHP ¶¶ 6, 7)

Although Israel Polansky was a director of the company by reasons of what he understood to be Delaware requirements he had no role of any kind in the operation of OSM. Israel Polansky's son Robert Polansky, was the President and in charge of all operations (IHP ¶¶ 8, 9)

In 1999 Israel Polansky was reaching the point that he could no longer make investments in OSM and in 2000 he stopped making investments altogether. (IHP ¶ 12)

Israel Polansky made no representations to Mr. Wainright with respect to the condition of OSM or his guaranty of salary. (IHP ¶ 16) In fact, in his deposition Mr. Wainright testified that his first communication of any substance with Israel Polansky was after he was employed by OSM. That communication took place at OSM's office. And that the substance of that communication "was his [Israel Polansky's] desire not to keep spending money, not keep investing money in the business to keep it going." Donald Wainright Deposition ("DWD") pp. 57-58. Mr. Wainright further testified that his communications with Israel Polansky continued in that same vein through the summer of 2000 when Mr. Wainright had his last communication with Israel Polansky (DWD pp. 59-61). Mr. Wainright did not know what role, if any, Israel Polansky had in the day-to-day operations of the company (DWD p. 65) He also acknowledged that if Israel Polansky had not been investing money into OSM that it could not have operated (DWD p. 77) and that Israel Polansky received no financial benefits from OSM (DWD p. 79)

Plaintiff Janet Wainright never spoke or communicated with Israel Polansky (Janet Wainright Deposition "JWD" p. 11) She had no contract with OSM and any of the defendants (id.)

In her deposition, Deborah Russo-Williams testified that she had never actually talked to Israel Polansky until the time she started working for OSM (Deborah Russo-Williams Deposition, "RWD" p. 20) Her pre-employment discussions were with Robert Polansky, and when asked about those, Ms. Russo-Williams made no mention of any participation by Israel Polansky (RWD pp. 23-24)

Ms. Russo-Williams also claims that Israel Polansky guaranteed her salary. In fact her meetings with Israel Polansky were to "pass the time of day as he came for other purposes" (RWD p. 36). Communications remained this way until her last communication with Israel Polansky in June of 1998 when, she said, she was going to take a job with another employer and that Israel Polansky met with her at the coffee house. "He told me that there were investors interested in the company; that he wanted me to stay on; he thinks that the company is going to take off again, and that I should consider staying on again and not take this new job. ... He led me to believe that he was going to keep investing in the company to keep it going for as long as it needed to be until they get investors in there. ... He said that.... I don't remember his exact words. I think he brought up the point that he had been putting money into the company to pay our salaries and he would continue to do that."

"Q. And, as best you can recall, how did he say that?"

"A. Pretty much like that, that he had been putting money into the company and he would continue to do that and I should stick around and things were going to happen soon."

"Q. So it wasn't a commitment to fund the company forever?"

"A. Well, I took it as such. He had been funding it up until that point and he led me to believe that he was going to fund it up until we got investors in there."

"Q. Even if it took ten years?"

"A. Yeah."

"Q. And that was your expectation?"

"A. No, I was hoping we would get investors in there and the company would be successful again."

"Q. But there was no discussion with him as to how long he would continue to fund the company?"

"A. Nothing specific, no. They had been meeting with a potential investor and he made it sound like that deal was going to happen and it was just a matter of time before real money started coming in and the company would be on its way up again."

"Q. So that he wasn't going to have to fund the company very much longer, isn't that right?"

"A. Yeah."

"Q. (By Mr. Sulzbach) Well, when you met with Mr. Polansky he told you there's an investor they were talking to, right?"

"A. Yes."

"Q. And they were optimistic about that?"

"A. Yes."

"Q. And you understood him to commit to continue to fund the company so that that investor or the deal with that investor could come through, isn't that right?

"A. Yeah, I guess that investor, or, you know, any investor that was interested in the company. They usually had a couple that were interested at the same time. I didn't know which investor he was referring to specifically."

7

"Q. But when he talked to you he felt and conveyed to you that an investment was imminent, isn't that right?"

"A. Yes."

"Q. And his commitment, if there was one, was to fund the company until that investment got made, isn't that right?"

"A. Well, until an investment got made. He was optimistic about that one but it didn't mean it was going to happen."

"Q. But he didn't say, I'm going to do it as long as it takes?"

"A. Well, yeah."

"Q. He did?"

"A. He pretty much conveyed that he's been investing up until this point and he was going to continue to invest until we got real money coming in."

"Q. How did you jump from the fact that he was telling you there was an imminent investment, and that he would fund the company so that could happen, to an undertaking to fund the company forever and forever?"

"A. Well, he was optimistic about this potential investor, but it didn't always mean that that's what was going to happen. I mean, they've had potential investors before and the deal fell through at the last minute."

"Q. But in the context of this discussion, the discussion was about an imminent investor, right?"

"A. I'm not sure if it was just one investor or if there were a couple out there and they were going to test the waters and see which one came back with the best offer."

"Q. But the discussion was about imminent investment?"

"A. What do you mean by "imminent", like how soon?"

"Q. Well, in the then foreseeable future."

"A. What kind of time frame?"

"Q. Well, tell me what kind of time frame."

"A. I mean, imminent could be within the next year. It doesn't necessarily mean within the next few weeks."

"Q. Would it have been a year?"

"A. Possible, yeah."

"Q. But not more than that?"

"A. With that particular investor?"

"Q. With those investors with whom he was talking.

"A. No, probably not."

"Q. So his commitment wouldn't have been more than that either, would it?"

"A. Well, his commitment was until the company was funded. He was optimistic about these two that they were working with, but it wasn't imminent that it was going to happen or definite that it was going to happen with either one of those. It could have fallen through with both of those and then there would be another investor that they would be optimistic about. So there was never really any deadline as to how long this was going to take. It was, he would fund

it for as long as it took. If this deal fell through, then they'd get another deal and the cycle would start all over again."

"Q. So what was it he said that made you believe that he would fund the company for however long it might take, even if it would be ten years?"

"A. I don't remember his exact words."

"Q. Well, can you paraphrase it?"

"A. It was my understanding that he was going to fund the company until the deal was signed."

"Q. No matter how long it took?"

"A. Yes."

"Q. And my question of you is: what did he say to you that gave you that understanding?"

"A. Well, that he kind of said something like that. Like I said, I don't remember exactly what he said, but it was, you know, relaying that he would continue to fund the company. He wanted me to stay around and he wanted Don to stay around and he would continue to put money into the company until the money was there."

"Q. How old was he at that time, do you know, Mr. Polansky, that is?"

"A. I don't remember. I know he's up there."

"A. I think he was either eighty-nine or ninety, something like that."

"Q. So did that lead you to believe that he would continue funding the company as long as he lived?"

"A. Yes."

"Q. And what was it he said that made you believe that?"

"MR. RILEY: I'll just object. I think this is the third time you've asked that question and I believe that she has paraphrased or...."

"MR. SULZBACH: It's a different question, and if you can answer it, please do."

"MR. RILEY: I'm not.... Can I just please hear the question again and how it's different from the last time it's been asked."

"MR. SULZBACH: The question was what he said that would make her believe that he would fund the company for as long as he lived."

"MR. RILEY: Thank you."

"A. Well, he didn't give me the impression that he was going anywhere any time soon. He seemed to be a pretty healthy person. And pretty much what I said before, that he said that until he got an investor he was going to continue to fund the company."

"Q. (By Mr. Sulzbach) Did he say anything else that you can recall?"

"A. No."

"Q. And what did you say to him?"

"A. I think I told him I had to think about it."

"Q. And when, if ever, was the next time you in ay manner communicated with Israel Polansky?"

"A. I didn't."

(DRW pp. 36-45)

In fact, Israel Polansky continued to fund the company for another year and a half before he finally gave up. (IPA pp. 12, 13)

After her alleged 1998 meeting with Mr. Polansky, Ms. Russo-Williams never communicated with Mr. Polansky again but did send communications to OSM with regard to expenses and salary, see Exhibits 7, 10, and 11 to her deposition.

### Anne Polansky

As Anne Polansky's affidavit makes clear, her only involvement with OSM was telephoning her husband, Robert Polansky, who worked there. She certainly had no control over OSM. She never had access to any OSM assets, accounts or credit cards. She did not possess or control and never possessed or controlled any asset or thing of value of OSM and she never received money or anything of value from OSM.

Donald Wainright was asked at page 78 of his deposition whether he had "any evidence at all that Anne Polansky received anything from OSM" he responded "Do I have evidence" … "No." At page 79 he responded that he was unaware of any financial benefits received by Israel Polansky from OSM. "How about Anne Polansky?" "A. I do not know."

At page 14 of her deposition Janet Wainright acknowledges that she has never had any contact with Anne Polansky, never met her and never communicated with her. She was asked "You've named her in your lawsuit; what's your claim against Anne Polansky, if any?" "A. I don't know."

At pages 33 and 34 of her deposition, Deborah Russo-Williams acknowledges that she had met Anne Polansky only once and that was before she was employed by OSM. She also

related that she only spoke with Mrs. Polansky when she "called and asked for Mr. Polansky." ... "She would just call and ask for him and we'd transfer the call over, that was it." "Q. No other discussions of any kind, is that right?" "A. No."

At pages 82 through 84 the following colloquy takes place with regard to the absence of facts to substantiate her claims against Anne Polansky.

"Q. With regard to Anne Polansky, part of your complaint says that money was drained from OSM and property was purchased through and placed in Anne Polansky's name to shield assets from OSM creditors. Do you have any reason to believe that's true?"

"A. Yes."

"Q. And what is that?"

"A. So we can't go after Robert Polansky for the money that he owes us."

"Q. What is it that Anne Polansky has that belonged to OSM?"

"A. I don't know."

"Q. I mean, you told us that the only money that OSM ever had came from Israel Polansky's investment, isn't that right?"

"A. Yes."

"Q. And what is it that OSM placed in Anne Polansky's name?"

"A. I don't know."

"Q. So you don't know yourself...."

"A. No.

13

"Q. .... of any reason to believe that in fact property had been purchased through and placed in Anne Polansky's name to keep it away from creditors? You don't know of any fact that supports that claim, do you?"

"A. Not off-hand, no."

"Q. Well, do you want to think about it a little more? I don't want you to have to make a snap judgment."

"A. Nothing that I can think of."

### Argument

The facts set forth here with respect to Israel H. Polansky and Anne Polansky are the same as those set forth at pages 11, 12 and 13 of Magistrate Judge Fitzsimmons' recommended ruling on Motion to Open Judgment and Stay Enforcement of Judgment in this matter. Copies of those pages are appended hereto and set forth the law in this case that these facts constitute a complete defense to the plaintiffs' claims.

Anne Polansky's and Israel H. Polansky's noninvolvement in the activities of OSM defeat the alter ego and instrumentality claims upon which the first and second causes of action are based.

As to the guarantee claims of the third and fourth causes of action, Mr. Polansky, Mr. Wainright and Ms. Russo-Williams are all in agreement that there were no communications at all between them and Israel H. Polansky before they accepted employment at OSM rendering it impossible for them to have relied on guarantees by Mr. Polansky in accepting employment at OSM.

Israel Polansky denies that he guaranteed Ms. Russo-Williams' salary at any time which includes the one time she claims that she spoke with Israel Polansky in June of 1998. Although Ms. Russo-Williams cannot remember exactly what she claims Mr. Polansky said in that discussion, her testimony in that regard is set forth at pages 6 through 12 of this Memorandum. Her testimony, taken most favorably, would have obliged Mr. Polansky to support her salary for a period of less than a year and, in fact, he did support her salary for another year and a half. Be all that as it may, because OSM's place of business was in New York City, and the claimed guarantee took place in New York, and all other matters relevant to the complaint occurred in New York, this claimed obligation is subject to New York's General Obligations Law § 5-701 (a)(1) and (a)(2).

### § 5-701. Agreements required to be in writing

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;

2. Is a special promise to answer for the debt, default or miscarriage of another person;

To have guaranteed her salary for more than a year clearly runs a foul of subsection a.1. Likewise, the alleged guarantee is clearly "a special promise to answer for the debt, default or miscarriage of another ..." Particularly on point to this situation is the case of *Worlock Paving Corp. v. Camperlino*, 617 N.Y.S.2d. 87, 207 A.D.2d. 975 (1994), a copy of which is appended

15

hereto. There, a subcontractor claimed that an owner had guaranteed payment in the event of default by the general contractor. The court applied the statute of frauds, § 5-701 (a)(2) because whether or not the alleged promise was supported by new consideration, there was no evidence that "the promisor has become in the intention of the parties a principal debtor primarily liable [*Id.* at 89]". The court considered dispositive the facts that the plaintiff invoiced the general contractor after the purported guarantee and that there was no indication that the new promise was intended to extinguish the general contractor's liability. [*Id.*]

In this case until the commencement of this lawsuit no demand for payment was made upon Israel Polansky and all demands were made upon OSM (see Exhibits 7, 10, and 11 to Deborah Russo-Williams' deposition, copies of which are attached hereto). All of these are demands for money addressed to OSM Communications. Of particular note is the fact that Ms. Russo-Williams' lengthy and self-serving letter of December 2000 (Exhibit 10) sets forth in great detail her employment history at OSM. It details the June 1998 job offer but makes no reference to Israel Polansky. In fact, she states "I decided to remain with OSM because I believed in the company and thought we could make it profitable again. My supervisor, Donald Wainright, also felt strongly about the deal that was being negotiated, which helped persuade me to stay." No mention is made of Israel Polansky or a guarantee.

The fifth cause of action asserts that Israel Polansky falsely represented that he would reimburse Mr. Wainright and Mrs. Wainright for relocation expenses. Given that Israel Polansky and Mr. Wainwright had no communications before Mr. Wainright came on board at OSM and,

by Mr. Wainright's own testimony, had no discussions beyond Mr. Polansky's dismay at continuing to fund OSM, it is impossible for Mr. Polansky to have guaranteed anything.

As to Mrs. Wainright's claim it should be particularly noted that there was never any communication between Janet Wainright and Mr. Polansky, and there was no contractual relationship between Mrs. Wainright and OSM. Her claim is without any basis at all.

## Conclusion

For the foregoing reasons, these defendants respectfully ask that their motions for summary judgment be granted as to all causes of action.

THE DEFENDANTS
ISRAEL H. POLANSKY and ANNE POLANSKY

By: _____
    J. Michael Sulzbach
    385 Orange Street
    New Haven, CT 06511
    Telephone: (203) 781-0880
    Fed. Bar No. ct00206
    Attorney for Defendants
    Israel H. Polansky and Anne Polansky

## CERTIFICATE OF SERVICE

This is to certify that on this 31st day of March, 2004, a copy of the foregoing was deposited in the United States mails, first-class, postage prepaid, addressed to:

Robert E. Arnold, Esquire
Law Offices of Robert E. Arnold, LLC
412 Orange Street
New Haven CT 06511
- Attorney for the Plaintiffs -


Keith R. Ainsworth, Esquire
Richard C. Feldman, Esquire
Evans Feldman & Boyer, LLC
261 Bradley Street
PO Box 1694
New Haven CT 06507
- Attorney for the Defendants OSM Communications, Inc. and Robert Polansky –

J. Michael Sulzbach