UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONALD WAINRIGHT, JANET WAINRIGHT,      Doc.# 3 0 1 -C V-2 1 58 ( W
WE)
AND DEBORAH A. RUSSO-WILLIAMS,

                    Plaintiffs, -

        against-

OSM COMMUNICATIONS, INC., ISRAEL H.
POLANSKY, ROBERT E. POLANSKY, AND
ANNE POLANSKY,
                  Defendants.      July 30, 2004-.-;cJ    c~



## PLAINTIFFS' SECOND MOTION FOR ENLARGEMENT OF TIME TO OBJECT TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 6(b)(2) and 56(e), the Plaintiffs in this matter hereby

respectfully submit their second motion for enlargement of time with which to object to the

Defendants' Motion for Summary Judgment (received by this firm on April 2, 2004). The

Plaintiffs request a Second Enlargement of Time to Object, not to exceed 45 days, in order to

allow the Plaintiffs to take the depositions and receive documents requested at the time of

the depositions of Robert Polansky and Anne Polansky, and to allow the completion of the

deposition of Israel Polansky OR in the alternative, until August 3, 2004, on the following

grounds:

1 . Plaintiffs' counsel Attorney Robert E. Arnold is currently in the process of moving

     his offices from New Haven, Connecticut to New Britain, Connecticut. In addition,

     Attorney Arnold has moved his residence as well. As a result, portions of the

     Plaintiffs[1] file, including scheduling of events and the Defendants' Motion for

     Summary Judgment is currently being pulled from inadvertent storage

and will not be available until Saturday, August 1,2004, Plaintiffs' counsel has had

less time available to schedule the depositions necessary to reply to the Defendants'

Summary Judgment Motion (please note the new fax number below);

2. The reason for the delay in the completion of Defendants' depositions is not within

the reasonable control of the movant, despite movant's good faith efforts;

3. Unavailability of either deponent or deponent's counsel has so far frustrated Plaintiffs'

counsel from scheduling the aforementioned depositions (See Plaintiffs' Motion For

Enlargement of Time dated April 22, 2004 and attached exhibits);

4. Depositions and accompanying document requests are necessary to oppose, outside

of the pleadings, the affidavits submitted by the Defendants in support of their 56(c)

Motion for Summary Judgment;

5. This motion is further supported by documents obtained by Plaintiffs' counsel from a

New York civil case, *Jones v. OSM Communications, Inc., et al S.D.N. Y. 97 Civ.*

*7595 (DC),* demonstrating that Israel Polansky may have received a salary from

OSM and acted as an active participant in OSM's activities (See Exhibits E and F

attached to Plaintiffs' Motion For Enlargement of Time dated April 22, 2004). These

documents must be authenticated or denied by the Defendants in the instant matter

through deposition testimony and document production in order to establish whether

there is a dispute as to any material facts relevant to the Defendants' Motion for

Summary Judgment;

6. The Plaintiffs' deposition of Defendant Anne Polansky and the accompanying

request for documents must take place in order to establish whether there is a

dispute as to any material fact relevant to the source of funds and the transfer of properties originating from income or investments of OSM;

7.  It was and still is the Plaintiffs' counsel's intention to conduct the aforementioned depositions as soon as possible, but that effort has been stymied by the Defendant Robert Polansky being unavailable. In addition, it has been represented to Plaintiffs' counsel that Robert Polansky is no longer represented by Evans, Feldman & Boyer, LLC of New Haven, as of the date of the last scheduled deposition of Robert Polansky;

8.  Pursuant to Local Rule 9, counsel for the plaintiffs states that he has been unable to ascertain the position of the defendant's counsel, M. Michael Sulzbach, as he is out of the country presently and is unavailable. The apparently unrepresented Defendant Robert Polansky has not been able to be contacted by Plaintiffs' counsel in order to ascertain his position on this Motion;

This Court should therefore grant Plaintiffs' counsel an enlargement of time to respond to Defendants' Summary Judgment Motion in order to depose and seek documents pursuant to depositions of the Defendants in order to effectively oppose the affidavits submitted by the Defendants.

Dated: New Haven,
Connecticut July 30, 2004

By:

Robert E. Arnold, Esq. (CT Federal Bar¥CT18093)
Law Offices of Robert E Arnold LLC
412 Orange Street
New Haven, Connecticut 06511
Telephone: (203) 777-3000
FAX: (86D) 224-0400

'£ isnSny Hl"n '9AijEm3]|B aqj m gqi M.of(B oj pue

'Xjjsuepd siray P^ue A")jsirci<M IB pgjsanbsi sjuaumDOp

SATSOSJ pue suoijisod^p UT 'sXep 5{7 p330X3 oj jou

'i03[qo oi 9UITX jo

"(frOOS '2 H^id^V uo ""If stqj /iq pSAraos-i) jugmSpn; AJBUIUITIS JDJ uoijojAf^oj joafqo 01

ipiqM. qiiM suiij jo ju3ui33iB[U3 joj uoiioui puooss Jisq) }iiuqns

stqi m                     P^UG

◄CNJ

<u>Ol</u>

uouisocbp

suoijisodap atjl jo sun; oj

sjjijuiBjcf sqi A\O|[B o;

jssnbai sjjijureyj

<u>QI akii jo iN3iv3OHv^r^iNia HO j NIOLIOW ciNOpas₁do
iHoaaaas MI AVVT AO</u>

3NNV

OMV 'A^SNVIOJ-3 i>iaao^'
'H 1HVXSI "OKI 'SNOIIVDIKntMWOO

v Hvaoaaa
XHNVf 'XHOniKIVM O7VMOQ

xoraisia
xoraxsia saxvxs

LEGAL STANDARD "Under Federal Rule of Civil Procedure Rule 6(b)(2), once a deadline has expired the court may only grant extensions of time where the party's failure to act was due to "excusable neglect." Lujan v. Nat'1 Wildlife Fed'n, 497 U.S. 871, 896 (1990). "Excusable neglect" under Rule 6(b)(2) is equivalent to "good cause." Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987). Some showing of "good faith" on the party seeking the enlargement and some reasonable basis for noncompliance within the time specified, is generally required to act was due to "excusable neglect." Lujan v. Nat'1 WJidlifeFed'n, 497 U.S. 871,896(1990).

"Without attempting a rigid or all-encompassing definition of f" good cause,' it would appear to require *at least* as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of 'good faith on the part of the party seeking the enlargement *and* some reasonable basis for noncompliance within the time specified' is normally required. 10 Wright & Miller, *Federal Practice and Procedure: Civil* § 1165 at 622 (emphasis added). The district court is clearly not *compelled* to accept a lesser 'excusable neglect[1] showing." Futnam v. Morris. 833F.2d903, 905 (10th Cir. 1987).

__THE PLAINTIFFS HAVE ACTED IN GOOD FAITH__ In support of the instant motion, the Plaintiffs have acted in good faith in attempting to schedule the depositions needed to oppose affidavits filed by the Defendants in support of their motion for summary judgment. This Court should therefore "...permit affidavits to be supplemented or opposed by depositions..." as allowed under Fed. R. Civ. P. 56(e) and grant the Plaintiffs' Motion for Enlargement of Time To Object.

Dated: New Haven,
Connecticut July 30, 2004

By: _____
Robert E. Arnold. Esc                     . (CT Federal Bar # CT18093)

Law OfficfeTof Robert E Arnold LLC
412 Orange Street
New Haven, Connecticut 065 31
 Telephone: (203) 777-3000
Fax:(860)224-0400

6

## <u>CERTIFICATION</u>

THIS I  that a copy of the foregoing was mailed, postage prepaid, day of My, 2004, to:

Counsel for the defendants OSM Communications, Inc., and Robert E. Polansky.

Richard C. Feldman, Esq.
Keith R. Ainsworth, Esq.
Evans, Feldman & Boyer, LLC
261 Bradley Street
P.O. Box 1694
New Haven, Connecticut 06507-1694

Counsel for the defendants Israel H. Polansky and Anne Polansky

.1. Michael Sulzbach 385
Orange Street New
Haven, CT 06511
Tel. 203-781-0880
Fax.203-781-0861

By: Robe
(CT Fede  . Arnold, Fer
ral Bar # C  T18093)

ORIGINAL TO: UNITED STATGS DISTRICT COURT, DISTRICT OF CONNECTICUT 915
LAFAYETTE BOULEVARD BRIDGEPORT, CONNECTICUT
06604 PHONE: (203) 579-5861 Attn: CLERK'S OFFICE



UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONALD WAINRIGHT, JANET WAINRIGHT,
AND DEBORAH A. RUSSO-WILLIAMS,

CM'                Mil APR 23  P 3 = 0 3
Doc.#301-CV-2158 (WWE)
US DISTRICT CCUPt
SniDCLFCnT, COKu

                              Plaintiffs,

                 -against-

OSM COMMUNICATIONS, INC., ISRAEL H.
POLANSKY, ROBERT E. POLANSKY, AND
ANNE POLANSKY,
                              Defendants.           April 22, 2004

## PLAINTIFFS' MOTION FOR ENLARGEMENT OF TIME TO OBJECT TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

|§ I  P    Pursuant to Fed. R. Civ. P. 6(b)(2) and 56(e), the Plaintiffs in this matter hereby

respectfully submit this motion for enlargement of time with which to object to the

|   Defendants' Motion for Summary Judgment (received by this firm on April 2, 2004).

The Plaintiffs request an Enlargement of Time to Object, not to exceed 45 days, or until

such time that the Plaintiffs are allowed to take the depositions and receive documents

requested at the time of the depositions of Robert Polansky and Anne Polansky, and are

allowed to complete the deposition of Israel Polansky, on the following grounds: 1.  The

reason for the delay in the completion of Defendants' depositions is not

within the reasonable control of the movant, despite movant's good faith efforts. ⊲r
£•£.. E|§Erailability of either deponent or deponent's counsel has so far frustrated

Plaintiffs' counsel from scheduling the aforementioned depositions (See Exhibits

C and D attached hereto).



"A. No, I was hoping we would get investors in there and the company would be successful again."

"Q. But there was no discussion with him as to how long he would continue to fund the company?"

"A. Nothing specific, no. They had been meeting with a potential investor and he made it sound like that deal was going to happen and it was just a matter of time before real money started coming in and the company would be on its way up again."

"Q.    So that he wasn't going to have to fund the company very much longer, isn't that right?"

"A.  Yeah."

"Q. (By Mr. Sulzbach) Well, when you met with Mr. Polansky he told you there's an investor they were talking to, right?"

"A.  Yes."

"Q.   And they were optimistic about that?"

"A.  Yes."

"Q. And you understood him to commit to continue to fund the company so that that investor or the deal with that investor could come through, isn't that right?

[1]A. Yeah, I guess that investor, or, you know, any investor that was interested in the company. They usually had a couple that were interested at the same time. I didn't know which investor he was referring to specifically."

"Q.     But when he talked to you he felt and conveyed to you that an investment was imminent, isn't that right?"

"A.  Yes."

"Q. And his commitment, if there was one, was to fund the company until that investment got made, isn't that right?"

"A. Well, until an investment got made. He was optimistic about that one but it didn't mean it was going to happen."

"Q.  But he didn't say, I'm going to do it as long as it takes?"

"A.  Well, yeah."

"Q.  He did?"

"A. He pretty much conveyed that he's been investing up until this point and he was going to continue to invest until we got real money coming in."

"Q. How did you jump from the fact that he was telling you there was an imminent Investment, and that he would fund the company so that could happen, to an undertaking to fund the company forever and forever?"

"A. Well, he was optimistic about this potential investor, but it didn't always mean that that's what was going to happen. I mean, they've had potential investors before and the deal fell through at the last minute."

**"Q. But** in the **context** of this discussion, the **discussion** was about an. imminent investor, **right?"**

"A.   I'm not sure if it was just one investor or if there were a couple out there and they were going to test the waters and see which one came back with the best offer."

"Q.  But the discussion was about imminent investment?"

"A.  What do you mean by "imminent", like how soon?"

"Q.  Well, in the then foreseeable future."

"A.  What kind of time frame?"

"Q.  Well, tell me what kind of time frame."

"A. I mean, imminent could be within the next year. It doesn't necessarily mean within the next few weeks."

"Q.  Would it have been a year?"

"A.  Possible, yeah."

"Q.  But not more than that?"

"A.  With that particular investor?"

"Q.  With those investors with whom he was talking."

"A.  No, probably not."                    :

"Q.  So his commitment wouldn't have been more than that either, would it?"

"A. Well, his commitment was until the company was funded. He was optimistic about these two that they were working with, but it wasn't imminent that it was going to happen or definite that it was going to happen with either one of those. It could have fallen through with both of those and then there would be another investor that they would be optimistic about. So there was never really any deadline as to how long this was going to take. It was, he would fund

it for as long as it took.    Tf this deal fell through, then they'd get another deal and the cycle .
would start all over again."

"Q.    So what was it he said that made you believe that he would fund the company for
however long it might take, even if it would be ten years?"

"A.  I don't remember his **exact words."**

"Q.  Well, can you paraphrase it?"

"A. It was my understanding that he was going to fund the company until the deal was
signed."

**"Q.  No matter how long it took?"**

"A.  Yes."

"Q.  And  my  question  of  you  is:  what  did  he  say  to  you  that  gave  you  that
understanding?"

"A. Well, that he kind of said something like that. Like I said, I don't remember exactly
what he said, but it was, you know, relaying that he would continue to fund the company. He
wanted me to stay around and he wanted Don to stay around and he would continue to put
money into the company until the money was there."

"Q.  How old was he at that time, do you know, Mr. Polansky, that is?"

"A.  I don't remember. I know he's up there."

"A.  I think he was cither eighty-nine or ninety, something like that."

*"Q*. So did that lead you to believe that he would continue funding the company as long as
he lived?"

10

"A.   Yes."

"Q.   And what was it he said that made you believe that?"

"MR. RILEY:   I'll just object.    I think this is the third time you've asked that question and I believe that she has paraphrased or...."

"MR. SQLZBACH: It's a different question, and if you can answer it, please do." "MR. RILEY: I'm not... Can I just please hear the question again and how it's different from the last time it's been asked."

"MR. SULZBACH: The question was what he said that would make her believe that he would fund the company for as long as he lived."

"MR. RILEY: Thank you."

"A. Well, he didn't give me the impression that he was going anywhere any time soon. He seemed to be a pretty healthy person. And pretty much what I said before, that he said that until he got an investor he was going to continue to fund the company,"

"Q.   (By Mr. Sulzbach) Did he say anything else that you can recall?"

"A.   No."

"Q.   And what did you say to him?" "A.   I think I told him I had to think ahout it."

"Q.  And when, if ever, was the next time you in ay manner communicated with Israel Polansky?"

"A.  I didn't."

(DRW pp. 36-45)

11

In fact, Israel Polansky continued to fund the company for another year and a half before he finally gave up. (IPA pp. 12,13)

After her alleged 1998 meeting with Mr. Polansky, Ms. Russo-Williams never communicated with Mr. Polansky again but did send communications to OSM with regard to expenses and salary, see Exhibits 7, 10, and 11 to her deposition.

<u>Anne Polansky</u>

As Anne Polansky's affidavit makes clear, her only involvement with OSM was telephoning her husband, Robert Polansky, who worked there. She certainly had no control over OSM. She never had access to any OSM assets, accounts or credit cards. She did not possess or control and never possessed or controlled any asset or thing of value of OSM and she never received money or anything of value from OSM.

Donald Wainright was asked at page 78 of his deposition whether he had "any evidence at all that Anne Polansky received anything from OSM" he responded "Do I have evidence" ... "No." At page 79 he responded that he was unaware of any financial benefits received by Israel Polansky from OSM. "How about Anne Polansky?" "A. I do not know."

At page 14 of her deposition Janet Wainright acknowledges that she has never had any contact with Anne Polansky, never met her and never communicated with her. She was asked "You've named her in your lawsuit; what's your claim against Anne Polansky, if any?" "A. I don't know."

At pages 33 and 34 of her deposition, Deborah Russo-Williams acknowledges that she had met Anne Polansky only once and that was before she was employed by OSM. She also

related that she only spoke with Mrs. Polansky when she "called and asked for Mr. Polansky." ... "She would just call and ask for him and we'd transfer the call over, that was it." "Q. No other discussions of any kind, is that right?" "A. No."

At pages 82 through 84 the following colloquy takes place with regard to the absence of facts to substantiate her claims against Anne Polansky.

"Q. With regard to Anne Polansky, part of your complaint says that money was drained from OSM and property was purchased through and placed in Anne Polansky's name to shield assets from OSM creditors. Do you have any reason to believe that's true?"

"A.  Yes."

"Q.  And what is that?"

"A.  So we can't go after Robert Polansky for the money that he owes us."

"Q.  What is it that Anne Polansky has that belonged to OSM?"

"A.  I don't know."

"Q.  I mean, you told us that the only money that OSM ever had came from Israel Polansky's investment, isn't that right?"

"A.  Yes."

"Q.  And what is it that OSM placed in Anne Polansky's name?"

"A,  I don't know."

**"Q.  So you don't know** yourself...."

"A.  No.

"Q. .... of any reason to believe that in fact property had been purchased through and placed in Anoe Polansky's name to keep it away from creditors? You don't know of any fact that supports that claim, do you?"

"A.  Not off-hand, no."

"Q. Well, do you want to think about it a little more? I don't want you to have to make a snap judgment."

"A. Nothing that I can think of."

Argument

The facts set forth here with respect to Israel H. Polansky and Anne Polansky are the same as those set forth at pages 11, 12 and 13 of Magistrate Judge Fitzsimmons' recommended ruling on Motion to Open Judgment and Stay Enforcement of Judgment in this matter. Copies of those pages are appended hereto and set forth the law in this case that these facts constitute a complete defense to the plaintiffs' claims.

Anne Polansky's and Israel H. Polansky's noninvolvement in the activities of OSM defeat the alter ego and instrumentality claims upon which the first and second causes of action are based.

As to the guarantee claims of the third and fourth causes of action, Mr. Polansky, Mr. Wainright and Ms. Russo-Williams are all in agreement that there were no communications at all between them and Israel H. Polansky before they accepted employment at OSM rendering it impossible for them to have relied on guarantees by Mr. Polansky in accepting employment at OSM.

14

Israel Polansky denies that he guaranteed Ms. Russo-Williams' salary at any time which includes the one time she claims that she spoke with Israel Polansky in June of 1998. Although Ms. Russo-Williams cannot remember exactly what she claims Mr. Polansky said in that discussion, her testimony in that regard is set forth at pages 6 through 12 of this Memorandum. Her testimony , taken most favorably, would have obliged Mr. Polansky to support her salary for a period of less than a year and, in fact, he did support her salary for another year and a half. Be all that as it may, because OSM's place of business was in New York City, and the claimed guarantee took place in New York, and all other matters relevant to the complaint occurred in New York, this claimed obligation is subject to New York's General Obligations Law § 5-701 (a)(l)and(a)(2).

### § 5-701. Agreements required to be in writing

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;

2. Is a special promise to answer for the debt, default or miscarriage of another person;

To have guaranteed her salary for more than a year clearly runs a foul of subsection a. 1. Likewise, the alleged guarantee is clearly "a special promise to answer for the debt, default or miscarriage of another ..." Particularly on point to this situation is the case of *Worlock Paving Corp. v. Camperlino,* 617 N.Y.S.2d. 87, 207 A.D.2d. 975 (1994), a copy of which is appended

15