UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



---

DONALD WAINRIGHT, ET AL


                    VS.                          CIVIL ACTION NO.

                                                 3:Ol-cv-02158{WWE,

OSM COMMUNICATIONS,   INC., ET AL




            Deposition of DONALD WAINRIGHT, taken

before Judi A. Roberts, Licensed Professional Reporter,

No. SHR.325, and Notary Public in and for the State of

Connecticut, pursuant to notice, at the law offices of

J. Michael Sulzbach, 385 Orange Street, New Haven,

Connecticut, on February 10, 2004 at 11:10 A.M.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
HARTFORD    MADISON, CT 06443   STAMFORD
203-245-9583         FAX 245-2760        800-839-6867



1    at that time.

2    Q.    Ballpark?

3    7V.    Ballpark.  How.... I mean, don't expect me

4    to hit it on target, but I would guess somewhere

5    around seventy to 75,000 as a guess.

6    Q.    Did anything change in your employment

7    dutie.s after the Valassis acquisition?

8    A.    I don't think anything changed in my duties.

9    I was still managing people that were developing the

10   product which was comprised of the software, so I was

11   still managing programmers, I was still in charge of

12   maintaining computer network in the building, but my

13   responsibilities when Valassis bought the company did

14   not change.

15   Q.    And how long did you remain with Valassis?

16   A.    Until 1995.

17   Q.    And what happened then?

19   A.    I'm sorry, 1996, I remained with Valassis.

19   Q.    What happened in 1996?

20   A.    Specifically why I left?

21   Q.    If that's what happened.  My question was,

22   was there a change and what was the change?

23   A.    I left Valassis Communications to go to work

24   for OSM.

25   Q,    By OSM, you mean OSM Communications, Inc.,

```
 1  A.   I only know that he spoke to his father,
 2  yes.
 3  Q.   And what happened at the end of year four,
 4  did things continue as they were going or did things
 5  change in any way?
 6  A.   Did specifically what change?
 V  Q.   We left off that you were working reduced
 G  hours to accommodate the train schedule.  It's still
 9  you and Deborah Russo being there, is that correct?
10  A.   That's correct.
11  Q.   Mr. Irving Polansky's last visit was in
12  connection with....
13  A.   I don't know if that was his last visit, but
14  that's the last visit that I remember.
15  Q.  ' Okay.  Did all of that change at some point
16  at the end of your fourth year?
17  A.   Did..,.
18  Q.   Did you quit coming in; did something
19  happen?
20  A.   Yes, at the end of the fourth year, yes,
21  there was a situation where we had fallen behind in
22  payrolls a considerable amount.   The health insurance
23  was cancelled due to nonpayment.  We were being told
24  by Mr. Polansky that the....
25  Q.   Which Mr. Polansky?
```

1   A.    Robert.... that we would be getting multiple

2   payrolls to catch up to where we were supposed to be,

3   and that the health insurance had been paid for.. And

4   after several conversations to that effect and not

5   having caught up, as we were told we would, we stopped

6   or I stopped coming in.

7   Q.    Was the health insurance ultimately paid

8   for?

9   A.    No.

10  Q.    And in terms of catching up, how caught up

11  did OSM get?

12  A.    From being behind five payrolls to being

13  behind four.

14  Q.    And payrolls....

15  **A.    I think.**

16  Q.    And payrolls were every week?

17  A.    No, twice per month.

18  Q.     In the materials produced in Exhibit 7, I'll

19  show you now the last page of that exhibit that you

20  have produced.  Can you identify that for us please?

21  A.    I can only identify that, that it was given

22  to me after I had left OSM.   I had never seen it

23  before.

24  Q.    And by whom was it given to you?

25  A.    I believe it was sent to me in a letter

1    after I had stopped coming in.

2    Q.    I show you now the last page of Exhibit 8 ;

3    can you identify that for us?

4    A.    Yes, I can.    It was a copy of a memo to me

5    from Robert Polansky to increase my pay.

6    Q.    And why was your pay being increased?

7    A.    Because at the time I had moved from

8    Michigan to Connecticut, I was still holding down two

9    mortgages because my house in Michigan had not sold.

10   OSM had not paid my moving expenses, so I was finding

11   it difficult to pay for everything, so Mr. Polansky

12   offered me another $2,000 or $1,000 per pay period.

13   Q.    Well, was this OSM's way of paying you for

14   your moving expenses and those things?

15   A.    No.

16   Q.    Just an act of generosity?

17   A.    I can't say I would label it as that.

18   Q.    What would you label it as?

19   A.    A raise.

20   Q.    At a time that the company was doing, as

21   you've described it?

22   A.    The company was doing as I described it,

23   yes.

24   Q.    Referring you again to the last page -of

25   Exhibit 7.    Regardless of whether you have seen it

1    the mortgages on two homes, because I was unable to

2    sell my home in Michigan as quickly as I had hoped;

3    that in my employment contract it stated that they

4    would pay for the difference in the selling price of

5    my Michigan home in terms of what I paid for it versus

6    what I sold iL for, and that he would give me a $2,000

*1*    per month raise.

8    Q.    And what was the linkage, if any, between

9    the moving expenses and the obligation to pay any

10    shortfall on your house sale and the $2,000 increase,

11    none?

12    *A,*    Can you....

13    Q.    Want me to restate that?

14    A.    Please.

15    Q.    What linkage was there, if any, between the

16    linkage between the $2,000 per month increase and the

17    fact that you had not been paid for your moving

18    expenses';[1]

19    A.    There was no linkage.  It was a situation in

20    which perhaps my frustration led me to approach him

21    that I was unable to cover all of the bills.  Some of

22    those bills were directly related to my taking on

23    employment by OSM.

24    Q.    Showing you again Exhibit 7, which is your

25    production.  Other than the last page, which you tell

```
 1   Q.    Okay.  But you said they would share other
 2   information regarding specific withdrawals?
 3   A.    When that information was given it would be
 4   as a result of her asking, I thought that you said
 5   that there was a wire received to the account.   And
 6   the person on the phone would say, yes,, but subsequent
 7   to the wire transfer I'm showing these transactions.
 8   Q.    Okay.   Now, when were these inquiries made?
 9   A,    Typically on pay day.
10   Q.    And of the four years of your employment
11   which years did you begin making those inquiries?
12   A.    Probably relatively early on since we were
13   having paychecks returned to us that didn't have -
14   enough money to clear them.
15   Q.    First year?
16   A.    I would say yes.  You have copies of the
17   checks, of some of the checks, you can look up the
18   dates.
19   Q.    Well, I'm asking what you recall.
20   A.    I don't recall.  I would like to.... I would
21   have to look at the checks to see when that began.
22   Because every time a check came back with insufficient
23   funds we would be charged for the check bouncing, so
24   we became careful as to when we would deposit the
25   checks.
```

1  corporate form?

2  A.   I don't even know what the corporate form

3  is, so I'm aware of no violations.

4  Q.   Okay.  Now, the number of hours you worked

5  each year, could you.... or per week, could you break

6  that down by year; did it change over time?

7  A.   As I described before, yes, it did.

8  Q.   Okay.  How many hours a week would you work

9  for year one?

10  A.   I w o u l d s a y i t w a s  approximately  forty.

11  Q.   A n d y e a r t w o ?

12  A.   About  the  same.

13  Q.   Year  three?

14  A.   About  the  same.

15  Q.   And.…

16  A.   To my knowledge, without consulting records

17  or what-have-you, I don't believe I reduced them until

18  year four„

19  Q.   Okay.  And approximately when in year four,

20  if you start with month one in year four going to

21  month twelve?

22  A.   It was specifically related to how far we

23  had fallen behind with payroll, and to my recollection

24  I don't know how exact it is, I believe that year four

25  is when we fell the furthest behind, and that's when I

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



DONALD WAINRIGHT, ET AL


                VS.                    CIVIL ACTION NO.

                                       3:Ol-cv-02158(WWE)

OSM COMMUNICATIONS,   INC., ET AL




        Deposition of JANET WAINRIGHT, taken

before Judi A. Roberts, Licensed **Professional** Reporter,

No. SHR.325, and Notary Public in and for the State of

Connecticut, pursuant to notice, at the law offices of

J. Michael Sulzbach, 385 Orange Street, New Haven,

Connecticut, on February 10, 2004 at 10:15 A.M.


        DEL VECCHIO REPORTING SERVICES, LLC
        PROFESSIONAL SHORTHAND REPORTERS
                117 RANDI DRIVE
        HARTFORD    MADISON, CT 06443   STAMFORD
203-245-9583          FAX 245-2760        800-839-6867

1  didn't pay us, and he told me during the conversation

2  that he was going to pay us our money.

3  Q.   Okay.   Do you believe that you are owed the

4  money that your husband was contracted to get paid

5  from OSM?

6  A.   Yes.

7  Q.   Okay.   The house in Michigan, did you own

8  that in your sole name or jointly?

9  A.   Jointly.

10  Q.   Was it fifty/fifty, or was there an uneven,

11  unequal split?

12  A.   It wasn't specified.   Both our names were on

13  the deed.

14  Q.   Do you recall what you paid for the house?

15  A.   No.

16  Q.   Do you recall what you sold it for?

17  A.   No.

18  Q.   Is there anyone else other than Robert

19  Polansky at OSM who you believe made promises to you?

20  A.   I never spoke to anybody else.

21  Q.   Okay.  Of the other conversations you had,

22  the other telephone conversations you had....

23  Actually, did you have any in-person conversations

24  with Robert Polansky during the course of your

25  husband's employment at OPM?

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



DONALD WAINRIGHT, ET AL


                VS.                        CIVIL ACTION NO.

                                           3:.01-cv-02158 (WWE)

OSM COMMUNICATIONS,   INC., ET AL




            Deposition of DEBORAH RUS50 WILLIAMS,

taken before Judi A. Roberts, Licensed Professional

Reporter, No. SHR.325, and Notary Public in and for the

State of Connecticut, pursuant to notice, at the .law

offices of Wiggin & Dana, 400 Atlantic Street, Stamford,

Connecticut, on March 1, 2004 at 10:42 A.M.

            DEL VECCHIO REPORTING SERVICES, LLC
            PROFESSIONAL SHORTHAND REPORTERS
                    117 RANDI DRIVE
        HARTFORD   MADISON, CT 06443  STAMFORD
203-245-9583            FAX 245-2760        800-839-6867

1   of items, and then they can go to their supermarket,

2   and if they buy those items a coupon gets printed out

3   at the register for twenty **cents** off or a dollar off

4   their next shopping order, things like that, and I

5   would be responsible for helping maintain that.

6   Q.    And your agreement was you would start after

7   your vacation or your honeymoon?

8   A.    Yes, I don[1]t remember the exact date though.

9   Q.    Did you ever go to work for them?

10  *A.    No.*

11  Q.    Did you tell them you would not be going to

12  work for them?

13  A.    Afterlgottheother Employment Agreement

14  from Robert Polansky then I called **them and told** them.

15  Q.    Showing you now Exhibit 6, which is a

16  memorandum from OSM Communications or on OSM

17  Communications' stationery to you, can you identify

18  that for us please?

19  A.    Yes.

20  Q.    What is that?

21  A.    It's the new Employment Agreement that

22  Robert offered me to continue to work for OSM.

23  Q.    And can you explain in your own words bow

24  the new deal worked?

25  A.    Can you be a little more specific?

1   Q.    Yes.  There was a change in your employment,

2   is that right, change in employment conditions?

3   A.    Yes.

4   Q.    Okay, which is the new **deal,** so to speak?

5   A.    Okay.

6   Q.    And how were you to be compensated under the

7   new agreement?

8   A.    A salary increase, and he guaranteed that he

9   would pay me the bonus that he had owed from the

10  previous year.

11  Q.    Anything else?

12  A.    No.

13  Q.    Paragraph three of the memorandum says the

14  whole amount or the balance remaining will be paid

15  upon funding of the company?

16  A.    Yes.

17  Q.    What does that mean?

18  A.    The remaining of the bonus from 1998 will be

19  paid when the company is funded.

20  Q.    Was the company ever funded, to your

21  knowledge?

22  A.    Well/ I **guess** it depends on **what you mean by**

23  "funded".

24  Q.    Well, what you told us was your agreement

25  provides specifically that the whole amount or balance

1  Q.    So this was a new task for you, is that

2  right, to go into the field?

3  A.    To this extent, yes.   I had been to other

4  supermarkets, like a handful of other ones, but

5  nothing to.... This was like, you know, I drove for

6  two days for 600 miles to fifteen big V stores and had

7  to manually update each store.

8  And originally Robert Polansky said that we

9  would use his car, I wouldn't have to drive.  But then

10 when it came to the time to actually go and perform

11 these updates, his car wasn't available and I had to

12 take my car.

13 Q.    Did you ever perform a task like that again?

14 A.    No.

15 Q.    And why did you retain a copy of that

16 memorandum?

17 A.    The communication between him and me, and it

18 was a bill for what he owed me for my expenses of

19 driving all that way.

20 Q.    And did you keep a hard copy or is that

21 something that was in your computer that you then

22 printed in the course of this litigation?

23 A.    No, 1 had a hard copy.  I think the original

24 version of this was in my computer at OSM, I didn't

25 have 1t at home.

1   Wainright left early and you stayed on?

2   A.   Yes.

3   Q.    How often did that occur?

4   A.    I don't know **exactly.**

5   Q.   Was there a time that Mr. Wainright began to

6   regularly leave early and come in late?

7   A.   He did but I don't remember when it started

8   or how often it occurred.

9   Q.   How about you, was there a time that you

10  began to regularly come in late and leave early?

11  A.   Not regularly, no.

12  Q.   And was there a time that you ceased to work

13  for OSM, .stop coming.in?

14  A.    That was in November.

15  Q.    In November of 2000, is that right?

16  A.   Two thousand, right, **because** he had owed us

17  five paychecks at that point and we couldn't reach him

18  to get in touch with him to find out if we were going

19  to get paid or when.

20  Q.   By "him", you mean OSM Communications?

21  A.   Yes.

22  Q.   You were unable to reach its president, is

23  that what you mean?

24  A.   Yes.  And at one point one of the paychecks

25  in September Don and his nephew, Mark, had gotten paid

1    bounced.

2    Q.    Did you find out about transactions made by

3    any part.i cular individuals or companies?

4    A.    No, they could just tell me the check

5    number, they didn't say who it was for.  Occasionally

6    they would say if a deposit was made but they didn't

7    say where it came from, it was just money was put into

8    fhp в ccount.

9    Q.    Did they tell you there were withdrawals by

10   particular individuals?

11   A.    No, it would just be a generic withdrawal, I

12   don't think they knew that information.

13   Q.    Did you relay any of this information to Mr.

14   Wainright?

15   A.    Yes.

16   Q.    What information did you relay to Mr.

17   Wainright?

18   A.    Mainly about checks clearing, because he was

19   more concerned about health insurance **being** cancelled

20   because we had problems with it in the past where the

21   checks bounced or they never got sent and then we lost

22   health insurance, and that was usually the one that

23   we'd worry about.

24   Q.    Did the banks ever relay to you any

25   information about Mr, Polansky, Robert Polansky's

1  A.    Yes.

2  Q.    What were the nature of those disputes?

3  A.    Not being paid.

4  Q.    Any other topics?

5  A.    Nothing that was really a dispute.

6  Q.    Any disagreements or let's say heated

7  concerns?

8  A.    Well, Don was concerned about the investors

9  and the number of investors that had come and gone and

10  no deal had been agreed on.

11  Q.    Did you share the same concerns?

12  A.    I was concerned but Don was more concerned

13  because he had a family to take care of and he was the

14  sole bread winner, I guess.

15  Q.    And you relayed in your testimony that you

16  were not paid for a period of time, five paychecks or

17  five pay periods?

18  A.    By the end of November, yes.

19  Q.    Okay.   When did you first go in arrears on

20  your pay periods?

21  A.    Go into what?

22  Q.    Arrears.  Whenwas your first paycheck **late?**

23  A.    I don't know.

24  Q.    Okay.   How many pay periods were you late

25  or actually in arrears on, in other words, not been

1  paid, let's say in July of 2000?

2  A.  Well, I can look at this and see.

3  Q.   Sure.

4  A.   From what I had here the paycheck for July

5  14 wasn't paid until August 17, and the paycheck for

6  July 31 wasn't paid until September 12th, which made

7  it forty-two days late.

8  Q.  When do you claim that you first went three

9  pay periods without pay?

10  A.   I don't remember.

11  Q.   At any time did Robert Polansky ever say to

12  you he would personally guarantee the payments of the

13  company to you?

14  A.   I'm not sure what you mean "personally".

15  Q.   Well, in the various exhibits the terms of

16  your employment are set forth at different points on

17  OSM letterhead, did you believe Robert Polansky was

18  speaking for himself or for the company?

19  A.   Well, the way we understood employment was

20  that his father was putting money into the account to

21  pay our salary.  So my understanding is that OSM is a

22  Polansky company.  It's like the money wasn't coming

23  from OSM, the money was coming from Israel Polansky.

24  So when he said that he was going to pay us, I assumed

25  it's coming from him and Israel.

1    Q.    Fair enough,    Other than the documents

2    you've produced today, do you know of any other

3    documents which document any promises made by Mr.

4    Polanskytoyou?

5    A.    No.

6    Q.    Do you believe there are any witnesses to

7    any promises that Mr. Robert Polansky made to **you?**

8    A.    I would say Donald Wainright would be the

9    only one.

10   Q.    What is it you believe he witnessed with

11   regard to promises made by Robert Polansky?

12   A.    Promises to pay our salary/ because usually

13   we were all in the office at the same time and Don

14   would have heard what was going on.

15   Q.    Did Mr. Robert Polansky ever say anything to

16   the effect, I will personally pay it out of my own

17   accounts?

18   A.    Wo.

19   Q,    Thank you.  I have nothing further.

20   MR. RILEY:  I have nothing.

21   MR. SULZBACH:    I've got a couple.

22   REDIRECT-EXAMINATION BY MR. SULZBACH:

23   Q.    With regard to Anne Polansky, part of your

24   complaint says that money was drained from OSM and

25   property was purchased through and placed in Anne

1  Polansky's name to shield assets from OSM **creditors.**

2  Do you have any reason to believe that's true?

3  A.   Yes.

4  Q.   And what is that?

5  A.   So we can't go after Robert Polansky for the

6  money that he owes us.

7  Q.   What is it that Anne Polansky has that

8  belonged to OSM?

9  A . I  don't know.

10  Q.   I mean, you told us that the only money that

11  OSM ever had came from Israel Polansky'5 investment,

12  isn't that right?

13  A.   Yes.

14  Q.   And what is it that OSM placed in Anne

15  Polansky's name?

16  A . I  don't know.

17  Q.   So you don't know yourself....

18  A.   No.

19  **Q.   .„„. of** any **reason** to believe that in fact

20  property had been purchased through and placed in Anne

21  Polansky's name to keep it away from creditors?  You

22  don't know of any fact that supports that claim, do

23  you?

24  A.   Not off-hand, no.

25  Q,   Well, do you want to think about it a little

1   more?  I don [7] I: want you to have to make a snap
2
4   judgment.
5
            A.    Nothing that I can think of.

            Q. Going back for a moment to Israel Polansky and
    what you knew about him. Prior to June of 1998 what did
    you know about Israel Polansky?

            A.    Regarding what?

            Q.    Regarding his participation in OSM, for
9   example.
1
0           A. I know he was putting money into the company so
1
1   he would pay our salaries and any significant bills that
1
2   came in.
1
3           Q.    How did you know that?
1
5           A.    Robert told us.
1
6           Q. What, if anything, did you know about Israel
1
7   Polansky's financial condition prior to June of 1998?
1
19          A.    I just knew he had a lot of money.
20          Q.    How did you know that?
21
22          A.    Pretty much based on the **fact** that he had been
23
24   paying us up until this point and had said that he was
25
    going to continue to fund the company until we got
    investors.

            Q. The last part where you said he was going to
    continue to fund the company until they got investors,
    that's really your conclusion of what he said, is that