UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

DONALD WAIWRIGHT. ET AL,                CASE NO. 3:01-CV-Q2158(WWE)

Plaintiffs

v.

OSM COMMUNICATIONS. INC., ET AL,                    i

Defendants.                OCTOBER 30, 2004

### AFFIDAVIT OF DEBORAH RUSSO-WILL1AMS

I, DEBORAH RUSSO-WILLIAMS, of 9 Wills Avenue, Wayne, NJ 07470 being duly sworn do hereby state under the penalties of perjury:

1) I am over the age of eighteen and believe in the obligations of an oath.

2) I am a plaintiff in the above captioned action, which is pending in the United States District Court for the District of Connecticut.

3) I am claiming damages in excess of $21,875.00 as a result of unpaid wages, UNPAID PRIOR BONUSES OF $30,000.00, INCREASES OF $32,000.00, CONTRACTUAL EXPENSES OF $2,600.00, EMPLOYEE BENEFIT INSURANCE COVERAGE AND LOSSES ASSOCIATED WITH THE DEFENDANTS-WILLFUL FAILURE TO PROVIDE THESE CONTRACTUAL HEALTH BENEFITS, IN THE AMOUNT OF APPROXIMATELY $5,000.00. expenses and benefits due as to me as an employee of defendant OSM Communications, Inc. ("OSM"), Robert Polansky and Israel Polansky.

4) The evidence which I have to document my damages are attached hereto.

1. Following the acquisition of VISM by OSM in 1996, Robert Polansky approached me to offer me employment with OSM, I possessed detailed knowledge and extensive experience of the electronic sign networking industry due to my eight years of experience, beginning in 1988, working for ISA, EMARC and VISM. Because of my performance in the industry, I had good chances of finding employment elsewhere, with benefits and pay comparable to or better than I had received at OSM.

2. At all times when I was considering employment with OSM, I relied upon Robert Polansky's representations concerning the existence of a line of credit in OSM's favor and the likelihood of future funding for OSM in making my decision to accept employment from OSM. I was unaware at the time that the existence of any alleged line of credit in OSM's favor that I had relied on was a sham.

3. I further became aware that Robert Polansky's father, Israel, possessed sufficient financial resources to back OSM should OSM, in the long term, be unable to raise sufficient capital from other sources. My good faith belief was that Israel Polansky was committed to providing such backing to OSM should it be necessary. In particular, Robert Polansky represented that Israel Polansky was prepared to utilize his personal financial resources to insure that OSM's obligations to myself for wages, benefits, and reimbursement for expenses would be met.

4. In reliance upon the promises of Robert and Israel Polansky, I entered into an employment agreement with OSM on or about August 3, 1996, (the

"Original Russo-WiHiarns Employment Agreement"). A copy of the Original Russo-Williams Employment Agreement is annexed hereto as Exhibit C. The Original Russo-Williams Employment Agreement provided that (would be Manager of Customer Relations for OSM and would receive a salary of $60,000 per annum and a guaranteed minimum bonus of 20% at the end of my first year of employment for a total annual compensation in the first year of at least $72,000.00. In addition, the Original Russo-Williams Employment Agreement provided that I would receive a comprehensive health and dental plan.

5. Israel and Robert Polansky had no intention of honoring their promises to me when they were made. At the time OSM was established, and at all times thereafter, it was the intent and purpose of Israel and Robert Polansky to either raise capital from others or to keep OSM as thinly capitalized as possible, so that the Polansky's could personally reap the benefit of OSM's success, while using OSM's corporate form to deny creditors recourse should OSM fail to prosper. Thus, when necessary, Israel Polansky, through personal funds or the funds of family members which he controlled, would provide enough money for OSM to stay in operation, but Israel Polansky, in direct contravention of his own and his son's promises to me, refused to provide sufficient funds for OSM to meet its obligations to employees such as myself.

6. Beginning on or about January of 1997, several payroll checks made payable to Ms. Russo-Williams and other OSM employees were

distributed late and **were returned due to insufficient funds. As a result, an OSM employee by the name** of Dan Giorgetti **resigned and I was forced to take over Mr. Giorgetti's** responsibilities **in order to insure uninterrupted service to** OSM's clients. **Nevertheless, I at all times continued to** conscientiously **perform** my duties.

7. **During 1907 and** 1998, I was told on numerous occasions, **by Robert Polansky,** that deals had been finalized with **potential investors in OSM** that would **raise the capital necessary for OSM to meet its obligations, including the unpaid wages, benefits** and reimbursements **that were owed to Ms.** Russo-Willfams. **During** this **period, Ms. Russo-Williams also received repeated assurances from** Robert **Polansky** that, if **capital could not be raised from an investment deal, the Polanskys themselves would personally insure that** Ms. Russo-Williams **received the wages, benefits and reimbursements due** from OSM,

8. In fact, an **investment deal was never secured by the Polanskys to injeftt capital** into OSM. Instead, OSM, upon **information and belief, was funded entirely and surreptitiously through the resources of the Polansky family under the personal control of** Israel Polansky. **Although OSM is headquartered** in New **York,** during the **time of my employment, OSM's principal bank account was maintained in Massachusetts and subsequently New Jersey. Upon information and** belief, these accounts **were under the direct control of Israel** Polansky who **treated the accounts as personal property** of the Polansky family, **funding them as necessary to**

allow OSM to continue its operations and withdrawing **funds at his discretion and as he saw** fit in **order to keep** OSM **undercapitalized and the Polanskys** shielded **from** meeting OSM's obligations. Checks and **transfers that I received** from OSM **came from the Massachusetts account** until 1998, and **from the New Jersey account thereafter.**

9. **In June of 1998, I received an unsolicited job** offer **from another company** for **a** management **position in retail marketing and advertising. Due to the continuing uncertainty** regarding the **financial** health of OSM, J **accepted the employment offer,** and communicated my **intention to leave OSM's employment to Robert Polansky. Robert** Polansky **responded by** ottering **me an increase** in salary and bonus. **Robert Polansky** also assured **me that a financing deal** in favor of OSM would be **forthcoming and that OSM was** viable financially.

10. **In addition, In June of 1998, Israel Polansky personally met with and promised me that he would personally guarantee OSM's financial obligations. In reasonable reliance on Robert and Israel Polansky's representations as to the ongoing financial health of OSM, I accepted Israel and Robert Polansky's counter-offer and agreed to continue my employment with OSM.**

11. **As a direct result of my** reasonable **reliance on** the promises of Israel and Robert **Polansky,** f, after first **agreeing to** alternate **employment, turned** down **the new job opportunity in June of 1998, thereby alienating** future employers in **customer** relations, **retail advertising and marketing.**

niuii iL.oo i-.-ii JIM JJJ

12. It was the intent of the Polanskys, in June of 1998 and throughout my employment with OSM, by means of misrepresentation, to induce me, a vital employee of OSM, to continue my duties as an employee of OSM despite OSM's failure to honor its obligations to me,

13. I entered into a Second Employment Agreement with OSM on or about July 15,1998, (the "Second Russo-Williams Employment Agreement"). A copy of the Second Russo-Williams Employment Agreement is annexed hereto as Exhibit D. The Second Russo-Williams Employment Agreement provided that I would receive a salary of $75,000 per annum and continue my minimum 20% bonus rate as per the Original Russo-Williams Employment Agreement. In fact, OSM failed to pay me for two years of my bonus due, totaling $30,000.00.

14. Beginning on or about July of 1998, OSM failed to pay health insurance premiums as promised in the Original Russo-Williams Employment Agreement for the benefit of Ms. Russo-Wifliams. Dental insurance coverage was never obtained by OSM. As a result, t was forced to arrange my own health and dental coverage and incurred the cost of health and dental premiums totaling $2,600.00.

15. In reliance on the promises of Israel and Robert Polansky, I continued to perform my duties as an employee of OSM despite continued late payroll checks, and the complete lack of payment for employment services rendered from September 2000 through December 2000, totaling $21,875.00 not including bonus from paragraph above.

16. On December 28, 2000, as a direct result of the personal financial distress created by OSM's failure to pay me my agreed upon salary and bonus despite my continued job performance,! was forced to resign my position with OSM .

17. Thereafter, I commenced discussions with OSM and the Polanskys to obtain payment of the amount still due and owing to me for wages, benefits and reimbursable expenses. I scheduled meetings in April of 2001 to discuss the situation with Robert Polansky, all of which were cancelled by Robert Polansky. Despite such persistent due demand, OSM and the Polanskys, they have continued to refuse to honor their obligations to me.

5) I am unaware of any liability Insurance that Defendant has available to satisfy any judgment.

6) Contrary to Israel Polansky's affidavit all of his statements as follows are facts that are directly in dispute:

1} Israel states that "Other than my investment in the company, I had no role of any kind in the operation of OSM, although I was a director of the company, because I was told that under Delaware Law that two directors were required. My son Robert Polansky was the other director." *He had direct control over the money and expenditures of OSM and assisted with seeking investors and participated in the tax benefits associated with OSM*

2} "Robert Polansky was the President and in charge of all operations". *Israel had dired control over the money and Qwendjurezof QSM and assisted with seeking investors and oarticipated in the tax benefits associated with OSM*

3} "My investment in **OSM provided** funds **for OSM to** function while **it sought** investment **capital."** *Israel continued to fund OSM as late as May of 2004 by* his own admission.

*4)* "OSM never had the capital to set up the telecommunications network." **Israel** *Intentionally* **mislead myself** *and Mum<pt_* **"potential investors if he actually** believes **this.**

5) **"In 1999,1 was reaching the** point that I **could make no further investments without** jeopardizing **the savings necessary to meet my needs and those of my** wife, **and in** 20001 stopped making investments altogether." **Tffis** AS *in direct* <u>mntradictt'on to his investment</u> in May *of 2004 as he stated* injiis <u>deposition.</u>

6) "**At** the same time, **my son** continued **to seek venture** capital **to sustain the company. He came close to success but never achieved it and as a result of** this **and because the company's software was missing or disabled, the company ceased all operations at the end of** 2000. <u>"Israel participated in the fraud and deceit of myself and investors by seekincjmoney for ajtompany he knew was^ sham</u>

7) "**From time to** time **I met with potential investors** who wanted to know who their capital partner would **be."** <u>This statement shows that Israel did participate in the company'sattempts to infuse</u> casl? <u>and since the efforts</u> failed <u>because 'A was nota real company, but rather a shejl^to fund the personal affairs of Robert. Anne and hispwn tax benefits.</u>

8) The company is no longer operational but does retain virtually all **of** the **assets it acquired in 1996 except, I am told by Robert Polansky,** mat certain essential, **proprietary operating** software was taken **or made inaccessible by plaintiffs** Donald Wainright **and Deborah Russo-Williams."/** <u>have not made any software inaccessible nor taken</u> any software from the company. All of the softwarefrom 1996 would <u>be obsolete at this</u> timeneaartffess ofanyjictiqn I am accused o£

11/01/04 MON 11:37 I'AA 201 J30 1781          NYK LINE

9) "At no lime did I ever guarantee to either the plaintiffs or anyone else that I would fund the company so that plaintiffs' salaries or benefits could be paid. I never made any representations to anyone to that effect. *"ThJiLis a <u>sjiBight out misrepresentation and tie by the defendant Israel Polanskv^as he didspeakto me directly and guarantee my salary and wages onmon^fhanpne</u> occasion.*

10) "To date, I have received no return on my investment and no repayment of any sums I loaned or invested." <u>Israel would have received texbenefitsjorthe losses ofO§M_as£</u>

1 1) "I never directed, controlled or otherwise influenced the operations of OSM." <u>Israel has already stated that hegaye^moneyto, met with jwgsto/s and helped wth _QSM anditsfundraisinQ goals. Israel Jias also participated in running the company and derived l&nefits from QSM'sJa^osses^tl to his benefit and now hejstwing to hide from his responsibilities thatjnureto him from running a sham corporation.</u>

**Signed under pains and penalties of** perjury, **this <u> ?/</u> day of October** 2004.

Deborah Russo-Williams

C

# OSM

Phone: £12-308-5400        Communications, Inc.        *fox*-. 2 12-308-655 1

Fax:   914-353-1685

To:   Debbie Russo

From:   Robert Polansky

Re:   Employment Agreement]

Date:   August 3, 1996



Per our conversation , this is to forward terms of our agreement.

Base Salary: $60/000 annually, t Bonus: guarantee of a minimum of .20%.

Benefits: Complete medical and dental.

Stock options: Participation in the company's stock option plan

Title: Manager Customer Relations

A

**OSM**

**COMMUNICATIONS, INC**

To: Debbi Russo From:

Robert E. Polansky Re:

Compensation Date: July 15,

1998

Per our discussion, this is to confirm:

1. An increase in base salary from $65,000 to $75,000 effective immediately.

2. A payment of a $13,000 bonus at the rate of $500 per pay period with the understanding that the full amount will be paid by October 31, 1998 requiring major payments in both September and October.

3. The whole amount or the balance remaining will be paid upon the funding of the Company.

4. The above does not go into effect if you are no longer employed by OSM.

*[signature]*
President
7/15/98

**EXHIBITS**

432 Park Avenue South Suite 1301 New York, NY 10016          (212)725-7777  (212) 725-1351 Fax