## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF
### CONNECTICUT

DONALD WAINRIGHT, ET AL,                CASE NO. 3;01-CV-02158 (WWE)

Plaintiffs  v.  OSM   COMMUNICATIONS,

INC., ET AL.,

    Defendants.                                OCTOBER 30, 2004

### AFFIDAVIT OF DONALD WAINRIGHT

I, Donald Wainright, of 30 Vista Drive, Easton, Connecticut OG612 being duly sworn do hereby stale under the penalties of perjury:

1) I om over the age of eighteen and believe in the obligations of an oath.

2) I am a plaintiff in the above captioned action, which is pending in the United States District Court for the District of Connecticut.

3) *I have suffered the following economic damages as to myself and my wife, a co-plaintiff Janet Wainright*

    *1) Back wages of $24,315.71,*

    *2) Unpaid prjor bonuses and increases of $128,500.00,*

    *3) Contractual moving losses and expenses of $41,821.30,*

    *4) Contractual based six-month severance pay of $62,000.00, and*

    *5) Employee benefit insurance coverage and losses associated with the defendants' willful failure to provide these contractual health benefits*

4)  The evidence which I have **to document** my damages is attached hereto.

riuv — fcj *i* ~ai   I *: ; wy   r¹ H       I к . tuti i Htt K ʌ HL.                    ^ta.i tl–tt) 1 b 1                      P .
Q3

5)  OSM owns and operates a nationwide network of programmable electronic I...E.D.
    signs in grocery stores throughout lhe United Slates. The network delivers
    advertising and promotional messages in grocery stnroa.  OSM soils advertising to
    manufacturers and marketers who wish to advertise their products among grocery
    store shoppers at the point of sale and provides grocery stores with o portion of
    the advertising revenue and free advertising in return for access to their premises
    for the placement of the advertising.

6)  Until 1993, the business of OSM was conducted by an entity known as In fifnrfi
    Advertising. Inc. ("ISA"), which was founded in 1986 by Israel and Robert Polansky
    and initially funded by $500,000 provided by Israel Polansky.

7)  ISA was controlled and operated by the Polanskys unlil about 1000, when Robert
    Polansky's activities in connection with the public offering of ISA oiock became the
    subject of a Securities and Exchange Commission ("SEC") investigation into fraud
    and record keeping vioialions.

8) As a result of the SEC investigation, it was alleged that Robert Polansky was
   responsible for misstating the net income of ISA in order to make it appear more
   profitable before the initial public offering, and directing that false contracts be
   prepared and provided to auditors and underwriters to conceal the fraudulent
   misstatement of ISA's income. In September 1996, Robert Polansky consented to
   the entry of a permanent injunction prohibiting him from any further violations of the
   anti-fraud and record keeping provisions of the Securities Act of 1933 and the
   Securities and Exchange Act of 1934.

9)  In 1993, ISA entered into bankruptcy and its assets were acquired by an investment
    group that opertated as Electronic Marketing and Retail Communication ("EMARC").
    The business was subsequently acquired by Valassis Communications Inc.
    ("Valassis"), which operated the business as Valassis In-Slora Marketing, Inc.
    ("VISM") until 1996, when the business wa3 acquired by OSM. The principals of
    OSM are, in fact, the some individuals, principally Israel and Robert Polansky, who
    founded ISA.

.i ti   (-t-i   i r- . U.HiJ / MC.iLiV i ML.          ]^I4.£ I'I-Itt 1 6 1
P.0-t

10)**As a** condition **of** its acquisition of VISM, OSM was required to obtain *R*
$250,000 line of credit to insure lhat OSM **possessed** adequate working
capital In **integrate** VISM into OSM and continue its operations.

11 )At the closing of tho salo, OSM provided Valassis with a letter from an entity called
Ameristar Capital Corporation indicating (hat it would make available to OSM a
credit line of up to $250,000. In fact, Arnerislar Capital Corporation's letterhead
shows that it was located at 444 Madison Avenue, Suite 303 - the very same
office building and suite as OSM.  Upon information and belief, the line of credit from
Ameristar Capital Corporation was a sham and, at the time of the acquisition of
VISM, OSM lacked adequate capital to operate VISM and meet its obligations lo its
employees and vendors.

12)As part of the acquisition, OSM also acquired the right to offer employment to key
pcraonncl of Valassis, including plaintiff Donald Wainright, who at the time of the
acquisition was MIS Group Leader. I had originally joined Valassis in 1993 as part
of the EMARC acquisition.

13)Thus, following the acquisition of VISM by OSM, Robert Polansky
approached me to offer me employment with OSM. I expressed concern about
OSM's financial stability and ability to meet its obligations should he accept
employment with OSM. I had accepted a position with Valassis Communications'
MIS department, and because of his performance in the industry, I had good
chances of finding employment elsewhere, with benefits and pay comparable to or
better than he had received at OSM.

14)In response to my concerns about OSM's ability to meet its obligations, and with
the intent of inducing me to enter inlo an employment contract with OSM, Robert
Polansky informed me that, as a condition of the sale of VISM, OSM was required to
obtain a $250,000 line of credit to insure that OSM could mcot its obligations to
vendors and employees, In addition, Robert Polansky informed me that OSM had
received a contract from NBC to fund OSM's operations   I was unaware at this time
that the line of credit was a sham and

**relied upon** Robert Polansky's representations concerning the existence of Ihis lino nf credit and **NEC's** funding in making his decision to accept employment from OSM.

15) Robert Polansky further stated to me that his father, Israel, possessed sufficicnl financial resources to back OSM should OSM, in the long term, be unable to raise sufficient capital from other sources. Robert Pnlansky further slated to me that Israel Polansky was committed to providing such backing to OSM should il hn necessary. In particular, Robert Polansky represented thai Israel Potansky was prepared to utilize his personal financial resources to insure that OSM's obligations to me for wages, benefits, and reimbursement for expenses would be met.

1G) In reliance upon the promises of Israel and Robert Polansky, I entered into an employment agreement with OSM on October *1,* 1996, (Ihc "Employment Agreement"). A copy of the Employment Agreement is annexed hereto as Exhibit A. Thn Employment Agreement provided that I would be Vice President-Operations for OSM and would receive a salary of $100.000 per annum and a guaranteed 25% bonus at the end of his first year of employment for a total annual compensation in the first year of $125,000.00. In addition, the Employment Agreement provided that I would receive either a comprehensive health plan or reimbursement for the costs incurred by myself in retaining the health plan from his previous employment.

17) Israel and Robert Polansky had no intention of honoring their promises to me when they were made, as I later learned At the time OSM was established, and at all limes thereafter, it was the intent and purpose of Israel and Robert Polansky to cither raise capita! from others or to keep OSM as thinly capitalized as possible, so that the Polansky's could personally reap the benefit of OSM's fraudulent success, while using OSM's corporate form to deny creditors recourse should OSM fail to prosper. Thus, when necessary, Israel Polansky. through personal funds or the funds of family members which

he controlled, would provide enough money for OSM to slay in operation, but Israel Polansky, in direct contravention of his and his son's promises to Mr. Wainright, refused to provide sufficient funds for OSM to moot its obligations to employees such as myself.

18) Sfarting Junn 1, 1997. my salary was increased by OSM to $124,00.00 for my first year of employment - a fact that is reflected in promotional materials prepared and distributed by OSM In potential investors.  A nnpy of the relevant portion of OSM's promotional materials is annexed hereto as Exhibit B.  In addition, OSM agreed that I would be entitled to his bonus of 25% of my salary on November 4, 1997, as provided for in the Employment Agreement.

10) In reliance on the representations of Israel and Robert Polansky concerning OSM's access to line of credit and their promises to fund OSM, if necessary, to enable it to meet its obligations to myself, I diligently performed the work under the Employment contract. I was responsible for operations, product development, and working with potential investors. ! reported directly to OSM's New York office.

20) During 1997. I was told on numerous occasions, by both Israel and Robert Polansky, that deals had been finalized with potential investors in OSM that would raise the capital necessary for OSM to meet its obligations, including the unpaid waqes, benefits and reimbursements that were owed to Mr. Wainrkjht, During this period, I also received repeated assurances from Israel and Robert Polansky that, if capital coufd not be raised from NEC or some other investment deal, the Polanskys themselves would personally insure that I received thn wages, bnnnfits and reimbursements dun from OSM.

21) Infact, an investment deal was never secured by the Polanskys in order to inject capital into OSM. Instead, OSM, upon information and belief, was funded entirely and surreptitiously through the resources of the Polansky family under Ih« personal control of Israel Polansky. Although OSM is

o a0Ao|dLua ue SB sajjnp siq *wJO^ad* A||njLUiej 01

enuijuoo pip j 'A>|sue|od |9BJS| pue jjoqoy jo sesiwojd eqj uo eoueiiej u|(sz

ALU japun

yq oj sm pajjnouj | sso| 341   sso| |et}UB)sqns B IB awoq uudjLp!|/\| ALU pjos

| 'sjiosnipesseiA! GBpuqiueo ui Apsdojd A^SUBJOJ am jo spgaoojd uiojj pspunj Dq

p|noM ^SO !^SLU ss.iuiojd S/^SUGIOJ yoqoy uo OQUCI|OJ

pue lyauaq jjsqj Of ||e '8UJ oj suone6i|qo si| JOUOLJ O| ajrijiKj s,y\iso a;[dsep

|^QQ jo aaAoiduie ue SB ssjjnp ALU cujoped o} anuiiuo3 oj ' jo 33Ao|diuo |B]i/\ B 'euj

sonpu) oj uoijejuesejdejsiuJ sji^ u.6nojLii

jouJSj putj Lioqoy p juafui aqj SB/VI )j 'jaqjey -atu o; suoijtfDi|qo s,

]ooui oj puu| jo *9\es* S/^SUBjOd (9eJS| Luojj spaaoojd Aue Buisn jo uoijuaju)

on peq A>|suB|Od |OBJS| pus aq jeq] 9Ui 01 siuaweieis asai|j GPBUJ gq

gqi }B m9u>j A^suBjOd ^loqoy 'paujBB| js{B| | sy 'aujoq ueDiq-jt^ ALU jo

Bujpuod sqf uo sso| pgpadxa oqj pue 'sssuadxg 'enuoq anpjaAO ALU joj SLU

DuiAed 01 podsoj qjjM A||t?oijpods 'suo^eBiiqo s)[ jagui [^JSO ᵈ|ᴰᴸᵢ| °t P^sn oq

p|HOM AOUOLU s|L[} 'pasop SJBS sqi st; uoos sy 'put; sjenop UOJIJJLU |t!J9Aas joj

siiosnqocssc^ 'oBpijqiuBO ui ja/\ia so|JBqo gqi uo Ayedojd OLUOB p|os jtinf

peq X>jsuB|od |OBJS| }Bqi SLU pjoj A^QUBjOd jjsqoy 7661- P'UJ ut (Ujod guo

**Aasjap** MSN am LUOJJ pue 'geet- !!>un JUHOODB s»asni(3BssB|^| LUOJJI

auiED IAISO "'OJJ paAiaoaJ | jeqj **sj3|suejj** pue s>paq3

s,|/\jso 6u!)09iu oioj| pap|9!qs sAjjsueiod 8L(j pue doa>(

o) japjo ui )|j MGS 9q SB pue uoiiaiDsip siq )B spun.)

A>jSUB|Od oqj jo Apodojd i^uosjad SB 9iunoooe sq) pO]i?oj( oqw paqoy pue ptsjsj

jo [ojjuoo }03J;p QLJJ japun pue suojjejado s)i onufjuoa oj 1AISO MO||B o]

AJBSSOOOU SB A>jsue|0d |oejs| Aq popunj OJOAA sjunoooo

/wa|\j u; Ajjuanbasqns pue

sudsnipessei/u uj pauiejujeuj semjunoooB >|UBq (edjauud

jo yutji ai|j Cuunp '>po,\ mafsj ui

26) In November 2000, I was compelled to seek other employment, which was obtained on January 29, 2001.

27) Thereafter, I commenced discussions with OSM and the Polanskys to obtain payment of (he amounts still due and owing to him for wages, benefils and reimbursable expenses- Despite due demand, OSM and the Polanskys have refused lo honor their obligations to me.

28) I am unaware of any liability insurance that Defendant has available to satisfy any judgment.

20) Gontrary to Israel Pnlansky's affidavit all nf his statements as follows are facts that are directly in dispute:

1) Israel states that "Olher than my investment in the company, I had no rolo of any kind in the operation of OSM, although I was a director of the company, because 1 was told that under Delaware Law [hot two directors were required, My son Robert Polansky was the other director." *He_liad. direct control overjtiemoneY^srd expenditures of QSMpnd investors and participated in the tax benefits associated with OSM.*

2) "Robert Polansky was the President and in charge of all operations". *Israel had direct control over the money and expenditures of OSM and assisted with seeking investors and participated in the\tax_ benefits associated with OSM.*

3) "My investment in OSM provided funds for OSM to function while if sought investment capital." *Israel continued to fund OSM as late as May of 2004 by his own admission.*

4) "OSM never had the capital to set up the telecommunications network," *Israel intcntfonallyͮmislead myselfand future or DotentMinvestors if he actually believes this.*

5) "In 1909,1 was reaching tho point that I could make no further inveslrnents without jeopardizing the savings necessary to meet my needs and **those of my**

wife, and in 2(100 I stopped making investments altogether." *This_is indirect contradiction to his investment in May of 2004 as he staled [ri_his deposition.*

6)  "At the same time, my son continued to seek venture capital to sustain the company. He came close to success but never achieved it and as a result of this and because the company's software was missing or disabled, the company ceased all operations at the end of 2000. *"Israel participated in the* frauc/ *and deceit o[_mysejfand investors by seeking money for a company he_knewwas a sham*

7)  "From lime to time I met with potential investors who wanied to know who their capital partner would be." *Ttiis_statement shows tliat Israel did participfitejn the company's attempts to infusocash andsince the efforts failed because it was nota real* company, *out rather a shell to fund the personajaffairs of Robert, Anne and his own tax benefits,*

8) "The company is no longer operational but does retain virtually all of (he assets il anqi jirnri in 109fi except, I am tnlri hy **Robert Polansky. mat** certain essential, proprietary operating software was taken or made inaccessible by plaintiffs Donald Wainright and **Deborah** Russo-Willinms." *I **have** not made any software fogcm:gs/E>te nor token any software, from the company.*

9) "At no time did I ever guarantee to either the plaintiffs or anyone else that I would fund the company so that plaintiffs' salaries or benefits could be paid. I never made any representations to anyone to that effect. *"This is a straight out misrepresentation and tic by the dcfcndantJsract_Polansl<v,* as/re *did,speak to me c//rec//y andfjuoranfeG funding of the company on more than one occasion.*

10) "To date,! have received no return on my investment and no repayment of any sums ! loaned or invested." *Israel would^have received tax henofijsjorjhe losses of OSM as a Board Director and shareholder.*

P. 10

*1 'l)"l* nevnr rlirncted, controlled or otherwise influenced the **operations** of OSM." **ferae/** has already ste/grf fftaf he *gave money to, met with investors and helped witli OSM finfj jfs funrifaJRinc) gonl$. Israel has also participated in running the company ond derived benefits from OSM's tax losses,* a// to *his benefitand_now h\*L* [e] *trying to hide from his responsibilities that inure* to *him from running a sham corporqtiori*

**Signed under pains and penalties of perjury, this ^j_ day of October 2004.**

Donald Wainrighl

ID:                           APR 27'04    14:43 No.003 P.01
                                          Communications. Inc.
# OSAA fax. £12-308-6551

313-432-2864

To: Don Wainright Front

Bob Polaneky Re;

Employment Contract

Date: July 23, 1996

This ie to forward the following terms of employment beginninq
September 3, 1996.                                    *      *

Base Salary: $100,000 Bonusa

25* guaranteed bonus

Denefitsi Comprehensive Medical coverage plus inmsurance (dental too).

StocK Options: To participate in the Company's stock option program

other Parameters!

1. Moving expenses.

2. Bonus to be expanded to cover short fall in Bale of house vs. purchase
price (Polonehy approval needed)

3. Car to toe included if bus in CBS ie in New York City not to exceed
$500/month.

Timing: September 10, 1996

444 Madison Rvofiuti   *   Sulifi ^01   *   New Voih, Netu Vorfo

| | fvarl | Year 2 | Year 3 | Year 4 | YtarS ,·! | Year 6'. | Year? |
|---|---|---|---|---|---|---|---|
| **(Hwlicndi** | | | | | | | |
| Siitiry: Bob **I'lilansky** Ismul | $130,ouo • | 154,300 51,300 | 159,133 | 163,909 54,636 | • 36,273: | 173,891 37.964 | 179,108 |
| Г, > busty Caniii-n | 50.l1H0 | | 53.04S | | | | 59,703 |
| IKMIL-CFO | | | | | | | |
| Al JiHii-s [roliiil s:i • | 73.000 | 77,230 1 23,600 | 75,368 127.308 | 81.9S3 | 84,413; | 86.946 139.1.13 | 89,354 143 |
| AJniiu (sckT iHMkl | 53.01101 | 36,650 | 38,330 | .131.127 60,100 | 133.06 h | 63,760 | .286 63,673 |
| * 23"iil:iN \rmgx | 12,500 | SS79375 | JJ9.rU! | 112,932. 561 | 61.903?. | 130A18 | 134.331 |
| **Tolol** | S562,50ll | | 5596,756 | 4,659 | 136,620 | S6J2.092 | 5671,654 |
| | | | | | 5633,09? | | |
| **(JtbcrOMi**' | | | | | | | |
| Oflki- S | 100.000 : | 103,000 25;750 | 106,090 26,523 | 109,273 27318 | 112.331.. | 113.927 28,932 | 1 19.403 |
| Insurani-i; | 25.000 . | 31.500 98,880 | 33,043 101,846 | 54,636 104,902 | 28.I3& | 37,964 111.290 | 29,831 39,703 |
| **Rail** | S0.fW0 ' | .. 15.430 | 15,914 233.398 | 16391 240,400 | 108.049; | 17,389 253,040 | 1 14,629 |
| Utilities (I'lHmtfvl | 96.1100 i | 226.600 | | | 16.883' | | 17.911 |
| **TotoKJtiirrOil** | 15.000. | | | | 247.6 ii,:' | | 262.692 |
| | 220,000 | | | | | | |
| 3J5JCM | , £06,000 | 521,180 | £96,815 | 551,920 | 569,507 s° | 586,593 .V | 6WJ90 |
| Man :iju.'«;, | 120.000 | 123.600 87.550 | 127,308 90,177 | . 131.127 | 133,061; | 139,1)3 98.538 | 143.286 |
| Don Wii | 85.000 | 61,800 66.950 | 63,654 68,939 | 92,882 65,364 | 91,668;. | 69,556 | 101,494 |
| Atldilinii.nl **Hclnil** | 60.00(1 | | | 71,027 | 67.531;;. | 73353 | 71.643 |
| Deb !ii i- Itiisti' | | | | | 73.138.. | | 77.613 |
| Daii [ijorpi-'Lli | | | | | | | |
| **Tola!** | 330,001) | 339,900 | 350,097 | 360,600 | 37U18 | 382,560 | 394,037 |

Page 1