UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONALD WAINRIGHT, ET AL,   CASE NO. 3:01-CV-02158 (WWE)

Plaintiffs

v.

OSM COMMUNICATIONS, INC., ET AL.,

Defendants.   FEBRUARY 7, 2005

## MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO APPEAR PRO HAC VICE

Plaintiffs in the above titled action, by and through their attorney, hereby submit this Memorandum of Law in opposition to Motion to Appear Pro Hac Vice made by Michael J. Tagliatela, Esq. on behalf of and for Michael P. Goldsmith, Esq. of New York, NY.

**INTRODUCTION**

The plaintiffs herein are seeking validation from the court for fraudulent inducement, failure to pay wages, and breach of contract, both legally and in terms of public policy and common law.

After the Complaint in this action was filed, the parties failed to provide an Answer (although originally Michael Goldsmith, Esq. attempted but failed to appear and file the proper papers) and a Motion for Default was filed and subsequently granted. Many months later a Motion to Open the Default Judgment was filed after the Plaintiff's filed an action in the State of

1

Massachusetts and attached property owned there by Israel Polansky. The Motion to Open was subsequently referred to Janet C. Hall and set down for a hearing. At the hearing Michael P. Goldsmith appeared and testified before this Court and was admonished from the bench for his failure to abide by the Federal Rules of Civil Procedure, because of his attempt to file an answer when he was not admitted to practice before this court (which answer was deficient even if admitted as it was in the format of a New York State Supreme Court Answer not even in Federal format) and his failure to file an appearance and even minimally follow the rules of Federal Civil Procedure as well as the Connecticut local rules. However, Judge Hall granted the Motion to Open in order to give the defendants a chance to defend the case on the merits.

Now comes the same attorney who was responsible for the initial delay and countless hours and expense by the plaintiffs asking to be allowed to practice before this Honorable Court. By reading the decision by Janet Hall in the granting of the Motion to Open this Court should be reminded that a cause of action for legal malpractice was basically outlined by Judge Hall for his actions and the Court should deny his instant application.

Additionally it was identified at that hearing that he was likely to be called as a witness during the trial by the plaintiffs and this was also disclosed to Michael Goldsmith prior to his initial attempts to become counsel in the initial stage of this case.

A conflict of interest exists in his attempting to represent Robert Polansky as Michael Goldsmith represented OSM Communications Inc. when he engaged as advisory counsel on several of the transactions that are factually at issue in this case. Specifically the claimed sale of the company and the personal liability of Israel and Robert Polansky in those sales and the fraudulent and inflated financial information transmitted of potential investors. (See Annexed hereto Exhibit A: Letter signed by Michael Goldsmith).

As well Michael Goldsmith is believed to have knowledge of material facts wherein Israel Polansky was listed as an active director and participant in the management as well as that of Robert Polansky, of OSM Communications Inc. (See Annexed hereto Exhibit B: Info relating to Israel and Robert Polansky). Given Israel Polansky's corporate background his participation added value to the company and made it more attractive to potential investors.

Further, to allow the proceedings at this time to be delayed again and to allow an unqualified, previously admonished attorney who has already demonstrated a clear disregard for the Federal and Local rules would further hinder this case. This is another example of the dilatory tactics of the defendants herein, as they are attempting to inundate the Court with ancillary matters and motions on this case to detract from the pending Motion to Compel for their failure to comply with discovery currently referred and being decided by Judge Fitzsimmons.

Based on the aforementioned reasoning, the Motion to Appear Pro Hac Vice should be denied.

The Plaintiffs

By: ROBERT E. ARNOLD, ESQ.
Law Offices of Robert E. Arnold LLC
205 Church Street, Suite 310
New Haven, CT 06510-1085
Tel: (203) 777-3000  Federal Bar# ct18093

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, of February 7, 2005, as follows to:

By mail to Counsel for the Defendants Israel H. Polansky and Anne Polansky
J. Michael Sulzbach
385 Orange Street
New Haven, CT 06511 Tel. 203-781-0880 Fax.03-781-0861

By mail Defendants Robert E. Polansky and OSM Communications, Inc.
9 Aspertuck Lane c/o Robert Rubin
Weston, CT 06883

By mail to Movant:
Michael J. Tagliatela, Esq.
385 Orange Street
New Haven, CT 06511
Tel: (203) 624-9363

**ORIGINAL TO:**
United States District Court, District Of Connecticut
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CONNECTICUT 06604
Phone: (203) 579-5861 attn: clerk's office
Mailed: Chambers courtesy copy to: (1) Judge Fitzsimmons and (2) Judge Eginton

Dated: 2/7/05

Robert E. Arnold, Esq.
FED. JURIS. NO. ct18093

Aug-16-00 01:27P Rivetts,Pawa&B1om LLP          212 587 5051          P.02

LAW OFFICES

# MICHAEL P. GOLDSMITH

420 LEXINGTON AVENUE
NEW YORK, N.Y. 10170
SUITE 2310

Telephone:   (212) 587-3000
Facsimile:   (212) 587-5051

August 16, 2000

Josh Nordan, Esq.

Re:   Comments on Agreement by VMG to purchase assets of OSM

Dear Josh

As I mentioned to you on the telephone last week, my clients and I have reviewed the agreement presented by VMG/TC Joint Venture to Messers. Israel and Robert Polansky to acquire the assets of OSM Communications Corp.

Our first concern was the lack of a description of the mechanism that would be put in place to support Robert Polansky (whose employment agreement is still to be fully outlined and negotiated) in his effort to achieve the goals set forth in the agreement. You explained to me that as part of the business plan VMG intended to raise sufficient money to support the payment of a lease and office operation. I note that no mention was made of the approximately $400,000.00 necessary to advance to the National Chains to get them to reinstate their contracts. I would appreciate receiving a copy of the business plan describing the set-up and operating costs for Newco.

My clients and I remain disturbed by the overall structure of the deal. Please note that my clients would like to make an arrangement with VMG but not under the terms as set forth in your proposed agreement. Specifically, how can I advise my clients to sell their assets to VMG, free and clear from all encumbrances, prior to VMG securing financing? Equally disturbing, is that if the deal does not go forward as VMG anticipates, then VMG will be able to sell signs to reimburse it for costs incurred in trying to complete the transaction. Why should I advise my clients to sell their assets to VMG for no consideration?

You now know my overall objection to the arrangement so rather than getting into the specific language of each paragraph, let me start with my clients' response to certain points in the agreement. In some cases I have described the particular section to avoid the necessity of going back and forth between this memo and the agreement.

Josh Nordan, Esq.
August 16, 2000
Page 2

(1) It is VMG's intention in this agreement to acquire all of OSM's assets as defined in Section 0.2. Please note that while the signs are extremely durable my clients cannot represent that the 2,000 signs in storage are in good working order. More, while we have made an arrangement to pay all outstanding storage charges the storage charges are not fully paid. There is approximately $48,000.00 currently due to the company storing the signs.

(2) Section 1.1 – The sale is to be made free and clear of all security interests. As we understand the agreement, VMG will have up to 90 days to close the deal once the agreement is signed by OSM. OSM will not make a sale to VMG free and clear of all security interests without money exchanging hands.

(3) Section 1.3 – Office lease is to be assigned to VMG. OSM is occupying space at its current location on an oral month-to-month arrangement with the Landlord. OSM cannot represent that it can assign this lease to OSM.

(4) Section 2.1 – VMG assumes none of OSM's liabilities and both Israel and Robert are to indemnify and hold VMG harmless from any and all liabilities. OSM retains the right to negotiate its liabilities and VMG will pay up to $400,000.00 to settle liabilities. OSM shall repay the $400,000.00 from the first moneys due OSM from the Royalties. The agreement further contemplates that VMG will pay moneys in excess of $400,000.00 only if non-payment will adversely affect effect business of VMG. Israel and Robert must personally guarantee the re-payment of the additional moneys paid by VMG. My clients believe that the re-payment of the money lent to satisfy liabilities should be paid on the back end of the Royalty. Additionally, my clients will not agree to personally guarantee the repayment of this money or any other money advanced pursuant to any agreement with VMG. They consider this part of VMG's risk in entering into this agreement.

(5) Section 3.1 – Preliminary price shall be up to $5,240,000.00 subject to certain conditions.

$100,000.00 is to be paid to OSM after completion of financing.

$50,000.00 is to be paid to OSM after delivery by OSM to VMG contracts from National Store chains giving access to 1000 stores with signs installed and delivery of signs to VMG which has a liquidation value equal to $300,000.00

$150,000.00 is to be paid to OSM after delivery by OSM to VMG contracts from National Store chains giving access to additional 1000 stores with signs installed, 200

Josh Nordan, Esq.
August 16, 2000
Page 3

National Stores with signs connected to computer network and 2000 signs available to VMG.

$700,000.00 is to be paid to OSM after OSM connects 1000 National Stores to computer network.

$1,000,000.00 is to be paid to OSM after OSM connects 1000 National Stores to computer network.

$3,240,000.00 is to be paid to OSM commencing the 1st day of the 3rd year and expire 3 years later. Actual amount to be paid subject to Section 3.3.1. Amounts loaned by VMG to settle liabilities will be paid out of this amount.

My clients believe that all goals established in this paragraph should be governed by a "best efforts" requirement and that the initial $100,000.00 to be paid to OSM, although consistent with the term sheet, must be paid upon signing of the agreement.

(6) Section 3.3.1 – This section calls for 2000 signs initially to be delivered and connected to computer network and 6000 within 18 months of the Closing Date. Purchase price pro rated based upon actual number of signs delivered and connected to computer network within 18 months of Closing. Provided that VMG establishes an appropriate office and support system, my clients are prepared to meet these goals.

(7) Section 4.1 – The agreement contemplates that the Closing will to occur within 60 days of the execution of the agreement and completion of the business plan. VMG can extend Closing Date by 30 days. Please note that in the event OSM receives a bona fide offer to purchase its assets between the time that this agreement is executed and prior to any closing on the financing that VMG seeks, OSM requires the ability to void this agreement and accept the other offer. Of course OSM will give VMG the right of first refusal provided VMG will agree to match the bona fide offer and close on the same terms, conditions and time frame.

(8) Section 5 – After execution of the agreement OSM must maintain and preserve business. As I mentioned earlier, by executing the proposed agreement, VMG desires to acquire all of OSM's assets free and clear. Without the actual receipt of funds from VMG, my clients are not prepared to maintain the business of OSM until VMG can arrange its financing. Until the financing is completed and money is exchanged, my clients will reserve their right to sell assets or raise capital as circumstances warrant. If they are required to sell assets prior to VMG securing financing, then all representations regarding signs and goals for National Chains will have to be re-negotiated.

Josh Nordan, Esq
August 16, 2000
Page 4

(9)   Section 10.4 – My clients must see a copy of the proposed employment agreement prior to the execution of the asset sale agreement.

(10)  Section 12.1(iv) – VMG should not have an absolute right to terminate if OSM does not meet sales goals. All goals should be achieved using "best efforts" standard.

(11)  Section 12 – Agreement may be terminated mutually on 3 days notice or other defaults. After the Closing date VMG can terminate if OSM does not meet deposit conditions and retain signs and sell them to repay itself for expenses incurred. This is not acceptable to my clients. If VMG terminates the agreement, then all assets must be returned to OSM. VMG may not retain the assets to recoup its costs.

(12)  Section 14 – OSM shall receive 10% of Newco although actual percentage shall be reduced if 2000 signs connected to network are not delivered and 6000 signs are not delivered connected to network after 18 months. My clients want 10% of Newco with the possibility of acquiring up to 15% based on reaching the stated goals.

(13)  Section 16 – 10 year no compete through out the US. Clearly, this provision violates length of time and scope of appropriate no-compete limitations and must be amended with more reasonable terms.

(14)  Section 18 – If VMG cancels this agreement it is entitled to all payments back with interest. If VMG defaults OSM gets liquidated damages – to keep the initial deposit $100,000.00. In the event of a termination of the agreement, unless arising out of my clients' intentional wrongdoing, money paid by VMG will not be returned.

Once again, these are our initial comments with regard to the agreement and as we discuss it there will be other issues that come to light. Overall I think we need to discuss the overall structure of the arrangement and I look forward to your input on how to move this discussion forward.

Very truly yours,

Michael P. Goldsmith

cc:   Israel Polansky
      Robert Polansky
      Robert Kaplan (Via Telecopier 603-452-9159)

# BOARD OF DIRECTORS





# BIOS - KEY PERSONNEL

## CHAIRMAN OF THE BOARD (DIRECTOR) - Israel H. Polansky

President of the Atlantic Paper Box Company, he put up the original $500,000 to start In-Store Advertising (ISA). He served as a member of the Board from 1986 - 1991.

Recognizing the potential of the Company, he moved rapidly to purchase Valassis In-Store Advertising from Valassis in April, 1996.

A knowledgeable and senior statesman, he brings a wealth of experience to the Company.

## PRESIDENT CEO (DIRECTOR) - Robert E. Polansky

Robert Polansky founded the original In-Store Advertising in 1986 after 18 years in Advertising in New York City. He began his career in advertising immediately after receiving an MBA from Columbia Business School (MBA'68).

As an Account Manager, he worked at several different shops including Benton & Bowles, Ogilvy & Mather and Young & Rubicam on accounts such as GE Major Appliances, Lever Brothers, General Foods, Nabisco, Colgate-Palmolive and JOHNSON & JOHNSON.

It was his work for the major New York Agencies on important "marketing oriented" accounts, that provided the background and experience to begin ISA.

Committed to the restaging of the Venture which did close to $20,000,000 under his leadership, he has aggressively put together a mixture of the old team and new to drive the business.

## EXECUTIVE V.P. BUSINESS DEVELOPMENT - Leighton (Lee) York Jr.

Lee York has been in the out-of-home "business" for 11 years.

Beginning his career with the Campbell Soup Company, he was both a Regional Sales Manager and New Product Marketing Manager. Moving to Sarah lee, where he spent ten and a half years, he was Vice President and General Manager of Branded and Non-Branded Food Products.

He worked with ACTMedia for 4 years where he was V.P. of Retail Sales and New Products. Moving to ISA in 1988, as head of Retail Sales, he helped to sign over 72 supermarket chains.

After ISA, he managed the introduction of the RENTRAK Software Video Program (An ABC Venture) into supermarkets. His most recent



AJ    0204

Exhibit B