UNITED STATES DISTRICT COURT 
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONALD WAINRIGHT, ET AL., | : | 2005 AUG -8  P 1: 52 |
| | : | CIVIL ACTION NO. |
| Plaintiffs; | : | 3:01-CV-02158 (WWE) |
| | : | |
| V. | : | |
| | : | |
| OSM COMMUNICATIONS, INC., | : | |
| ET AL; | : | |
| | : | JULY 27, 2005 |
| Defendants; | : | |

### JOINT MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs in the above titled action, by and through their attorney, hereby submit this Joint Memorandum of Law in support of Plaintiffs' Motion for Summary Judgment.

**INTRODUCTION**

Plaintiffs Donald Wainright, Deborah Russo-Williams, and Janet Wainright hereby bring this action against Defendants Israel Polansky, Robert Polansky, Anne Polansky, and OSM Communications Inc., to recover monies legally owing to them for the Defendants breach of employment agreements and for the victimization of the Plaintiffs by Defendants use of a corporate fiction.

The Defendants induced Donald Wainright and Deborah Russo-Williams to become employees of OSM Communications Inc. through fraudulent representations and guarantees as to salary, benefits, and other compensation that would be paid to the Plaintiffs. The Plaintiffs Donald Wainright and Deborah Russo-Williams filed a Complaint in Federal District Court for the District of Connecticut on November 14,

1

2001 sounding in breach of contract, violation of Connecticut General Statutes §§31-71b and 31-72, breach of guarantee, and fraudulent inducement. Plaintiff Janet Wainright, the spouse of Plaintiff Donald Wainright, also brings an action in fraudulent inducement.

At all times, OSM was under the complete domination and control of Israel, Robert and Ann Polansky and was their alter ego, used as a conduit to transfer funds from Israel Polansky to his son Robert and daughter-in-law Anne Polansky. At all times, OSM 's bank accounts were used as if they were the personal bank accounts of Robert Polansky to support a tax-free lifestyle for him and his wife Ann Polansky. This with full knowledge and consent of Israel Polansky. At the same time OSM provided Israel Polansky with tax-beneficial losses, while he attempted to solicit millions in investment dollars. OSM as a corporate shell, was used to perpetrate the fraud and statutory violations which are the subject of this action and which caused the damages complained of herein with the design of shielding any personal liability for Israel Polansky.

A default Judgment was entered in this matter against Israel Polansky, Anne Polansky and Robert Polansky on February 28, 2002 and was issued by the Honorable Judge Warren W. Eginton. That Judgment was in the amount of $897,374.93 plus interest to be awarded to Donald and Janet Wainright and $259,425 plus interest awarded to Deborah Russo-Williams. Judgment was then reopened in March 2002. Discovery has proceeded since that date, however, the Defendants have not provided key financial documents including but not limited to Israel's personal bank accounts, Israel's tax returns, Anne Polansky's personal bank accounts, Robert Polansky's personal bank accounts. There are no corporate ledgers that have ever been produced for OSM. Despite

information and belief that OSM is a continuing concern, there has been no disclosure of any dealings after November 2000.

**STANDARD FOR SUMMARY JUDGMENT**

The United States Supreme Court has decided that in the context of a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See Fed R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct 2505, 91 L.Ed.2d 202 (1986).* A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact."*Miner v. City of Glens Falls, 999F.2d 655, 661 (2d. Cir. 1993)* (internal quotation marks and citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Aldrich v. Randolph Cent. Sc. Dist. 963 F.2d 520, 523 (2d. Cir. 1992)*

**FACTS**

    a.    **History**

In 1986, Israel and Robert Polansky, as father and son, started a corporation known as In-Store Advertising, Inc., ("ISA"). Israel served as a member of the Board for ISA between 1986 through 1991. Israel put up the original $500,000 for start-up costs for ISA (See Exhibit A). Robert Polansky served as President of ISA, he put none of his own money into ISA. ISA was a retailer of advertising services that used flat screen

3

LCD monitors placed in retail stores to reach customers in promoting its clients. In 1990, ISA attempted to go public with an initial public offering. Immediately thereafter, Robert Polansky became the target of a Securities and Exchange Commission ("SEC") criminal investigation.

The SEC complaint filed against Robert Polansky, Et Al., alleged that he violated the antifraud and record keeping provisions of the federal securities laws in connection with ISA 1990 initial public offering of $40 million in common stock. According to the SEC complaint, ISA's IPO materially misstated its net income to make the company appear more profitable than it actually was prior to the IPO. In particular, ISA's revenues were shifted forward in periods before the July 1990 IPO and were then shifted back and decelerated in the period after the IPO. The complaint alleged that, to conceal the fraud, Polansky, ISA's president, chairman and chief executive officer, had falsified contracts that were used to prepare financial statements presented in connection with the IPO. The complaint also alleged that material misrepresentations were made by ISA in its offering materials regarding the effectiveness of its advertising. (See Exhibit B). This matter was resolved when on the same day is the SEC filed its complaint, Robert Polansky and his accomplices consented to the entry of permanent injunctions prohibiting them from committing future violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5, 13b2-1 and 13b2-2 (See Exhibit B).

In 1993 ISA may or may not have filed for bankruptcy protection. All the same, its assets were all purchased by an outside corporation known as Electronic Marketing and Retail Communications Inc., ("EMARC").

**b.     OSM**

On June 10, 1993, around the same time that ISA was alledgedly seeking bankruptcy, and Robert Polansky was being targeted by the SEC, Israel Polansky and Robert Polansky formed a second corporation known as OSM Communications Inc., ("OSM") under the laws of the State of Delaware (See Exhibit C).Per the corporation documents, Israel Polansky was issued 93% of the issued shares and was named as a Director.  Robert Polansky was named president of OSM Communications Inc., and he received 7% of the issued shares.  No other Board members named.  The purpose of this corporation was to provide for the "selling of satellite systems in the retail environment." (See Exhibit C ) In short, OSM was formed to carry on the business of the debunked ISA.  On April 18, 1996 OSM purchased back its original ISA business from the then current owner VALASSIS.  As a condition of that purchase agreement, OSM had to obtain a $250,000 line of credit. (See Exhibit D).  OSM did obtain this line of credit from Ameristar Capital Corporation , which was a business apparently operating out of the same office and suite as OSM. OSM never used this line of credit even though it could have borrowed against it to pay back some of its debts.  (See Exhibit E). OSM actively began soliciting new investors and hiring new staff shortly thereafter this purchase agreement.

**b.     Employment of Donald Wainright**

On July 23, 1996, OSM was successful in soliciting Plaintiff Donald Wainright, who was living in Michigan with his family at the time, to become an employee of OSM. A facsimile entitled "Employment Contract" set forth the following terms of employment

to begin on September 3, 1996. The base salary was set at $100,000.00. Donald Wainright was to be paid a **"25% guaranteed bonus"** each year and full medical benefits. Also, Donald Wainright was to have his moving expenses covered and a "bonus to be expanded to cover shortfall in the sale of house vs. purchase price (Polansky approval needed)." (See Exhibit F). This promise to pay for such losses and the other terms of the employment agreement were later reduced to a written contract entitled "Employment Agreement" dated October 4, 1996 and October 7, 1996 and was signed by both Robert E Polansky and Donald Wainright (See Exhibit G). Donald Wainright eventually sold his Michigan home at a loss of $41,821.30. OSM and the Polanskys breached their agreement to Donald Wainright and his wife Janet who were never compensated for their large economic loss.

During his employment with OSM Donald Wainright experienced several bounced employment checks, of which $24, 315.71woth were never reissued to Donald Wainright (See Exhibit H). While it is disputed, by the Defendants, Donald Wainright was given assurances by Robert and Israel Polansky that he would be fully paid all monies owed to him through the terms of his employment. Sometime in November 2000, after not paying him for months, Donald Wainright was terminated by OSM. Additionally, OSM never paid Donald Wainright his guaranteed 6 months of severance per his Contract. (See Exhibit G).

c.   **Employment of Deborah Russo-Williams**

On August 3, 1996, OSM successful solicited Deborah Russo-Williams to enter into an employment agreement with OSM for the position of Art Director. The terms of

that Agreement were that Deborah would receive a salary of $60,000 a year, and a guaranteed annual bonus of at least 20% and health benefits. (See Exhibit I)

Starting in 1997, Deborah Russo-Williams experienced several bounced payroll checks. In June 1998, Deborah Russo-Williams had received offers for alternative employment. While it is disputed by the Defendants, Deborah states that she had a direct in-person conversation with Israel Polansky, about her future with the company wherein Israel guaranteed to personally pay her future salaries if she agreed to stay with the company. Defendant's motion for summary judgment supports the fact that Israel was personally paying Deborah Russo-Williams salary. Following this alleged conversation, a second employment Agreement was made between Deborah Williams and OSM on July 15, 2005 increasing her yearly salary from $65,000 to $75,000. Also the company recognized that it had not paid its original bonus of $13,000 and agreed to make for one year, bi-weekly payments of $500, the balance to be paid in full once an investor funds the company. (See Exhibit J).

Despite the assurances and increases in her pay, Deborah Russo-Williams continued to experience returned payroll checks for insufficient funds and in December 2000 she was terminated after the company failed to pay her for more than two and a half months (See Exhibit K). To date, an excess of $21,875 in payroll has not been paid to Deborah Russo-Williams. Deborah Russo-Williams was also never paid her last two years of bonuses totaling $30,000 and has incurred other expenses for health benefits as detailed in the Complaint she filed

      d.     **OSM Bank Records**

At deposition, Robert Polansky was questioned about a facsimile showing that on October 28, 1996 Israel Polansky had opened a bank account for OSM at US Trust Bank located at 560 Common Wealth Avenue, Boston, MA (See Exhibit L). Per that document, Israel Polansky was the only signatory on the account from October 28, 1996 through January 22, 1997. Robert Polansky originally disputed that Israel was ever a signatory on the account, however, he subsequently stated that he was not a signatory on the account that Robert was "aware of" and finally stated that "he had no comment" as to this document. (See Exhibit M). In sum, Robert Polansky never fully denied the legitimacy of the document or the presence of his January signature there upon (See Exhibit L).

Since Russo-Williams began working for OSM in August 1996 and Donald Wainright started working in September 1996, Israel Polansky must have been personally involved in writing checks to OSM employees, because Robert would not have been authorized on the account to do so and no earlier account has been disclosed to Plaintiffs.

The OSM banking records, or as much of the records that have been disclosed, contain several reoccurring monthly transactions where funds which were wired into the account are being liquidated into cash by ATM withdrawals or by tellers at various Banks including Chase, Citibank, Toyoko, Citizens Bank, Interbank, etc. These monthly withdrawals are as high as $10,241 (occurring in June 1998, See Exhibit N) but usually averaged between $5,000 and $8,000 per month. For instance in the last five months of the records provided the following are transactions where cash is being directly drawn from the account: in March 2000 withdrawals equal $5,870; in April 2000 withdrawals

equal $9,450; in May 2000 withdrawals equal $6,711; in June 2000 withdrawals are for $6,407 and in July there is $4723 withdrawn (See Compilation Exhibit O ). Additionally, there are several non-business expenses that the corporation is paying. It is obvious and evident from the records that Robert Polansky used the corporate account to purchase clothing from tailors, groceries, meals at neighborhood restaurants such as Parma, home items at Gracious Homes, gifts for his wife from Yves St, Laurent and Tiffanys, etc. At deposition Robert Polansky clearly admits that he would at times use the corporate funds to pay for his family's expenses (See Exhibit P ).

It is clear from the records, that these withdrawals and personal expenditures often caused OSM to bounce its employees payroll checks. Finally, these withdrawals are never reflected on Robert Polansky's tax returns in fact, in Year 2000 Robert Polansky reports a loss on his K-1 of $14,547 (See Exhibit Q) These withdrawals are also not reflected by the joint tax returns filed by both Robert and Anne Polansky. Note, the returns that Robert and Anne Polansky produced are almost indecipherable on many of the copies the year and date is truncated, the schedules and signature pages are not included and pages of New York State and Federal Returns are inexplicably mixed together. Despite all of this the Plaintiffs were able to determine that the following income being reported for the following years: Year 1996 reported $11,895; Year 1997 $3,288; Year 1999 a loss of $1,810.18. (See Exhibit R). Also, of interest is the Schedule A for Year 1999, which clearly shows a deduction for home mortgage interest points of $4210.24. This is of particular importance since Robert Polansky at his deposition has stated that there is no mortgage on his home. (See Exhibit R )

### e. Israel Polansky

Israel Polansky was a successful businessman having been the president of a successful company, namely the American Paper Box Company in Newton, MA. The extent of Israel Polansky's wealth is unknown since he has never provided copies of his actual tax returns or bank records. To date, Israel Polansky has only provided copies of his K1 schedules for the years in question.

Israel Polansky involvement with the OSM began in 1986 when Israel personally paid $500,000 to start ISA. That $500,000 was used in hopes of raising $40 million dollars through a fraudulently designed IPO. As with OSM Robert Polansky was named to all the top executive positions and Israel was named to the Board. When the SEC began investigating ISA, Israel ended his Board membership with ISA in 1991(See Exhibit A ).

During the Bankruptcy filing of ISA, Israel with his son Robert created a second company to carry on ISA's original goal of attracting large investment dollars to a unique advertising business. Again, Robert Polansky was made President/CEO of the business and Israel was a Director.

OSM as incorporated was 93% owned by Israel. The money that OSM used to operate between 1996 and 2000 was drawn perhaps exclusively from Israel's private accounts since the wires recorded in the banking records are similar to the amounts that Israel claims to have wired to the company and had taken tax losses for during those years. Those amounts being: in 1996, $208,800; in 1997, $371,650; in 1998, $394,300 and in 1999-2000, $284,500. The Plaintiff has no proof that these were in fact actual

amounts wired by Israel, since his bank records have not been provided despite repeated requests.

There is no evidence of separate loan agreements being made each time a wire was dispersed as is proper business protocol for loans. In his deposition, he stated that he simply advanced money to the corporation whenever his son requested it. According to Israel, "I assumed that they were going to use it for the functions necessary to maintain the corporation." (See Exhibit S) Israel also points out that there were no real corporate formalities observed and that the annual meetings were nothing more than a phone call to say that Robert Polansky was still the President (See Exhibit T).

Despite contentions to the contrary, Israel was deeply involved in the day to day operations of OSM. First, Israel is copied on an employment contract with Donald Wainright. Robert makes it clear that Israel must approve of the terms and conditions of Robert Polansky's offer to pick up any loss of money from the sale of Donald Wainright's home. Second, Israel Polansky is a signatory on the corporate account. Third, Israel is aware of the SEC ruling against his son yet he apparently takes no documented actions regarding the ATM withdrawals, bank teller transactions occurring monthly while employees checks are being returned for insufficient funds. Israel also apparently does not inform any of these potential investors of such transactions. Moreover, the OSM account is kept thinly capitalized resulting in constant returned checks for insufficient funds. Also, in trying to attract new investors, promotional materials demonstrate that Israel Polansky is the "Chairman of the Board", who "brings a wealth of experience to the Company" Corporation (See Exhibit U ). Finally, despite his

affidavit that he no longer could keep funding OSM, Israel claims to have sent wires of money to OSM as late as Spetember 2004 (See Exhibit )

**ARGUMENT**

    a.    **Piercing the Corporate Veil**

"The issue of whether the corporate veil is pierced presents a question of fact." Angelo Tomasso, Inc. v. Armor Const. & Paving, Inc. 187 Conn. 544, 561(1982). Connecticut courts have established two rules for piercing the corporate veil: the instrumentality rule and the identity rule. Zaist v. Olson 154 Conn. 563, 575 (1967). Under the instrumentality rule, a plaintiff must prove three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.(Internal citations omitted)

Id.

The instrumentality rule applies where a corporate entity is controlled by an individual who uses the corporate fiction to perpetrate fraudulent or wrongful acts or to avoid contractual or personal liability. As to the second element of the instrumentality test, the individual will be held liable if he has: "[E]xercised complete domination over a corporation in total disregard of its existence as a separate entity. We have found such misconduct, even absent fraud or illegality, when the individual in control has used a corporate instrumentality to avoid personal liability that he had previously assumed.

(Internal citations omitted) Zaist v. Olson, supra, 154 Conn. at 578; Campisano v. Nardi 212 Conn. 282, 292-293 (1989).

A wrongful act or breach of duty is sufficient to remove the protections of the corporate shell from the principle even in the absence of criminal conduct. A corporate officer may not use the corporation to shield herself from liability for, "[a] fraud or wrong ... the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights" Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 187 Conn. at 553.

"The instrumentality rule merely requires the trial court to find that the defendants committed an unjust act in contravention of the plaintiff's legal rights." Toshiba America Medical Systems, Inc. v. Mobile Medical Systems, Inc. 53 Conn. App. 484, 491-492, (1999). In Toshiba America, the court held that where a corporate officer diverted company revenue to prevent the payment of corporate contractual obligations, the corporate veil should be pierced. Id. At 491.

The identity theory is a parallel theory often applied to hold an individual accountable for the liabilities of the corporation or to hold one corporation liable for the obligations of another which it controls. Zaist, supra, 154 Conn. 563 at 576. Where an individual or corporation has such control over a corporate entity that it has no independent identity, "[a]n adherence to the fiction of separate identity would serve only to defeat justice and equity." Id.

Summary Judgment should enter against OSM Communications, Inc., and Israel Polansky and Robert Polansky individually as officers, principles and primary beneficiaries of said corporation because said Polansky Defendants maintained absolute

domination and control over the OSM corporation from the time of its formation, they failed to observe only the slightest of corporate formalities, they used the corporate shell to avoid personal and contractual liability and to perpetrate frauds and statutory violations which resulted in damages to against the Plaintiffs. Anne Polansky as a financial beneficiary of this scheme must also not be shielded from personal liability because of this corporate sham.

OSM was a continuation of ISA which attempted to defraud investors of $40 million dollars of their money. Israel Polansky has between the two companies ISA and OSM contributed at least $1.9 million dollars with the continued goal of attracting large investment dollars from third parties. Israel Polansky directed the finances of this company and attempted to avoid personal liability by allowing his son to be named President/CEO. Israel kept the accounts of OSM thinly capitalized to shelter monies while engaged in this business. Israel did not take any action to prevent Robert Polansky's continued withdrawals of monies meant for the continued operations of the company such as the payment of salaries, benefits and guaranteed bonuses to OSM's employees. Israel's complete domination of this company directly led to the harms being suffered by the former employees of OSM.

### b. Breach of Contract

The employment Agreement made between OSM and Donald Wainright and the employment Agreement made between OSM and Deborah Russo-Williams were both binding contracts that obligated OSM to pay specific amounts for the continued labor and services of the Plaintiffs. OSM has breached its contractual duties by not paying its

employees but rather using money in its accounts to satisfy personal and individual needs of its principals. As a consequence of its contract breach Donald Wainright has suffered an amount of not less than $256,637.01. As a result of its contract breach Deborah Russo-Williams has suffered an amount owing to her under the contract of not less than $86,475.00.

### c. Statutory Violations

OSM has violated Connecticut General Statutes §§ 31-71b and 31-72 by not paying the agreed to salaries, bonuses, benefits and other agreed to monies of its employees. Pursuant to Connecticut General Statute §31-71b, "[E]ach employer, by himself, his agent or representative, shall pay weekly all moneys due each employee on a regular pay day, designated in advance by the employer, in cash, by negotiable checks or, upon an employee's written request, by credit to such employee's account in any bank which has agreed with the employer to accept such wage deposits." Connecticut General Statute § 31-72 provides for damages as such "[W]hen any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71j inclusive ... such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action. There is sufficient evidence to show that monies for salaries and related benefits were not paid to the plaintiff employees by OSM. Accordingly, double damages, attorneys fees and costs should be rendered in favor of the plaintiffs pursuant to §31-72.

**CONCLUSION**

Those counts of the Plaintiffs complaint that sound in personal guarantees made by Israel Polansky and those sounding in fraudulent inducement still present issues of disputed facts. Accordingly, the plaintiff does not move for summary judgment on those counts. The Plaintff does contend, however, that those counts sounding in breach of contract, and violations of Connecticut General Statutes § 31-71b and 31-72 have enough facts not in dispute that clearly demonstrate that the Plaintiffs are entitled to summary judgment as a matter or law. Moreover, such summary judgment should enter in not only against the Defendant OSM Inc., but also judgment should be rendered against Israel Polansky, Robert Polansky and Anne Polansky as individuals who have attempted to hide behind the corporate form while denying the Plaintiffs their agreed to pay and other benefits. Respectfully, the Plaintiff so moves this court.

THE PLAINTIFFS

BY /s/
Robert E. Arnold III
Law Offices of Robert E. Arbold LLC
205 Church Street
New Haven, CT
TEL 203-777-3000
FAX 860-224-04000
Federal Bar CT#18093
arnoldlawfirm@msn.com

## CERTIFICATION

This is to Certify that a copy of the foregoing was mailed, postage prepaid, of August 7, 2005, to:

By mail to Counsel for Defendants Robert Polansky and OSM Communications, Inc
Michael P. Goldsmith
38 West 21st Street
New York, NY 10010-6977

By mail to Counsel for Defendants Israel Polansky and Anne Polansky
J. Michael Sulzbach
385 Orange Street
New Haven, CT 06511

Karen Haley, Esq.
419 Whalley Avenue
New Haven, Connecticut

**Original to: United States District Court, District of Connecticut**
**915 Lafayette Boulevard**
**Bridgeport, Connecticut 06604**

BY:

Robert E. Arnold III
Law Offices of Robert E. Arbold LLC
205 Church Street
New Haven, CT
TEL 203-777-3000
FAX 860-224-04000
Federal Bar CT#18093
arnoldlawfirm@msn.com