UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONALD WAINRIGHT, ET AL., | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs; | : | 3:01-CV-02158 (WWE) |
| | : | |
| V. | : | |
| | : | |
| OSM COMMUNICATIONS, INC., | : | |
| ET AL; | : | |
| | : | JULY 27, 2005 |
| Defendants; | : | |

PLAINTIFF'S LOCAL RULE 56(a)1 STATEMENT

Pursuant to new local rule 56(a)1 effective May 1, 2005, Plaintiff hereby submits a listing of facts that Plaintiff argues are not entirely in dispute and are based on documents and/or statements obtained in discovery and depositions. Plaintiff concedes that Defendants have never agreed to the amounts allegedly owing to the Plaintiffs in this action for unpaid wages, severances and bonuses etc. Plaintiff reserves the right to put on other testimony at trial if summary judgment is not granted

**FACTS**

1.  In 1986, Israel and Robert Polansky, as father and son, started a corporation known as In-Store Advertising, Inc., ("ISA"). <u>This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS – KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact. This part of OSM's promotional materials that were given to potential investors.</u>

2.  Israel served as a member of the Board for ISA between 1986 through 1991. Israel put up the original $500,000 for start-up costs for ISA <u>This is not a</u>

1

    disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS – KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact.

3. Robert Polansky served as President of ISA, he put none of his own money into ISA. This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS – KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact.

4. ISA was a retailer of advertising services that used monitors placed in retail stores to reach customers in promoting its clients. This is not a disputed fact, both Defendants have testified about the business functions of ISA.

5. In 1990, ISA attempted to go public with an initial public offering.

6. Immediately thereafter, Robert Polansky became the target of a Securities and Exchange Commission ("SEC") criminal investigation. Exhibit B is the SEC official release which details the ISA investigation and findings to which Robert did not contest to an injunction being granted.

7. The SEC complaint filed against Robert Polansky, Et Al., alleged that he violated the antifraud and record keeping provisions of the federal securities laws in connection with ISA 1990 initial public offering of $40 million in common stock. According to the SEC complaint, ISA's IPO materially misstated its net income to make the company appear more profitable than it actually was prior to the IPO. In particular, ISA's revenues were shifted forward in periods before the July 1990 IPO and were then shifted back and

       decelerated in the period after the IPO. The complaint alleged that, to conceal the fraud, Polansky, ISA's president, chairman and chief executive officer, had falsified contracts that were used to prepare financial statements presented in connection with the IPO. The complaint also alleged that material misrepresentations were made by ISA in its offering materials regarding the effectiveness of its advertising. <u>Exhibit B is the SEC official release which details the ISA investigation and findings to which Robert did not contest to an injunction being granted.</u>

8. This matter was resolved when on the same day the SEC filed its complaint, Robert Polansky and his accomplices consented to the entry of permanent injunctions prohibiting them from committing future violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5, 13b2-1 and 13b2-2. <u>Exhibit B is the SEC official release which details the ISA investigation and findings to which Robert did not contest to an injunction being granted. See specifically paragraph 2 of this release</u>

9. In 1993 ISA's assets were all purchased by an outside corporation known as Electronic Marketing and Retail Communications Inc., ("EMARC"). <u>This matter does not appear to be disputed</u>

10. On June 10, 1993, around the same time that ISA and Robert Polansky were being investigated by the SEC, Israel Polansky and Robert Polansky formed a second corporation known as OSM Communications Inc., ("OSM") under the laws of the State of Delaware <u>Exhibit C are three of the Corporate Documents</u>

3

<u>for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application.</u>

11. Per the incorporation documents, Israel Polansky was issued 93% of the issued shares and was named as a Director. Robert Polansky was named president of OSM Communications Inc., and he received 7% of the issued shares. No other Board members named. <u>Exhibit C are three of the Corporate Documents for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application.</u>

12. The purpose of this corporation was to provide for the "selling of satellite systems in the retail environment." <u>Exhibit C, OSM Inc SS-4 Application line 13.</u>

13. In short, OSM was formed to carry on the business of the debunked ISA. <u>Exhibit C, OSM Inc SS-4 Application line 13. Also deposition testimony of Israel Polansky will confirm this statement of fact</u>

14. On April 18, 1996 OSM purchased back its original ISA business from the then current owner VALASSIS. <u>Exhibit D is page 7 of the Purchase Agreement between VALASSIS and OSM. The entire Agreement can be reproduced if necessary.</u>

15. As a condition of the VALASSIS purchase agreement, OSM had to obtain a $250,000 line of credit. <u>Exhibit D is page 7 of the Purchase Agreement</u>

4

between VALASSIS and OSM. Section 5.6 discusses this obligation as to the line of credit

16. OSM did obtain this line of credit from Ameristar Capital Corporation , which was a business apparently operating out of the same office and suite as OSM. OSM never used this line of credit even though it could have borrowed against it to pay back some of its debts. Exhibit E is an April 18, 1996 letter describing the terms of a line of credit for $250,000 from Ameristar Capital Corporation to OSM.  The Address of Ameristar Capital Corporation is 444 Madison Avenue, Suite 303, New York, NY.  This is the same exact address used by OSM Communications Inc.  Robert Polansky has testified at deposition that he never used this line of credit money.

17. On July 23, 1996, OSM was successful in soliciting Plaintiff Donald Wainright, who was living in Michigan with his family at the time, to become an employee of OSM.  Exhibit F is a facsimile dated July 23, 1996 detailing the agreed to terms of employment between OSM and Donald Wainright.

18. A facsimile entitled "Employment Contract" set forth the following terms of employment to begin on September 3, 1996.  The base salary was set at $100,000.00.  Donald Wainright was to be paid a "25% guaranteed bonus" each year and full medical benefits.  Also, Donald Wainright was to have his moving expenses covered and a "bonus to be expanded to cover shortfall in the sale of house vs. purchase price (Polansky approval needed)." Exhibit F is a facsimile dated July 23, 1996 detailing the agreed to terms of employment between OSM and Donald Wainright.

19. This promise to pay for such losses and the other terms of the employment agreement were later reduced to a written contract entitled "Employment Agreement" dated October 4, 1996 and October 7, 1996 and was signed by both Robert E Polansky and Donald Wainright <u>Exhibit G is an Employment Agreement between Donald Wainright and OSM/Robert Polansky</u>

20. Donald Wainright eventually sold his Michigan home at a loss. <u>Testimony of Donald Wainright, Janet Wainright and home sales records. See Also Exhibit G Subsection 3g.</u>

21. OSM and the Polanskys breached their agreement to Donald Wainright and his wife Janet because they never compensated them for their economic loss. <u>Testimony of Donald Wainright, Janet Wainright and home sales records. See Also Exhibit G Subsection 3g</u>

22. During his employment with OSM Donald Wainright experienced several bounced employment checks, of which $24,315.71 worth were never reissued to Donald Wainright <u>Exhibit H is photo-static copies of bounced checks from OSM to Donald Wainright.</u>

23. Sometime in November 2000, after not paying him for months, Donald Wainright was terminated by OSM. Additionally, OSM never paid Donald Wainright his guaranteed 6 months of severance per his Contract. <u>Exhibit G is the Employment Agreement between Donald Wainright and OSM/Robert Polansky. Refer to page 5 sub-section 5(a)(ii).</u>

24. On August 3, 1996, OSM successful solicited Deborah Russo-Williams to enter into an employment agreement with OSM for the position of Art

6

Director. The terms of that Agreement were that Deborah would receive a salary of $60,000 a year, and a guaranteed annual bonus of at least 20% and health benefits. <u>Exhibit I is a facsimile dated August 3, 1996 detailing the agreed to terms of employment between Deborah Russo-Williams and Donald Wainright.</u>

25. Starting in 1997, Deborah Russo-Williams experienced several bounced payroll checks. <u>Exhibit K are photo-static copies of bounced checks from OSM to Deborah Russo-Williams. These records come from Deborah Russo-Williams Provident Bank Account #163019071</u>

26. In June 1998, Deborah Russo-Williams had received offers for alternative employment. <u>Deposition Testimony of Deborah Russo-Williams</u>

27. It is disputed by the Defendants, that Deborah had a direct in-person conversation with Israel Polansky, about her future with the company wherein Israel guaranteed to personally pay her future salaries if she agreed to stay with the company. <u>Deposition Testimony of Deborah Russo-Williams</u>

28. Following this alleged conversation, a second employment Agreement was made between Deborah Williams and OSM on July 15, 2005 increasing her yearly salary from $65,000 to $75,000. Also per the Agreement, the company recognized that it had not paid its original bonus of $13,000 and agreed to make for one year, bi-weekly payments of $500, the balance to be paid in full once an investor funds the company. <u>Exhibit I is a facsimile dated July 15, 1998 detailing the agreed to terms of employment between Deborah Russo-Williams and Donald Wainright.</u>

7

29. Despite the assurances and increases in her pay, Deborah Russo-Williams continued to experience returned payroll checks for insufficient funds and in December 2000 she was terminated after the company failed to pay her for more than two and a half months <u>Deposition Testimony of Deborah Russo-Williams. See also Exhibit I.</u>

30. To date, an excess of $21,875 in payroll has not been paid to Deborah Russo-Williams. <u>Deposition Testimony of Deborah Russo-Williams. See also Exhibit I.</u>

31. Deborah Russo-Williams was also never paid her last two years of bonuses totaling $30,000 and has incurred other expenses for health benefits as detailed in the Complaint she filed. <u>Deposition Testimony of Deborah Russo-Williams. See also Exhibit I.</u>

32. At deposition, Robert Polansky was questioned about a facsimile showing that on October 28, 1996 Israel Polansky had opened a bank account for OSM at US Trust Bank located at 560 Common Wealth Avenue, Boston, MA <u>Exhibit L is a Xerox copy of a facsimile between Terri Narc of US Trust Kenmore Square Office Boston, MA.</u>

33. Moreover, per that facsimile Israel Polansky was the only signatory on the account from October 28, 1996 through January 22, 1997.

34. Robert Polansky disputed that Israel was ever a signatory on the account, however, he rhen subsequently stated that he was not a signatory on the account that Robert was "aware of" and finally stated that "he had no

comment" as to this document. <u>Exhibit M, Deposition of Robert Polansky starting page 67 line 20, p 68 line 20 and page 68 lines 12 and 20</u>

35. In sum, Robert Polansky never fully denied the legitimacy of the document or the presence of his January signature there upon. <u>Exhibit M, Deposition of Robert Polansky starting page 67 line 20, p 68 line 20 and page 68 lines 12 and 20</u>

36. Since Russo-Williams began working for OSM in August 1996 and Donald Wainright started working in September 1996, Israel Polansky must have been personally involved in writing checks to OSM employees, because Robert would not have been authorized on the account to do so and no earlier account has been disclosed to Plaintiffs. <u>This is conjecture based on the evidence, the bank records were only recently disclosed to Plaintiffs who have not had any other opportunity to re question the Defendants.</u>

37. The OSM banking records, or as much of the records that have been disclosed, contain several reoccurring monthly transactions where funds which were wired into the account are being liquidated into cash by ATM withdrawals or by tellers at various Banks including Chase, Citibank, Toyoko, Citizens Bank, Interbank, etc. These monthly withdrawals are as high as $10,241 (occurring in June 1998, See Exhibit N) but usually averaged between $5,000 and $8,000 per month. <u>Exhibit N, is a copy of the bank records of First Union National Bank for OSM vor the month of June 1998. This record shows excessive ATM withdrawals, which is solid evidence of OSM co-mingling of funds. .</u>

9

38. To illustrate these withdrawals, the last five months of the records provided the following: in March 2000 withdrawals equal $5,870; in April 2000 withdrawals equal $9,450; in May 2000 withdrawals equal $6,711; in June 2000 withdrawals are for $6,407 and in July there is $4723 withdrawn. <u>Exhibit O is the bank ATM and check card withdrawals for the last five months for which records were provided. Exhibit O could easily be supplemented with the remaining records for each of the five months discussed and/or for every month that OSM had money siphoned through ATM withdrawals. Exhibit O is kept limited for convenience to the court.</u>

39. Additionally, there are several non-business expenses that the corporation is paying. It is obvious and evident from the records that Robert Polansky used the corporate account to purchase clothing from tailors, groceries, meals at neighborhood restaurants such as Parma, home items at Gracious Homes, gifts for his wife from Yves St, Laurent and Tiffany's, etc. <u>The bank records show every month multiple expenses which are almost definitely personal in nature and located at the neighborhood vicinity of the Defendants Robert and Anne Polanskys' apartment</u>

40. At deposition Robert Polansky clearly admits that he would at times use the corporate funds to pay for his family's expenses. <u>Deposition of Robert Polansky pp 68-69 starting at line 23</u>.

41. It is clear from the records, that these withdrawals and personal expenditures often caused OSM to bounce its employees payroll checks. <u>See Bank Records Generally.</u>

42. Finally, these withdrawals are never reflected on Robert Polansky's tax returns in fact, in Year 2000 Robert Polansky reports a loss on his K-1 of $14,547. Exhibit Q shows that Robert and Anne Polansky suffered a loss from Robert's ownership share of OSM.  However, since there is more than $32,000 being drawn from ATM and bank tellers in the last five months of Year 2000 the loss does not appear accurate.

43. These withdrawals are also not reflected by the joint tax returns filed by both Robert and Anne Polansky.  Note the following income being reported for the following years: Year 1996 reported $11,895;  Year 1997 $3,288;  Year 1999 a loss of $1,810.18. Exhibit R shows the various tax returns and parts of returns that the Polansky's finally produced.  None of these returns show any evidence of tax-free ATM withdrawals on average between $8,000 and $5,000 being made month after month.

44. Also, of interest is the Schedule A for Year 1999, which clearly shows a deduction for home mortgage interest points of $4210.24.  This is of particular importance since Robert Polansky at his deposition has stated that there is no mortgage on his home. See Exhibit R, page 7 schedule A Tax Year 1999

45. Israel Polansky was a successful businessman having been the president of a successful company, namely the American Paper Box Company in Newton, MA. This is not a disputed fact, both Defendants have testified about the origins of ISA.  Exhibit A is a document called "BIOS – KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this

11

fact. This part of OSM's promotional materials that were given to potential investors.

46. The extent of Israel Polansky's wealth is unknown since he has never provided copies of his actual tax returns or bank records. To date, Israel Polansky has only provided copies of his K1 schedules for the years in question.

47. Israel Polansky involvement with the OSM began in 1986 when Israel personally paid $500,000 to start ISA. This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS – KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact. This part of OSM's promotional materials that were given to potential investors.

48. That $500,000 was used in hopes of raising $40 million dollars through a fraudulently designed IPO. Exhibit B is the SEC official release, which details the ISA investigation and findings to which Robert did not contest to an injunction being granted. This document states that the amount of the IPO was for $40,000,000.00

49. As with OSM Robert Polansky was named to all the top executive positions and Israel was named to the Board. Exhibit C are three of the Corporate Documents for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application

50. Sometime after the SEC began investigating ISA, Israel ended his Board membership with ISA in 1991. <u>Exhibit B is the SEC official release, which details the ISA investigation and findings to which Robert did not contest to an injunction being granted. This document states that the amount of the IPO was for $40,000,000.00</u>

51. During the sell-off of the assets of ISA, Israel with his son Robert created a second company to carry on ISA's original goal of attracting large investment dollars to a unique advertising business. Again, Robert Polansky was made President/CEO of the business and Israel was a Director. . <u>Exhibit C are three of the Corporate Documents for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application</u>

52. OSM as incorporated was 93% owned by Israel. . <u>Exhibit C are three of the Corporate Documents for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application</u>

53. The money that OSM used to operate between 1996 and 2000 was drawn perhaps exclusively from Israel's private accounts since the wires recorded in the banking records are similar to the amounts that Israel claims to have wired to the company and had taken tax losses for during those years. <u>See Bank records Generally.</u>

54. Those amounts being: in 1996, $208,800; in 1997, $371,650; in 1998, $394,300 and in 1999-2000, $284,500. The Plaintiff has no proof that these were in fact actual amounts wired by Israel, since his bank records have not been provided despite repeated requests.

55. There is no evidence of separate loan agreements being made each time a wire was dispersed, as is proper business protocol for loans. In his deposition, he stated that he simply advanced money to the corporation whenever his son requested it. According to Israel, "I assumed that they were going to use it for the functions necessary to maintain the corporation." <u>Exhibit S, Israel Polansky Deposition starting at Page 8 line 20.</u>

56. Israel also points out that there were no real corporate formalities observed and that the annual meetings were nothing more than a phone call to say that Robert Polansky was still the President. <u>Exhibit T, Israel Polansky Deposition starting at Page 16 line 17.</u>

57. Plaintiffs contend that despite contentions to the contrary, Israel was deeply involved in the day to day operations of OSM.

58. It appears that Israel was copied on an employment contract with Donald Wainright. Robert makes it clear that "Polansky" must approve of the terms and conditions of Robert Polansky's offer to pick up any loss of money from the sale of Donald Wainright's home. <u>Exhibit F is a facsimile dated July 23, 1996 detailing the agreed to terms of employment between OSM and Donald Wainright.</u>

59. Israel Polansky is a signatory on the corporate account. <u>Exhibit L is a Xerox copy of a facsimile between Terri Narc of US Trust Kenmore Square Office Boston, MA.</u>

60. Israel is aware of the SEC ruling against his son yet there is no evidence that he takes no documented actions regarding the ATM withdrawals, bank teller transactions occurring monthly while employees checks are being returned for insufficient funds. <u>There is simply no evidence to the contrary</u>

61. There is no evidence that Israel informed any potential investors of such cashing out transactions involving the corporate account. <u>There is simply no evidence to the contrary</u>

**62.** The OSM account is kept thinly capitalized resulting in constant returned checks for insufficient funds. Also, in trying to attract new investors, promotional materials demonstrate that Israel Polansky is the "Chairman of the Board", who "brings a wealth of experience to the Company" Corporation <u>This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS – KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact. This part of OSM's promotional materials that were given to potential investors. See Also, Exhibit U which is the organizational chart also part of OSM promotional materials clearly shows Israel at the top of the corporate chart as Chairman of the Board</u>

63. Finally, despite his affidavit that he no longer could keep funding OSM, Israel claims to have sent wires of money to OSM as late as September 2004

15

Exhibit T, Israel Polansky Deposition starting at Page 14 line 14 through Page 16 line 3.

                        THE PLAINTIFFS

                        BY_____
                        Robert E. Arnold III
                        Law Offices of Robert E. Arbold LLC
                        205 Church Street
                        New Haven, CT
                        TEL 203-777-3000
                        FAX 860-224-04000
                        Federal Bar CT#18093
                        arnoldlawfirm@msn.com

<u>CERTIFICATION</u>

This is to Certify that a copy of the foregoing was mailed, postage prepaid, of August 8, 2005, to:

By mail to Counsel for Defendants Robert Polansky and OSM Communications, Inc
Michael P. Goldsmith
38 West 21st Street
New York, NY 10010-6977

By mail to Counsel for Defendants Israel Polansky and Anne Polansky
J. Michael Sulzbach
385 Orange Street
New Haven, CT 06511

Karen Haley, Esq.
419 Whalley Avenue
New Haven, Connecticut

Original to: United States District Court, District of Connecticut
915 Lafayette Boulevard
Bridgeport, Connecticut 06604


BY:

_____
Robert E. Arnold III
Law Offices of Robert E. Arbold LLC
205 Church Street
New Haven, CT
TEL 203-777-3000
FAX 860-224-04000
Federal Bar CT#18093
arnoldlawfirm@msn.com