UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONALD WAINRIGHT, ET AL., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| | : | 3:01-CV-02158 (WWE) |
| v. | : | |
| | : | |
| OSM COMMUNICATIONS, INC., ET AL., | : | |
| | : | |
| Defendants. | : | September 8, 2005 |

### AFFIDAVIT OF ROBERT E. POLANSKY IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT OF
### DEFENDANTS ROBERT E. POLANSKY AND
### OSM COMMUNICATIONS, INC. AND
### IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY PLAINTIFFS

State of New York        )
                         )    ss.:
County of New York       )

Robert E.Polansky being duly sworn, deposes and says:

1.    I am one of the defendants and was the President of the corporate
defendant, OSM Communications, Inc., in the above-captioned action.  I am personally
familiar with all the facts and circumstances previously had herein and I submit this
affidavit in support of my application and OSM Communications, Inc.'s ("OSM
Communications") application for Summary Judgment pursuant to Rule 56(c) of the
Federal Rules of Civil Procedure.

2.    The complaint in this action was brought by two (2) former employees of
defendant OSM Communications, Inc., Donald Wainright ("Wainright") and Deborah

Russo-Williams ("Russo-Williams") as well as the wife, Janet Wainright, of the employee Wainright.

## Factual Background

3.     The complaint assets four causes of action against defendants OSM Communications, Inc. Robert Polansky, Israel Polanksy and Anne Polansky who is my wife.  I was an officer (the President) and minority (7%) shareholder of defendant OSM Communications.  Israel Polansky (my father) was the majority shareholder and loaned substantial sums of money to OSM Communications over a period of approximately four (4) years to help re-stage the company.  Anne Polansky is my wife and had absolutely no relationship to OSM Communications.

4.     In summary, the plaintiffs seek to recover unpaid wages, bonus and benefits from all the defendants.  To do so, in recognition of the fact that defendant OSM Communications is no longer a functioning entity, they seek to pierce the corporate veil and thus allege that they were fraudulently induced to accept employment with defendant OSM Communications based on representations made to them by me and my father, Israel Polansky.  The plaintiffs further allege that the individual defendants purposely kept OSM Communications undercapitalized to reap personal benefits and shield themselves from liability for personal obligations.  Nothing could be further from the truth.

5.      As was established in discovery, Israel Polansky lent defendant OSM Communications in excess of $1,100,000.00.  It cannot be disputed but that of this sum in excess of $747,036.00 was paid to both Wainright and Russo-Williams.

6.      Under these circumstances it is difficult to understand how the plaintiffs can claim, without making up stories out of whole cloth, that we used the proceeds for our own personal benefit and that they were fraudulently induced to accept employment regardless of what was said to them.  Rather, it seems readily apparent that it was the plaintiffs who achieved personal benefits from the payment of the aforementioned wages, not the defendants.

7.      At the time plaintiffs Wainright and Russo-Williams commenced employment with OSM Communications; OSM Communications had just acquired a nationwide network of programmable L.E.D. signs that existed on-site in supermarkets but there was no communication link to manage the signs.  OSM Communications hoped to raise capital to establish a link to the signs.  Many million of dollars were required for this communication link.  It was OSM Communications intention then, through delivery by a satellite network, to sell advertising space on the L.E.D. signs that would then be viewed by grocery/convenience store shoppers in the stores at the time they were making decisions about their purchases.

8.      In 1996 OSM Communications acquired the assets for its business from a company called Valassis Communications.  At that time OSM also acquired the opportunity to offer employment to plaintiff Donald Wainright then a Valassis employee.  After purchasing the Valassis assets, I also hired Deborah Russo-Williams,

another former employee.  Both plaintiffs knew the circumstances of Valassis winding down the business and OSM's purchase of the Valassis assets and further they were intimately familiar with OSM's proposed business operations, including the prior history of ISA.  They also knew that the purchase of the Valassis' assets was accomplished to take possession of an existing infrastructure of the core advertising business that Valassis had shut down.  They also knew that OSM Communications was a "start-up" company needing millions of dollars to set up a communication link with the signs and to create a vast network of employees to service the signs and that the initial funding would come from Israel Polansky principally to pay their salaries.  With this knowledge they still elected to enter into employment with OSM Communications.

9.     In their complaint, Wainright and Russo-Williams claim to have received specific assurances about salary and bonus payments and thus Wainright sold his home in Michigan and did continue to faithfully perform his employment obligations. Separately, Russo-Williams alleges that Israel Polansky agreed to personally guarantee OSM Communications' financial obligations to her and based upon those alleged assurances Russo-Williams did continue to be employed.

10.    In their motion for summary judgment, plaintiffs make unsupported allegations combined with conjecture, innuendo and false statements regarding my involvement with another company, In-Store Advertising, Inc. for the sole and express purpose of trying to convince this court that by tainting my conduct it might influence the court in this action.  The plaintiffs have misconstrued the events that took place over

fifteen (15) years ago.  Their overtly inflammatory innuendo compels me to address their comments and set the record straight.

11.      I founded In-Store Advertising, Inc. ("ISA") in 1988 and was President-CEO and member of the board of directors until June 1991.

12.      My father, Israel Polansky, provided funding for the Company with a cash infusion of $500,000.00 and served on the Board of Directors until June 1991 when he chose to resign when my contract with ISA was not renewed.  He was 80 years old at the time.

13.      Israel Polansky served as Chairman of the Board for less than a year solely to assist with the start up of the company.  He was never an officer of the company.

14.      ISA received its first funding, other than from Israel Polansky, in 1989 and within six months my father and I no longer controlled ISA.  In fact, our equity position continually was diminished as additional influxes of capital were taken in by ISA.

15.      With the additional investment of capital, ISA was eventually controlled by a Board of Directors made up of the principal corporate investors and these individuals aggressively micromanaged ISA.   Representatives of the following investor/companies served on the Board of Directors at that time including, but not limited to, Chemical Ventures (now Chase Ventures), Merrill Lynch Capital Markets, Technology Funding, The SC Johnson Family/Wind Point Venture Group and ABC/Cap Cities.

16.      ISA went public in August of 1990.  Prior to the initial IPO Robert E. Polansky and Israel H. Polansky each owned approximately 6% of ISA.  After the IPO

the Polanskys stake in ISA was reduced resulting in each of us owning approximately 2.6% of the outstanding stock in ISA.

17.    I had very little to do with the initial public offering of ISA.  The chief financial officer, Mr. John Capps, who reported directly to the Board of Directors on this matter, bypassing me entirely, managed the initial public offering.

18.    At that time, all the financial affairs were handled by the Chief Financial Officer, John Capps, and ISA's books were continually audited by a top ten accounting firm, then known as Peat Marwick and Partners under the auspices of a Board directed audit committee.

19.    At the time of the IPO a total of $42 million was raised through the efforts of Bear Sterns.  $9 million in lease lines, approximately $10 million from the venture capital community with a $20 million line of credit from the Canadian Imperial Bank and $1 million line of credit from Society Bank of Connecticut.  Prior to the IPO, ISA raised approximately $50 million from private venture groups to fund its operations.

20.    It is a matter of public record that the Securities and Exchange Commission commenced an investigation into the initial public offering of ISA and targeted me as well as other officers/management of the company.

21.    Being one of the targets in the investigation left me in a unique position to know the facts.

22.    The Board of ISA, rather than settle with the Securities and Exchange Commission attributed their wrongdoing to me and other officers/management of the

company. As a result we faced not only investigation by the SEC but also criminal investigation by the United States Attorney for the Southern District of New York.

23. After four (4) arduous years the SEC complaint was resolved on the same date it was filed by the execution of a consent decree by me and the other officers under investigation. The SEC demanded that I execute the non-compliance document which in summary stated that the SEC did not know if I did anything wrong but if I did I had to agree in writing not to do it again. Thus an injunction was entered against me.

24. In addition, and not mentioned by the plaintiffs, the ISA Board later settled with the SEC, not for the $4 million fine negotiated by me, but for $9.5 million. I did not participate in the negotiation of the later settlement.

25. The United States Attorney for the Southern District of New York concluded its investigation finding no wrongdoing.

26. At no time was any wrongdoing proven against me. I never acknowledged any wrongdoing to the SEC or the United States Attorney for the Southern District of New York. Rather, to save money and pursuant to the advice of counsel, I signed the non-compliance document and permitted the entry of an injunction. If I had known then in 1993, that the Internet would make press release of the resolution of the investigation so readily available to anyone looking for it, I would have found the funds to complete my successful fight to protect my name and my innocence.

27. Today, as then, I am able to be an officer of a public company and I have no restrictions whatsoever lingering from the ISA investigation.

28.     Of significance is that Wainright and Russo-Williams knew the complete history of the ISA investigation for they lived through it and were interviewed by various investigators.  Even with this knowledge of my supposed nefarious conduct, they still chose to accept employment at OSM Communications.

29.     In 1990, ISA had approximately 65 employees.

30.     Wainright was hired by ISA in approximately 1989 or 1990.  Russo-Williams was hired by ISA in 1989.

31.     When ISA moved to Detroit Michigan in 1993, Wainright remained an employee and moved with the company.  Russo-Williams chose not to move and, I believe, found other employment locally.

32.     After I left ISA I worked on other projects and sold satellite systems for GTE.

33.     What happened at ISA occurred over fifteen (15) years ago and is many years removed from the activities of OSM Communications.  Thus it has absolutely no bearing on what happened at OSM Communications.


**The Complaint**

34.     In the First Cause of Action Wainright claims to be due the sum of $256,637.01 and Russo-Williams claims to be due the sum of $86,475.00 arising out of OSM Communications alleged failure to pay wages, bonus, benefits and reimbursement of expenses.  Plaintiffs assert that the individual defendants are liable due to the fact that OSM Communications is merely an alter ego and instrumentality of the individual

defendants.  A copy of the complaint was filed on November 19, 2001 and is listed on the Docket as Entry Number 1.

35.     In the Second Cause of Action plaintiffs allege that OSM Communications failure to pay wages at least once a month represents a violation of Section 31-71b of the Connecticut General Statutes.  Plaintiffs claim that OSM Communications failure to pay them was willful entitling Wainright to damages of $256,637.01 and Russo-Williams to damages of $54,475.00 plus reasonable attorneys fees and damages equal to twice the amount of wages, benefits and bonus found to be due. Once again Plaintiffs assert that the individual defendants are liable due to the fact that OSM Communications is merely an alter ego and instrumentality of the individual defendants.

36.     In the Third Cause of Action Plaintiffs allege that to accept employment and remain an employee of OSM Communications both Israel Polansky and Robert Polansky personally guaranteed OSM Communications financial obligations to them. Plaintiffs claim Israel Polansky failed to honor his obligations to them and allege that Israel Polansky is liable to Wainright in the amount of $256,637.01 and Russo-Williams in the amount of $86,475.00.

37.     In the Fourth Cause of Action Plaintiffs allege that they were fraudulently induced to accept employment with defendant OSM Communications by Robert Polansky and Israel Polansky misrepresenting the financial condition of OSM Communications.  Plaintiffs allege that Israel Polansky and Robert Polansky were acting in their capacity as officers and directors of OSM Communications at the time they made the representations.     Plaintiffs allege that as a result of the

misrepresentations Wainright has been damaged in the amount of $256,637.01 and Russo-Williams has been damaged in the amount of $86,475.00 which damages should be trebled.

38.     In the Fifth Cause of Action, Wainright alleges that both Israel Polansky and Robert Polansky agreed to reimburse him for expenses incurred in relocating from Michigan to Connecticut.  Wainright alleges that Israel Polansky and Robert Polansky were acting in their capacity as officers and director of OSM Communications at the time they made this promise.  Wainright alleges he is entitled to reimbursement of $41,821.30.  Plaintiff Janet Wainright claims entitlement to relief upon the sole allegation that she also owned the Michigan home.


## Answer to Complaint

39.     Defendants responded to the complaint by denying the material allegations of the complaint and asserting four counterclaims directed against plaintiffs Wainright and Russo-Williams.  A copy of the answer with counterclaims was filed on March 28, 2003 and is listed on the Docket as Entry Number 2.

40.     In the first counterclaim OSM asserted, among other things, that both plaintiffs breached their duty of good faith and loyalty to OSM, that by their conduct they harassed me, that they sought outside business opportunities which conflicted with their duties to OSM, that Wainright failed to install certain software owned by OSM on OSM computers and that Wainright removed this software from OSM's premises, Wainright destroyed computer files and Russo-Williams set passwords on

her computer blocking OSM from gaining access to the information on her computer all causing damages to the defendant OSM.

41.    In the second counterclaim, OSM asserted that Wainright's actions constituted a breach of his employment contract and the loss of business income and business opportunities.

42.    In the third counterclaim, OSM asserted that Wainright's actions constituted a theft of OSM's property and the loss of business income and business opportunities.

43.    In the fourth counterclaim, OSM asserted that Russo-Williams actions depriving OSM of its property constituted negligence and the loss of business income and business opportunities.

44.    OSM moves for summary judgment on liability at this juncture due to the fact that the plaintiffs' admitted their conduct during the course of their deposition testimony thereby obviating the need for a trial on liability.


## Summary Judgment should be resolved in favor of the defendants

### (a)    Claim of Janet Wainright

45.    It must be noted that I never had any substantive conversations with Janet Wainright.

46.    I made no promises to Janet Wainright and Janet Wainright is not an intended third party beneficiary of any communication that I had with plaintiff Donald Wainright.  Consequently, Janet Wainright's claim lacks merit, is not based upon any

factual premise that supports any known claim at law and summary judgment must be awarded to me disposing of her cause of action.

### (b)   Claim of Donald Wainright

47.   As to plaintiff Wainright, he admitted in his deposition testimony that he was concerned about defendant OSM Communications being a start-up company but that based upon representations made solely by me about defendant OSM Communications he resigned his position at Valassis In-Store Advertising, Inc.   See Page 35 of the transcript of the deposition testimony of Donald Wainright dated February 24, 2004 attached hereto as Exhibit "A".

48.   Presumably that was all the due diligence that Wainright felt necessary to undertake with regard to his concerns about the new venture.   Of course, this decision was made in light of the fact that Wainright had previously been an employee of In-Store Advertising, a company that was run by me when Wainright worked there as an employee.

49.   Wainright also admitted that at the height of OSM's business, in addition to me, there were only three other employees, Wainright, Russo-Williams and Dan Georgetti.   Eventually Mr. Georgetti left leaving only Wainright and Russo-Williams as the employees.

50.   To be blunt, it did not take a genius to realize that not only was OSM Communication's business not growing but rather that the business was shrinking as contracts with supermarket chains were expiring and not being renewed because of the

failure of the new venture to obtain the required outside funding necessary to maintain and/or refurbish the equipment previously installed then, for years, neglected by Valassis. Indeed it was one of the major objectives of both Wainright and Russo-Williams to assist in the process of raising the millions of dollars necessary to keep OSM Communications functioning. Their continued presence demonstrated to potential investors that OSM Communications had an existing and knowledgeable organization that just needed an infusion of cash to get up and running again.

51.     At no time were either Wainright or Russo-Williams indentured servants of OSM Communications. If they were unhappy about any aspect of the business, they were always free to seek other employment. If they were unsure of OSM Communication's future or otherwise concerned about receipt of their salary, they were free to move on.

52.     In spite of the defects in OSM Communications they hung around.

53.     But more importantly, for the purposes of this motion, Wainright executed a contract with OSM Communication and Russo-Williams became at at-will employee for OSM Communications, which was based in New York, and they both performed their duties in New York. As demonstrated by the W-2 forms, attached hereto as Exhibit "E" all New York City local and state taxes were paid with regard to payroll given to the plaintiffs.

54.     All activities of OSM Communications took place in New York. There is no nexus with Connecticut other than the fact that Wainright lives there. Connecticut employment statutes are simply inapplicable to the facts of the case at bar.

55.     But perhaps most significantly, Wainright's employment contract in

pertinent part states:

> 8. (f)   THIS AGREEMENT SHALL BE GOVERNED BY,
> AND SHALL BE CONSTRUED ACCORDING TO, THE
> INTERNAL LAWS OF THE STATE OF NEW YORK AS
> APPLICABLE TO AGREEMENTS TO BE WHOLLY
> PERFORMED THEREIN.   THE EXECUTIVE HEREBY
> CONSENTS TO THE JURSIDICTION OF THE COURTS OF
> THE STATE OF NEW YORK, COUNTY OF NEW YORK,
> AND THE UNITED STATES DISTRICT COURT FOR THE
> SOUTHERN DISTRICT OF NEW YORK AND HEREBY
> WAIVES ANY CLAIM THAT NEW YORK COUNTY OR
> THE SOUTHERN DISTRICT OF NEW YOPRK IS AN
> INCONVENIENT FORUM.

Thus not only is the District Court of Connecticut the wrong jurisdiction to decide this

dispute there is, by Wainright's prior agreement and consent, no basis for the court to

apply Connecticut statutes or law to decide the case at bar.

56.     Wainright's employment contract was entered into with defendant OSM

Communications, Inc. on November 4, 1996.  See Exhibit "B" attached hereto.  Rather

than pay Wainright his moving expenses, in June 1997 I sent Wainright a memorandum

increasing his salary by $2,000.00 per month (to cover his moving expenses) and

advising him that the company would pay no bonuses until new venture capital could

be found.   A condition of the change to the employment contract was Wainright's

acceptance of the increased salary.  Wainright accepted the increase and continued to

work with his employment modified.  See Exhibit "C" attached hereto.

57.     Wainright's only legitimate claim was to get paid on a timely basis.  It

must be conceded that defendant OSM Communications did indeed make payment of

its salary obligations although admittedly sometimes late.   OSM Communications

continued to make payments to the plaintiffs until both plaintiffs ceased giving their full time commitment to the business and walked out on OSM Communications.

58.     When the plaintiffs left the company they admitted that they sabotaged the OSM Communications computers that they were given to use by putting password codes into the computers, failed to give me the passwords thereby precluding me from having access to the computers.  They also took operating software that belonged to the company from the company's premises.  By doing so the plaintiffs effectively shut down the business and prevented it from securing replacement employees who could learn the business in their absence.

59.     Their warped rationale was that they were justified in harming the equipment.  To the contrary, this wrongful conduct alone precludes them from any recovery in this action.

60.     At no time did I ever guarantee the payment of Wainright's or Russo-Williams' salary, which under New York law, was an obligation of defendant OSM Communications and to be assumed by me had to have been in writing.  See New York General Obligations Law § 5-701 (a)(1) and (a)(2) set forth in pertinent part:

### § 5-701. Agreements to be in writing

a.     Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1.     By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime;

        2.     Is a special promise to answer for the debt, default or miscarriage of another person;

### (c)    Claim of Deborah Russo-Williams

61.    Russo-Williams was nothing more than an at-will employee whose employment was confirmed in a memorandum written by me on defendant OSM Communications stationary.  See Exhibit "D" attached hereto.  She also was familiar with me having been an employee of In-Store Advertising when I ran the company.

62.    There is no question that both Wainright and Russo-Williams were valuable employees whose continued involvement was important to the corporation.  But no one – neither Israel Polansky nor I was in a position to personally guarantee payment of funds to OSM Communications, Wainright or Russo-Williams.

63.    As has been documented in discovery, Israel Polansky lent OSM Communications in excess of $1,100,00.00.  No less than $747,036.00 or almost seventy percent (70%) of these funds was paid to Wainright and Russo-Williams in salaries and benefits.

64.    And just like with Wainright, at no time did I ever guarantee the payment of Russo-Williams' salary, which under New York law, was an obligation of defendant OSM Communications and to be assumed by me had to have been in writing.

65.    The plaintiffs' claims certainly begs the question - What else could they possibly be entitled to?

66.    Additionally, I did nothing to overreach my position as President of defendant OSM Communications as it pertained to Wainright and Russo-Williams.

With the limited money available I made sure their salaries were paid for as long as I could. But it should be remembered that OSM Communications had a goal and it was not simply to pay Wainright and Russo-Williams forever.

67.     Israel Polansky was never an officer of OSM Communications and never received a financial benefit except for tax losses on his income tax. He never signed a company check to pay a company obligation. He had no knowledge or control over the operations of OSM Communications. He was simply a passive investor who remained in Massachusetts with his wife. It was because of his experience and reputation that he was listed on the corporation as a director as his presence would lend credibility to OSM's Communications efforts to attract other investors.

68.     We were a small company and I was the authorized signatory on the accounts. Mr. Herb Padob, a CPA, handled the accounting for the company. There were no other employees because OSM Communications had no business. The plaintiffs can point to no action other than their own feelings of entitlement and their desire to convince the court that they are entitled to money they did not earn is the sole basis of this lawsuit. Attached hereto as Exhibit "E" are copies of memos sent by me to Wainright and Russo-Williams complaining about their lack of commitment to their employment functions, which resulted in their forfeiture of their employment. Never once did they respond to my letters leaving the clear implication that what I wrote was in fact, true.

69.     In order for the plaintiffs to successfully pierce the corporate veil and seek personal liability against me they must establish through documentary evidence that I

so totally dominated OSM Communications that I abused the privilege of doing business as a corporation and that I used this domination and control to commit an injustice against the plaintiffs.

70.     OSM Communications offered the plaintiffs employment and paid them in excess of $747,036.00 for their loyalty and commitment.  That is all.

71.     As time went on and the business did not pick up it was not incumbent on the corporation, its officers or shareholders to continue the business simply to pay plaintiffs' salaries or to guarantee continuing payments of salary to the plaintiffs. Employment is not an entitlement, as these plaintiffs would have this court hold.

72.     It is beyond the pale to suggest that I was not entitled to take any money from the corporation to do that which was necessary to meet with, entertain and attract new investors.  The money that Israel Polansky put into the business was intended to keep the corporation minimally functional and included funds for the payment of rent, phones, supplies, entertainment, etc.  And, as stated above the plaintiffs received no less than $747,036.00 of those monies.  This represents approximately seventy percent (70%) of the funds invested in the company and direct loss to Israel Polansky when funding for the company could not be secured.  See the employees W-2s attached hereto as Exhibit "F".

73.     At no point have the plaintiffs demonstrated – nor can they demonstrate – that I disregarded the corporate formalities.  I had an office with a lease, telephone lines and a bank account in OSM Communications' name.  OSM Communications had an accountant.  OSM filled out its corporate books.  All these activities are respectful of

corporate formalities.  In fact, as a director of the company, Israel Polansky participated in annual meetings and gave his advice when I sought it.  But the advice I sought never related to the payment or non-payment of the salaries or benefits of the plaintiffs.

74.     That I made cash withdrawals from ATM machines is irrelevant and proof of nothing.  My cash withdrawals were used to maintain the business of OSM Communications.  OSM Communications was on a cash basis with all of its vendors and the cash was used to pay corporate obligations.  All payments were justified to OSM Communications' accountant, Mr. Herb Padob, who unfortunately passed away last year.

75.     I did not take cash from OSM Communications bank account to dilute the company of cash and deprive the plaintiff of their salaries.  I took cash to pay bills.

76.     As a result, I am entitled to an order of this court granting me summary judgment against the plaintiffs and disposing of their complaint against me personally.

77.     In 2000, coincident with OSM Communications ceasing operations and Israel Polansky's personal finances not permitting further funding of OSM Communications, Israel Polansky stopped contributing funds except to advance funds to OSM Communications for the express purpose of making payments to attorneys who represented both Israel Polansky and OSM Communications for a short period of time.

78.     Ann Polansky had no role whatsoever in OSM Communications and no assets or thing of value belonging to OSM Communications was ever transferred to her.

**OSM Communications is entitled to Summary Judgment on its Counterclaim**

79.     Starting with Wainright, under oath, he admitted the following:

(a)     Testifying about his role in the customization of the software used to

communicate with the advertising signs placed in stores Wainright stated:

> During  .  .  .  We talked earlier about the software that was
> written to communicate with the signs directly in the stores
> by hooking up a computer, that was done during my
> employment with OSM.  Prior to that the last customization
> in terms of the operational software for the company that
> transmitted to the signs was done for Valassis
> Communications.

Page 84 (lines 23-25) and Page 85 (lines 1-4).

(b)     Testifying about his possession of the proprietary software:

> Q.     Do you today have any software or data that was
> contained on those computers?
>
> A.     Again, if I have copies that were backed up, I'm not
> aware of where they are, but it's entirely possible that
> during the years at OSM that I made back-ups for safety
> purposes, yes.
>
> Q.     And took them home?
>
> A.     To store them off site, yes.

Page 87 (lines 4-11)

> .  .  .
>
> Q.     At any point were you requested to return any
> software or discs that were owned by OSM?
>
> A.     Yes, as described in those letters that I received from
> Mr. Polansky following my departure from OSM.

Q.     Upon receipt of those letters did you do anything in response to look for such items?

A.     No.

Page 88 (lines 10-17)

(c)     Testifying about passwords to access OSM computers:

Q.     When you left did you deliver your passwords to OSM?

A.     No.

Page 89 (lines 14-16)

.  .  .

Q.     Explain to me the difference between an exchange of what you felt was owed to you and the passwords and a quid pro quo?

A.     All I'm saying is that the letters that I received from Mr. Polansky after I had stopped coming in to the New York office were for my to return whatever he felt that I had that belonged to the company.  And when I received that letter from him I consulted my attorney who advised me not to do anything.

Page 90 (lines 13-22)

.  .  .

A.     I think at the time that the request was made I would have remembered in my head what the password was.

Q.     And at the present time you have no recollections?

A.     I do not.

Page 92 (lines 1-6)

Q.      Now, one last point on the passwords.  Do you know if Deborah Russo Williams knew of your password or you of her's?

A.      We exchanged passwords.

Q.      Do you know if either of your passwords were shared with Mr. Polansky during the course of your employment?

A.      I do not know.

Q.      Do you know if yours were?

A.      I don't believe so.

Q.      When you say you don't believe so . . . .

A.      I don't recall.

Page 94 (lines12-23).  See the aforesaid pages of the deposition transcript of Donald

Wainright dated February 24, 2004 attached hereto as Exhibit "G".

80.      With regard to Russo-Williams, under oath, she admitted the following:

Q.      Now, how did one gain access to your computer at OSM when you weren't there?

A.      I had it password protected.

Q.      And so that when you left if one didn't have that password one couldn't have access to the computer or the data base, could they?

A.      I think you can get access to some things, just not everything.  I think some of the more official stuff I hid on the computer.

(Page 58, lines 17-25).

Q.      You hid on the computer?

A.      Well, It was password protected on the computer.

Q.   And did anyone else at OSM know the password?

A.   No.

Q.   Did you ever communicate the password to anyone else at OSM?

A.   No.

Q.   So that when you left taking the password with you OSM could no longer have access to much of its data base and software, isn't that correct?

A.   I think so.  I don't remember exactly what was protected and what wasn't.

(Page 59, lines 1-14).  See the aforesaid pages of the deposition transcript of Deborah Russo-Williams dates March 1, 2004 attached hereto as Exhibit "H".

Q.   The question was though: did you return the things that the memorandum requested?

A.   I guess officially not everything.

Q.   And what didn't you return?

A.   Well, the passwords that you brought up.

(Unnumbered page between 59 and 60, lines 4-8).  See the aforesaid pages of the deposition transcript of Deborah Russo-Williams dates March 1, 2004 attached hereto as Exhibit "H".

81.   It is clear that both Wainright and Russo-Williams precluded OSM Communications' access to its computers and the corporate information contained thereon.

82.     To the date of this motion this information has never been supplied to OSM Communications.

83.     As a result thereof, OSM Communications is entitled to summary judgment on liability with regard to the unlawful taking of its property by the plaintiffs.

84.     In sum:

(a)      Robert E. Polansky is entitled to summary judgment on the first cause of action due to a complete failure of the plaintiffs to prove that OSM Communications was merely an alter ego and instrumentality of the individual defendant.  The corporate defendant paid the plaintiffs' salaries for four (4) years as well as paying their taxes to the United States of America, the State of New York and the City of New York.

(b)      Robert E. Polansky and OSM Communications, Inc. are entitled to summary judgment on the second cause of action as there is no legal basis for the court to apply Connecticut's own statutes to employment circumstances that occurred solely within the State of New York.

(c)      Robert E. Polansky is entitled to summary judgment on the third cause of action due to the fact that New York law requires that one who answers for the debt of another must do so in writing.  Plaintiffs' parole evidence, made up out of whole cloth does not meet this standard.

(d)      Robert E. Polansky is entitled to summary judgment on the fourth cause of action due to the fact that plaintiffs received the benefit or their bargain

and suffered no damage by accepting employment with defendant OSM Communications.

(e)     Robert E. Polansky is entitled to summary judgment on the fifth cause of action due to the fact that plaintiffs have set forth no admissible evidence that Robert E. Polansky individually took on the corporate obligation as alleged by the plaintiffs, which obligation, under New York Law had to be in writing.

(f)     OSM Communications is entitled to summary judgment on liability on the first counterclaim due to plaintiffs' admissions as recounted above in paragraphs 79 and 80.

(g)     OSM Communications is entitled to summary judgment on liability on the second counterclaim due to plaintiffs' admissions s recounted above in paragraphs 79 and 80.

(h)     OSM Communications is entitled to summary judgment on liability on the third counterclaim due to plaintiffs' admissions s recounted above in paragraphs 79 and 80.

(i)     OSM Communications is entitled to summary judgment on liability on the fourth counterclaim due to plaintiffs' admissions s recounted above in paragraphs 79 and 80.

WHEREFORE it is respectfully submitted that defendant Robert E. Polansky is

entitled to summary judgment in his favor as there is no real factual dispute or question

of law involved in this matter exposing his to personal liability to the plaintiffs and

summary judgment in favor of the defendant OSM Communications on liability arising

out of plaintiffs theft of corporate assets.  In addition thereto, defendant Robert E.

Polansky requests that this court award him his reasonable attorneys fees and the costs

and disbursements incurred in the defense of this action.


Robert E. Polansky

Sworn to before me this
8 th day of September 2005


Michael P. Goldsmith

MICHAEL P. GOLDSMITH
Notary Public, State of New York
No. 02GO4759534
Qualified in New York County
Commission Expires Sept. 30, 2006

26

## CERTIFICATE OF SERVICE

This is to certify that on this 8th day of September 2005, a copy of the foregoing Affidavit of Robert E. Polansky in Support of Motion for Summary Judgment and the Exhibits attached thereto was deposited in the United States mail, first-class, postage prepaid, addressed to:

Robert E. Arnold, Esq.                          J. Michael Sulzbach, Esq.
Law Offices of Robert E. Arnold, LLC            385 Orange Street
205 Church Street, Suite 310                    New Haven, CT 06511
New Haven CT 06510-1805

_____
Michael P. Goldsmith, Esq.