EXHIBIT G

19      A.    They were simply applications written to run

20  on those computer systems.

21      Q.    What do those applications specifically do?

22      A.

23  files in a data base so they can be retrieved based on

24  the locations they were being sent to.

25      Q.    Okay.  Now, so over time is it fair to say

DEL VECCHIO REPORTING
203-245-9583

84

1  that there would be an accumulation of data regarding

2  the signs and information that would be inputted on

3  them?

4      A.    Yes, it was accumulated into a data base.

5      Q.    Okay.  Now, it seems that there are two

6  different sets of values: one would be the operational

7  software that actually runs the system, and then

8  there's the data base that has, let's say, proprietary

9  business information?

10      A.    Yes.

11      Q.    Now, who did the customization that made

12  that software run?

13      A.    The programmers that worked for OSM, or the

14  programmers that worked for incarnations of the

15  company before OSM.

16      Q.    Was there any additional customization after

17  OSM took over the business?

18     A.   No.

19     Q.   Did you develop any of the customizations?

20     A.   Pieces of it, yes.

21     Q.   When was the last time you developed

22  customizations to it?

23     A.   During.... We talked earlier about software

24  that was written to communicate with the signs

25  directly in the stores by hooking up a computer, that

DEL VECCHIO REPORTING
203-245-9583

85

1  was done during my employment with OSM.  Prior to that

2  the last customization in terms of the operational

3  software for the company that transmitted to the signs

4  was done for Valassis Communications.

5     Q.   Now, when OSM purchased the business from

6  Valassis, did they purchase just the hardware and

7  software or the business itself?

8     A.   I don't know specifically how to answer

9  that.  They purchased the assets of the company.

10     Q.   Okay.  Did the assets include the software

11  and the hardware?

12     A.   Yes, they did.

13     Q.   And how was the hardware and software

14  physically transported to OSM from Michigan?

15     A.   It was shipped from the Michigan

16  headquarters of Valassis to OSM's warehouse in

17  Bridgeport, Connecticut.

18    Q.    Whose job was it to make sure it got there?

19    A.    Jeff Mount.

20    Q.    Did you have any duties with respect to that

21    transfer?

22    A.    No, I did not, aside from the dismantling of

23    the software in the computer room to prepare it for

24    shipping.

25    Q.    Was the software licensed?  Was there a


DEL VECCHIO REPORTING
203-245-9583


86

1    company that owned the proprietary rights to it?  Was

2    there any licensing agreements, to your knowledge?

3    A.    It was owned by Valassis at the time and

4    then purchased from them, but there was.... to my

5    knowledge I don't know of any document.

6    Q.    Okay.  Do you know if it was sold to any

7    other entities?

8    A.    No, I don't know that it was.  I don't

9    believe it was.  I don't know for a fact.

10    Q.    Okay.  During the course of your employment

11    at OSM did you develop any modifications to any

12    software that you claim are yours?

13    A.    No.

14    Q.    Do you currently have any copies of any

15    software or data that were used by OSM during your

16    employment?

17      A.    I don't believe I have it.  I can't say for

18  a fact that there are no copies in existence on the

19  floppy discs somewhere.  But I believe that all copies

20  of the software that were not the copies installed on

21  the hardware are in residence at the warehouse in

22  forms of back-up copies.

23      Q.    When you were at OSM did you utilize stand

24  alone PCs?

25      A.    Yes.

Case 3:01-cv-02158-WWE    Document 123    Filed 09/09/2005    Page 5 of 13

DEL VECCHIO REPORTING
203-245-9583


                                                    87

1      Q.    When you left your employment did you take

2   possession of any of them and leave with them?

3      A.    No.

4      Q.    Do you today have any software or data that

5   was contained on those computers?

6      A.    Again, if I have copies that were backed up,

7   I'm not aware of where they are, but it's entirely

8   possible that during the years at OSM that I made

9   back-ups for safety purposes, yes.

10     Q.    And took them home?

11     A.    To store them off site, yes.

12     Q.    Were you requested by OSM to take copies of

13  proprietary software to your home?

14     A.    I would not have taken any copies of

15  proprietary software because we did not have any

16  proprietary software installed on our personal

17    computers.

18         Q.    So then what.... Or I guess I'm confused.

19    What did you think you could possibly have taken for

20    security

21         A.    Simply copies of spread sheets that I had

22    been working on and would work on at home, but copies

23    so that if there was a catastrophic failure we would

24    have something to start with.

25         Q.    When you left employment did you look for

88

1     any of these copies to return them to OSM?

2          A.    No.

3          Q.    On whose discs were those software copies

4     and data copies kept?

5          A.    They would have been my own.

6          Q.    So you would bring in your own discs and

7     copy those?

8          A.    Yes, we had no supplies there to make copies

9     with so it would have been on mine.

10         Q.    At any point were you requested to return

11    any software or discs that were owned by OSM?

12         A.    Yes, as described in those letters that I

13    received from Mr. Polansky following my departure from

14    OSM.

15         Q.    Upon receipt of those letters did you do

16  anything in response to look for such items?

17      A.    No.

18      Q.    Were the computers you operated at OSM

19  protected by password protection?

20      A.    Yes.

21      Q.    Who had access to the passwords at OSM?

22      A.    The passwords?  I would have had access to

23  my passwords; Debbie Russo Williams would have access

24  to her passwords.

25      Q.    Now, when you say passwords, how many


                    DEL VECCHIO REPORTING
                        203-245-9583



                                                89

1   passwords would there be?

2       A.    I don't know, I'm just using it as a term.

3       Q.    Okay, then let me ask specifically regarding

4   your, either the computers or the software that you

5   worked with.  How many programs do you believe had

6   password protection or was it just the initial entry

7   into your computer?

8       A.    I believe it was.... I don't recall

9   specifically.  I believe it was just the initial

10  entry.

11      Q.    Okay.   And just to clarify.  That computer

12  would have been owned by OSM?

13      A.    Yes.

14      Q.    When you left did you deliver your passwords

15  to OSM?

16      A.   No.

17      Q.   Is there any particular reason why you

18 wouldn't have given them your passwords to the

19 computer they owned?

20      A.   Because when I was asked for the passwords I

21 was in contact with my attorney, and at that point I

22 believe we were trying to arrive at some kind of an

23 agreement as to exchange.  I don't want to imply that

24 there was any kind of a ramsom going on but there was

25 no active discussion in terms of returning property

DEL VECCHIO REPORTING
203-245-9583

90

1 and making payments on what was due.

2      Q.   Okay.   Do you believe that one of the

3 conditions....

4      A.   I didn't say that.  All I'm saying is that

5 when I left there was no dialogue, it was simply a

6 demand to return things.  And because there was no

7 dialogue, I felt that my request to deliver what was

8 owed to me should have been included in a

9 conversation.

10      Q.   Sounds awfully like a quid pro quo, I'll

11 give you the passwords if you give me the back-up?

12      A.   That was never said but....

13      Q.   Explain to me the difference between an

14 exchange of what you felt was owed to you and the

15  passwords and a quid pro quo?

16       A.   All I'm saying is that the letters that I

17  received from Mr. Polansky after I had stopped coming

18  in to the New York office were for my

19  whatever he felt that I had that belonged to the

20  company.   And when I received that letter from him I

21  consulted my attorney who advised me not to do

22  anything.

23       Q.   Okay.   And at the present time do you

24  have.... Well, what are the passwords to the computers

25  that you had at that time?


                    DEL VECCHIO REPORTING
                       203-245-9583



                                                   91


1        A.   I don't know.

2        Q.   Do you have any documentation or way of

3   finding out what those passwords are?

4        A.   There's a possibility, yes.   I don't know

5   honestly.

6        Q.   Okay.   And if you were to diligently look

7   for it, how would you go about determining what that

8   password was?

9        A.   I would look to see if I had any notes as to

10  what the passwords were.

11       Q.   And at the time you were having these

12  discussions in which you were prepared at that point

13  to turn over the passwords in exchange for what was

14  owed to you?

15     A.    We never had discussions.

16     Q.    Okay.    At the time that you were

contemplating having the communications....

18     A.    At the time that I was asked, right?

19     Q.    At the time....

20     A.    When I received a letter from Mr. Polansky.

21     Q.    Okay.    At the time that you were requested

22  to turn over what the company had, did you have the

23  capability of turning over that password?

24     A.    Um-hum.

25     Q.    Now, you say that with some assurance.


                    DEL VECCHIO REPORTING
                       203-245-9583



                                                 92


1     A.    I think at the time that that request was

2  made I would have remembered in my head what the

3  password was.

4     Q.    And at the present time you have no

5  recollection?

6     A.    I do not.

7     Q.    Now, with regard to the functioning of the

8  software.  How frequently would OSM have to update the

9  information to the signs?

10     A.    When the company was.... The company was

11  never in operation when it was owned by OSM.   Prior

12  to OSM's acquiring the assets of the company we would

13  communicate with the signs in their locations

14    approximately once a week.

15      Q.   In order to run this software, or in order

16    to run the advertising to do what the customers wanted

17    and were OSM would have to

18    communicate with the signs?

19      A.   Yes.

20      Q.   Would OSM also have to have access to the

21    data base and the software?

22      A.   Yes.

23      Q.   So without passwords that would be

24    impossible?

25      A.   No, all of the software, all of the data


                    DEL VECCHIO REPORTING
                       203-245-9583



                                                93

1    bases, all of the information dealing with the

2    locations of the signs and their installations were

3    contained upon the server, that the last I am aware

4    was in OSM's offices.

5      Q.   And the server was accessed by what?

6      A.   By any user who wishes to use it.

7      Q.   Was the server itself password protected?

8      A.   It was.

9      Q.   And whose password was that?

10      A.   It was the company's password.  And to my

11    knowledge that was never changed from when it was

12    operating under Valassis.

13      Q.   Do you know what that password is?

14    A.    There was one password I know.    There was a

15 production ID that was used by all the people running

16 production jobs to transmit information to the signs.

17 The ID was PROD; p-r-o-d, and the password was

18 process.

19    Q.    So that was one of the passwords for the

20 server?

21    A.    Um-hum.    And that password and ID were

22 written throughout any documentation that was

23 published for the operation of the system.

24    Q.    Now, when you say documentation, that would

25 be the manuals and operational documentation for the


                    DEL VECCHIO REPORTING
                       203-245-9583



                                                         94


1    software that would have been transferred from

2    Valassis to OSM?

3        A.    That was shipped with the computer systems

4    to the warehouse in Bridgeport, Connecticut.

5        Q.    Now, how do you know that those things were

6    shipped with it?

7        A.    Because we physically packed them in boxes

8    and arranged for the shipment of all of that

9    information, of all of those assets, boxes,

10   documentation, cables, wires, computers to the

11   facility in Bridgeport.

12       Q.    Now, one last point on the passwords.    Do

13    you know if Deborah Russo Williams knew of your

14    passwords or you of her's?

15        A.    We exchanged passwords.

16        Q.    Do you know if either of your passwords were

17    shared with Mr. Polansky during the course of your

18    employment?

19        A.    I do not know.

20        Q.    Do you know if yours were?

21        A.    I don't believe so.

22        Q.    When you say you don't believe so....

23        A.    I don't recall.

24        Q.    Now, during your earlier testimony you

25    mentioned how you knew that there was money being


                    DEL VECCHIO REPORTING
                        203-245-9583



                                                95

1    taken out of OSM came through a certain investigation

2    into the finances of OSM?

3        A.    Investigation into the finances?

4        Q.    Inquiries.

5        A.    Okay.

6        Q.    Who made those inquiries?

7        A.    Deborah Williams.

8        Q.    Okay.    Were you aware that she was making

9    these inquiries at the time she was making them?

10        A.    Yes.

11        Q.    Did you ask her to make those inquiries?

12        A.    I certainly would.... I think, yes,