UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONALD WAINRIGHT, ET AL., | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs; | : | 3:01-CV-02158 (WWE) |
| | : | |
| V. | : | |
| | : | |
| OSM COMMUNICATIONS, INC., | : | |
| ET AL; | : | |
| | : | September 8, 2005 |
| Defendants; | : | |

**DEFENDANT OSM COMMUNICATIONS, INC. AND ROBERT E. POLANSKY'S
RESPONSE TO
PLAINTIFFS' LOCAL RULE 56(a)1 STATEMENT**

Defendants, OSM Communications, Inc. and Robert E. Polansky hereby submit their response to the listing of facts that Plaintiff argues are not entirely in dispute and are based on documents and/or statements obtained in discovery and depositions. Defendants concur with Plaintiffs' concession that Defendants have never agreed to the amounts allegedly owing to the Plaintiffs in this action for unpaid wages, severances and bonuses etc.

For the sake of clarity, Defendants have listed each of Plaintiffs' proposed undisputed facts and set forth their response immediately thereafter.

**FACTS**

1.  In 1986, Israel and Robert Polansky, as father and son, started a corporation known as In-Store Advertising, Inc., ("ISA"). <u>This is not a disputed fact both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS - KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact. This part of OSM's promotional materials that were given to potential investors.</u>

Defendants' Response:        This is not a disputed fact.

2.        Israel served as a member of the Board for ISA between 1986 through 1991. Israel put up the original $500,000 for start-up costs for ISA <u>This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS - KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact.</u>

Defendants' Response:        This is not a disputed fact.

3.        Robert Polansky served as President of ISA, he put none of his own money into ISA.   <u>This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS - KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact.</u>

Defendants' Response:        This is not a disputed fact.

4.        ISA was a retailer of advertising services that used monitors placed in retail stores to reach customers in promoting its clients. <u>This is not a disputed fact, both Defendants have testified about the business functions of ISA.</u>

Defendants' Response:        It is not disputed that ISA was a retailer of advertising services.  It is disputed that ISA used monitors.  ISA used one color (red) two line scrolling LED (light emitting diodes) message boards in stores.  See affidavit of Robert E. Polansky submitted in support of motion for summary judgment sworn to the 8th day of September 2005 paragraph 7. (Hereinafter referred to as (Polansky Affidavit").

5.        In 1990, ISA attempted to go public with an initial public offering.

Defendants' Response:        This is a disputed fact.  ISA did not attempt to go public it actually did go public in July/August 1990.  See Polansky Affidavit paragraph 16.

6.        Immediately thereafter, Robert Polansky became the target of a Securities and Exchange Commission ("SEC") criminal investigation. <u>Exhibit B is the SEC official release which details the ISA investigation and findings to which Robert did not contest to an injunction being granted.</u>

Defendants' Response:        This is a disputed fact.  The SEC investigation commenced some five (5) months after the public offering.  Robert E. Polansky was not the sole target of the investigation.  The SEC was investigating the actions of all members of the Board, its officers and management group.  See Polansky affidavit paragraph 20.

7.      The SEC complaint filed against Robert Polansky, Et Al., alleged that he violated the antifraud and record keeping provisions of the federal securities laws in connection with ISA 1990 initial public offering of $40 million in common stock. According to the SEC complaint, ISA's IPO materially misstated its net income to make the company appear more profitable than it actually was prior to the IPO. In particular, ISA's revenues were shifted forward in periods before the July 1990 IPO and were then shifted back and decelerated in the period after the IPO. The complaint alleged that, to conceal the fraud, Polansky, ISA's president, chairman and chief executive officer, had falsified contracts that were used to prepare financial statements presented in connection with the IPO. The complaint also alleged that material misrepresentations were made by ISA in its offering materials regarding the effectiveness of its advertising. <u>Exhibit B is the SEC official release which details the ISA investigation and findings to which Robert did not contest to an injunction being granted.</u>

Defendants' Response:      This is a disputed fact, as it is not supported by admissible evidence.  Robert E. Polansky did contest the charges for there was no proof of any wrongdoing committed by Robert E. Polansky.  Robert E. Polansky permitted the entry of the injunction after an arduous and very costly four (4) year investigation to put an end to the process.  Robert E. Polansky did not contest the SEC's request for an injunction because it did not call for any affirmative admissions, sanctions or other penalties and did not preclude Robert E. Polansky from becoming an officer of a public company or be on the board of a public company.  See Polansky affidavit paragraphs 23, 25-27.


8.      This matter was resolved when on the same day the SEC filed its complaint, Robert Polansky and his accomplices consented to the entry of permanent injunctions prohibiting them from committing future violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 1 Ob-5,13b2-l and 13b2-2. <u>Exhibit B is the SEC official release which details the ISA investigation and findings to which Robert did not contest to an injunction being granted. See specifically paragraph 2 of this release</u>

Defendants' Response:      This is a disputed fact, as it is not supported by admissible evidence.  It is undisputed that on the day the SEC filed its complaint without admitting any wrongdoing, Robert E. Polansky did consent to the entry of a permanent injunction prohibiting future violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5, 13b-2-1 and 13b2-2.  The injunction makes no reference to "accomplices".


9.      In 1993 ISA's assets were all purchased by an outside corporation known as Electronic Marketing and Retail Communications Inc., ("EMARC"). <u>This matter does not appear to be disputed</u>

Defendants' Response:        This is not a disputed fact.

10.        On June 10,1993, around the same time that ISA and Robert Polansky were being investigated by the SEC, Israel Polansky and Robert Polansky formed a second corporation known as OSM Communications Inc., ("OSM") under the laws of the State of Delaware <u>Exhibit C are three of the Corporate Documents for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application.</u>

Defendants' Response:        This is not a disputed fact..

11.        Per the incorporation documents, Israel Polansky was issued 93% of the issued shares and was named as a Director. Robert Polansky was named president of OSM Communications Inc., and he received 7% of the issued shares. No other Board members named. <u>Exhibit C are three of the Corporate Documents for QSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from QSM Minute Book provided by the Defendant and a copy of the QSM Inc SS-4 Application.</u>

Defendants' Response:        This is not a disputed fact.

12.        The purpose of this corporation was to provide for the "selling of satellite systems in the retail environment." <u>Exhibit C, OSM Inc SS-4 Application line H</u>

Defendants' Response:        This is not a disputed fact.

13.        In short, OSM was formed to carry on the business of the debunked ISA. <u>Exhibit C, OSM Inc SS-4 Application line 13. Also deposition testimony of Israel Polansky will confirm this statement of fact</u>

Defendants' Response:        This is a disputed fact.  OSM did not market is advertising services to supermarkets but rather pursued other venues.  See Polansky affidavit paragraphs 7-8.

14.        On April 18,1996 OSM purchased back its original ISA business from the then current owner VALASSIS. <u>Exhibit D is page 7 of the Purchase Agreement between VALASSIS and OSM. The entire Agreement can be reproduced if necessary.</u>

Defendants' Response:        This is not a disputed fact.  The assets of Valassis were purchased for $50,000.00.  Several months before the purchase Valassis had shut operation of the sign

4

network having no connectivity to the signs or revenue stream.  See Polansky affidavit paragraph 8.

15.     As a condition of the VALASSIS purchase agreement, OSM had to obtain a $250,000 line of credit.  <u>Exhibit D is page 7 of the Purchase Agreement between VALASSIS and OSM. Section 5.6 discusses this obligation as to the line of credit</u>

Defendants' Response:        This is not a disputed fact.

16.     OSM did obtain this line of credit from Ameristar Capital Corporation, which was a business apparently operating out of the same office and suite as OSM. OSM never used this line of credit even though it could have borrowed against it to pay back some of its debts.  <u>Exhibit E is an April 18. 1996 letter describing the terms of a line of credit for $250.000 from Ameristar Capital Corporation to OSM. The Address of Ameristar Capital Corporation is 444 Madison Avenue, Suite 303, New York. NY. This is the same exact address used by OSM Communications Inc. Robert Polansky has testified at deposition that he never used this line of credit money.</u>

Defendants' Response:        This is not a disputed fact except for the allegation that OSM could have borrowed against the credit line to pay debts.  This second allegation is not supported by admissible evidence.

17.     On July 23,1996, OSM was successful in soliciting Plaintiff Donald Wainright, who was living in Michigan with his family at the time, to become an employee of OSM.  <u>Exhibit F is a facsimile dated July 23,1996 detailing the agreed to terms of employment between OSM and Donald Wainright.</u>

Defendants' Response:        This is not a disputed fact.  The circumstances of Mr. Wainright's employment were that Valassis gave Mr. Wainright possession of the software to control the LED signs with instructions to install and interface the software for OSM.  Mr. Wainright requested employment with OSM for he had worked for Robert E. Polansky at ISA and was fully familiar with all company details and aspects of the business.  See Polansky affidavit paragraph 8.

18.     A facsimile entitled "Employment Contract" set forth the following terms of employment to begin on September 3,1996.  The base salary was set at $100,000.00. Donald Wainright was to be paid a "25% guaranteed bonus" each year and full medical benefits. Also, Donald Wainright was to have his moving expenses covered and a "bonus to be expanded to cover shortfall in the sale of house vs. purchase price (Polansky approval needed)."  <u>Exhibit F is a facsimile</u>

dated July 23,1996 detailing the agreed to terms of employment between OSM and Donald Wainright.

Defendants' Response:        This is not a disputed fact.


19.    This promise to pay for such losses and the other terms of the employment agreement were later reduced to a written contract entitled "Employment Agreement" dated October 4,1996 and October 7,1996 and was signed by both Robert E Polansky and Donald Wainright Exhibit G is an Employment Agreement between Donald Wainright and OSM/Robert Polansky

Defendants' Response:        This is not a disputed fact.


20.    Donald Wainright eventually sold his Michigan home at a loss. Testimony of Donald Wainright Janet Wainright and home sales records. See Also Exhibit G Subsection 3g.

Defendants' Response:        This is not a disputed fact.


21.    OSM and the Polanskys breached their agreement to Donald Wainright and his wife Janet because they never compensated them for their economic loss. Testimony of Donald Wainright Janet Wainright and home sales records. See Also Exhibit G Subsection 3g

Defendants' Response:        This is a disputed fact.


22.    During his employment with OSM Donald Wainright experienced several bounced employment checks, of which $24,315.71worth were never reissued to Donald Wainright Exhibit H is photo-static copies of bounced checks from OSM to Donald Wainright.

Defendants' Response:        This is a disputed fact.  The checks were not reissued but rather replacement checks were provided and Mr. Wainright was paid until he failed to come to the office and do his job.  See Polansky affidavit paragraph 68.


23.    Sometime in November 2000, after not paying him for months, Donald Wainright was terminated by OSM. Additionally, OSM never paid Donald Wainright his guaranteed 6 months of severance per his Contract. Exhibit G is the Employment Agreement between Donald Wainright and OSM/Robert Polansky. Refer to page 5 sub-section 5(a)(ii).

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.  Termination was justified when Mr. Wainright ceased to perform his job functions, became destructive, refused to provide software and made negative comments (as did Deborah Russo-Williams) to potential investors and all others who called the office.  See Polansky affidavit paragraph 68 and Exhibit "E" attached to the affidavit.

24.    On August 3,1996, OSM successful solicited Deborah Russo-Williams to enter into an employment agreement with OSM for the position of Art Director. The terms of that Agreement were that Deborah would receive a salary of $60,000 a year, and a guaranteed annual bonus of at least 20% and health benefits. Exhibit I is a facsimile dated August 3,1996 detailing the agreed to terms of employment between Deborah Russo-Williams and Donald Wainright.

Defendants' Response:        This is a disputed fact.  Ms. Russo-Williams solicited Robert E. Polansky.  She worked under Mr. Polansky for three years at ISA.  See Polansky affidavit paragraph 8.

25.    Starting in 1997, Deborah Russo-Williams experienced several bounced payroll checks. Exhibit K are photo-static copies of bounced checks from OSM to Deborah Russo-Williams. These records come from Deborah Russo-Williams Provident Bank Account #163019071

Defendants' Response:        This is not a disputed fact.

26.    In June 1998, Deborah Russo-Williams had received offers for alternative employment. Deposition Testimony of Deborah Russo-Williams

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

27.    It is disputed by the Defendants, that Deborah had a direct in-person conversation with Israel Polansky, about her future with the company wherein Israel guaranteed to personally pay her future salaries if she agreed to stay with the company. Deposition Testimony of Deborah Russo-Williams

Defendants' Response:        Defendants agree that this is a disputed fact, as it is not supported by admissible evidence.

28.    Following this alleged conversation, a second employment Agreement was made between Deborah Williams and OSM on July 15,2005 increasing her yearly salary from $65,000 to $75,000. Also per the Agreement, the company recognized that it

had not paid its original bonus of $13,000 and agreed to make for one year, bi-weekly payments of $500, the balance to be paid in full once an investor funds the company. <u>Exhibit I is a facsimile dated July 15, 1998 detailing the agreed to terms of employment between Deborah Russo-Williams and Donald Wainright.</u>

**Defendants' Response:**     It is a disputed fact that an employment agreement was made with Ms. Russo-Williams and there is no admissible evidence to sustain the conclusion that Ms. Russo-Williams was employed pursuant to a written employment agreement. Ms. Russo-Williams was an at-will employee of OSM. It is not disputed that paragraph 28 recites the terms of Ms. Russo-Williams employment.

29.     Despite the assurances and increases in her pay, Deborah Russo-Williams continued to experience returned payroll checks for insufficient funds and in December 2000 she was terminated after the company failed to pay her for more than two and a half months <u>Deposition Testimony of Deborah Russo-Williams. See also Exhibit I.</u>

**Defendants' Response:**     This is a disputed fact, as it is not supported by admissible evidence. Ms. Russo-Williams was terminated when she ceased to perform her duties as an employee, stole the software, password protected a company computer and failed to come to the office. See Polansky affidavit paragraph 68.

30.     To date, an excess of $21,875 in payroll has not been paid to Deborah Russo-Williams. <u>Deposition Testimony of Deborah Russo-Williams. See also Exhibit I.</u>

**Defendants' Response:**     This is a disputed fact, as it is not supported by admissible evidence.

31.     Deborah Russo-Williams was also never paid her last two years of bonuses totaling $30,000 and has incurred other expenses for health benefits as detailed in the Complaint she filed. <u>Deposition Testimony of Deborah Russo-Williams. See also Exhibit I.</u>

**Defendants' Response:**     This is a disputed fact and is not supported by admissible evidence.

32.     At deposition, Robert Polansky was questioned about a facsimile showing that on October 28,1996 Israel Polansky had opened a bank account for OSM at US Trust Bank located at 560 Common Wealth Avenue, Boston, MA <u>Exhibit L is a Xerox copy of a facsimile between Terri Narc of US Trust Kenmore Square Office Boston, MA.</u>

Defendants' Response:        This is a disputed fact.  Robert E. Polansky did not recollect that Israel Polansky had signed the proffered document.  It is a fact that Israel Polansky never signed any checks or paid any bills or took any money form the account opened in Boston.  See Polansky affidavit paragraph 67.

      33.     Moreover, per that facsimile Israel Polansky was the only signatory on the account from October 28,1996 through January 22,1997.

Defendants' Response:        This is a disputed fact.  It is not disputed that Israel Polansky was a signatory on the account.  Robert E. Polansky believes that he became a signatory for the proffered account but at no time were any checks written from the proffered account.  See Polansky affidavit paragraph 67.

      34.     Robert Polansky disputed that Israel was ever a signatory on the account, however, he then subsequently stated that he was not a signatory on the account that Robert was "aware of and finally stated that "he had no comment" as to this document. <u>Exhibit M, Deposition of Robert Polansky starting page 67 line 20, p 68 line 20 and page 68 lines 12 and 20</u>

Defendants' Response:        This is not a disputed fact.

      35.     In sum, Robert Polansky never fully denied the legitimacy of the document or the presence of his January signature there upon. <u>Exhibit M Deposition of Robert Polansky starting page 67 line 20. p 68 line 20 and page 68 lines 12 and 20</u>

Defendants' Response:        This is not a disputed fact.

      36.     Since Russo-Williams began working for OSM in August 1996 and Donald Wainright started working in September 1996, Israel Polansky must have been personally involved in writing checks to OSM employees, because Robert would not have been authorized on the account to do so and no earlier account has been disclosed to Plaintiffs. <u>This is conjecture based on the evidence, the bank records were only recently disclosed to Plaintiffs who have not had any other opportunity to re question the Defendants.</u>

Defendants' Response:        This is a disputed fact, as it is not based on admissible evidence.

      37.     The OSM banking records, or as much of the records that have been disclosed, contain several reoccurring monthly transactions where funds which were wired into the account are being liquidated into cash by ATM withdrawals or by tellers at various Banks including Chase, Citibank, Toyoko, Citizens Bank,

Interbank, etc. These monthly withdrawals are as high as $10,241 (occurring in June 1998, See Exhibit N) but usually averaged between $5,000 and $8,000 per month. <u>Exhibit N. is a copy of the bank records of First Union National Bank for OSM for the month of June 1998. This record shows excessive ATM withdrawals, which is solid evidence of OSM co-mingling of funds..</u>

Defendants' Response:        This is not a disputed fact.

38.    To illustrate these withdrawals, the last five months of the records provided the following: in March 2000 withdrawals equal $5,870; in April 2000 withdrawals equal $9,450; in May 2000 withdrawals equal $6,711; in June 2000 withdrawals are for $6,407 and in July there is $4723 withdrawn. <u>Exhibit O is the bank ATM and check card withdrawals for the last five months for which records were provided. Exhibit O could easily be supplemented with the remaining records for each of the five months discussed and/or for every month that OSM had money siphoned through ATM withdrawals. Exhibit O is kept limited for convenience to the court.</u>

Defendants' Response:        This is not a disputed fact except that the actual amounts indicated as taken as cash the balance asserts facts not supported by admissible evidence.

39.    Additionally, there are several non-business expenses that the corporation is paying. It is obvious and evident from the records that Robert Polansky used the corporate account to purchase clothing from tailors, groceries, meals at neighborhood restaurants such as Parma, home items at Gracious Homes, gifts for his wife from Yves St, Laurent and Tiffany's, etc. <u>The bank records show every month multiple expenses which are almost definitely personal in nature and located at the neighborhood vicinity of the Defendants Robert and Anne Polanskys' apartment</u>

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

40.    At deposition Robert Polansky clearly admits that he would at times use the corporate funds to pay for his family's expenses. <u>Deposition of Robert Polansky pp 68-69 starting at line 23.</u>

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

10

41.     It is clear from the records, that these withdrawals and personal expenditures often caused OSM to bounce its employees payroll checks. <u>See Bank Records Generally.</u>

Defendants' Response:     This is a disputed fact, as it is not supported by admissible evidence.  There is no correlation to the cash withdrawals and the payment of the employees.

42.     Finally, these withdrawals are never reflected on Robert Polansky's tax returns in fact, in Year 2000 Robert Polansky reports a loss on his K-l of $14,547. <u>Exhibit Q shows that Robert and Anne Polansky suffered a loss from Robert's ownership share of OSM. However, since there is more than $32.000 being drawn from ATM and bank tellers in the last five months of Year 2000 the loss does not appear accurate.</u>

Defendants' Response:     This is a disputed fact, as it is not supported by admissible evidence.  The cash withdrawals from OSM were to pay legitimate corporate expenses and were properly expensed to OSM.  See Polansky affidavit paragraph 74.

43.     These withdrawals are also not reflected by the joint tax returns filed by both Robert and Anne Polansky. Note the following income being reported for the following years: Year 1996 reported $11,895; Year 1997 $3,288; Year 1999 a loss of $1,810.18. <u>Exhibit R shows the various tax returns and parts of returns that the Polansky's finally produced. None of these returns show any evidence of tax-free ATM withdrawals on average between $8.000 and $5,000 being made month after month.</u>

Defendants' Response:     This is a disputed fact, as it is not supported by admissible evidence.

44.     Also, of interest is the Schedule A for Year 1999, which clearly shows a deduction for home mortgage interest points of $4210.24. This is of particular importance since Robert Polansky at his deposition has stated that there is no mortgage on his home. <u>See Exhibit R, page 7 schedule A Tax Year 1999</u>

Defendants' Response:     This is a disputed fact, as it is not supported by admissible evidence.  Anne Polansky is required to pay maintenance to live in the cooperative apartment.  A portion of the maintenance is deductible for it consists of Anne Polansky's share of the mortgage paid on the cooperative apartment building, not the individual apartment.

45.     Israel Polansky was a successful businessman having been the president of a successful company, namely the American Paper Box Company in Newton, <u>MA. This is not a disputed fact both Defendants have testified about the origins of ISA.</u>

11

Exhibit A is a document called "BIOS - KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact. This part of OSM's promotional materials that were given to potential investors.

Defendants' Response:        This is not a disputed fact.

46.    The extent of Israel Polansky's wealth is unknown since he has never provided copies of his actual tax returns or bank records. To date, Israel Polansky has only provided copies of his Kl schedules for the years hi question.

Defendants' Response:        This is a disputed fact as it is not supported by admissible evidence and it is irrelevant to the current issue at bar.

47.    Israel Polansky involvement with the OSM began in 1986 when Israel personally paid $500,000 to start ISA. This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS - KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact. This part of OSM's promotional materials that were given to potential investors.

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

48.    That $500,000 was used in hopes of raising $40 million dollars through a fraudulently designed IPO. Exhibit B is the SEC official release, which details the ISA investigation and findings to which Robert did not contest to an injunction being granted. This document states that the amount of the IPO was for $40.000.000.00

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

49.    As with OSM Robert Polansky was named to all the top executive positions and Israel was named to the Board. Exhibit C are three of the Corporate Documents for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from QSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

50.     Sometime after the SEC began investigating ISA, Israel ended his Board membership with ISA in 1991. Exhibit B is the SEC official release, which details the ISA investigation and findings to which Robert did not contest to an injunction being granted. This document states that the amount of the IPO was for $40.000.000.00

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

51.     During the sell-off of the assets of ISA, Israel with his son Robert created a second company to carry on ISA's original goal of attracting large investment dollars to a unique advertising business. Again, Robert Polansky was made President/CEO of the business and Israel was a Director.. Exhibit C are three of the Corporate Documents for OSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the OSM Inc SS-4 Application

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

52.     OSM as incorporated was 93% owned by Israel. . Exhibit C are three of the Corporate Documents for QSM. These documents include the seal of the Secretary of State of Delaware. A Corporate Data Sheet taken from OSM Minute Book provided by the Defendant and a copy of the QSM Inc SS-4 Application

Defendants' Response:        This is not a disputed fact.

53.     The money that OSM used to operate between 1996 and 2000 was drawn perhaps exclusively from Israel's private accounts since the wires recorded in the banking records are similar to the amounts that Israel claims to have wired to the company and had taken tax losses for during those years. See Bank records Generally.

Defendants' Response:        This is a disputed fact and is not supported by admissible evidence.

54.     Those amounts being: in 1996, $208,800; in 1997, $371,650; in 1998, $394,300 and in 1999-2000, $284,500. The Plaintiff has no proof that these were in fact actual amounts wired by Israel, since his bank records have not been provided despite repeated requests.

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

55.     There is no evidence of separate loan agreements being made each time a wire was dispersed, as is proper business protocol for loans. In his deposition, he stated that he simply advanced money to the corporation whenever his son requested it. According to Israel, "I assumed that they were going to use it for the functions necessary to maintain the corporation." Exhibit S. Israel Polansky Deposition starting at Page 8 line 20.

Defendants' Response:       This is a disputed fact, as it is not supported by admissible evidence.

56.     Israel also points out that there were no real corporate formalities observed and that the annual meetings were nothing more than a phone call to say that Robert Polansky was still the President. Exhibit T, Israel Polansky Deposition starting at Page 16 line 17.

Defendants' Response:       This is a disputed fact, as it is not supported by admissible evidence.

57.     Plaintiffs contend that despite contentions to the contrary, Israel was deeply involved in the day to day operations of OSM.

Defendants' Response:       This is a disputed fact, as it is not supported by admissible evidence.

58.     It appears that Israel was copied on an employment contract with Donald Wainright. Robert makes it clear that "Polansky" must approve of the terms and conditions of Robert Polansky's offer to pick up any loss of money from the sale of Donald Wainright's home. Exhibit F is a facsimile dated July 23, 1996 detailing the agreed to terms of employment between OSM and Donald Wainright.

Defendants' Response:       This is a disputed fact, as it is not supported by admissible evidence save for the allegation that a copy of the proposed contract with Wainright was sent to Israel Polansky.

59.     Israel Polansky is a signatory on the corporate account. Exhibit L is a Xerox copy of a facsimile between Terri Narc of US Trust Kenmore Square Office Boston. MA.

Defendants' Response:       This is not a disputed fact in so far as the paragraph refers to the very first corporate account.

60.    Israel is aware of the SEC ruling against his son yet there is no evidence that he takes no documented actions regarding the ATM withdrawals, bank teller transactions occurring monthly while employees checks are being returned for insufficient funds. <u>There is simply no evidence to the contrary</u>

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

61.    There is no evidence that Israel informed any potential investors of such cashing out transactions involving the corporate account. <u>There is simply no evidence to the contrary</u>

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

62.    The OSM account is kept thinly capitalized resulting in constant returned checks for insufficient funds. Also, in trying to attract new investors, promotional materials demonstrate that Israel Polansky is the "Chairman of the Board", who "brings a wealth of experience to the Company" Corporation <u>This is not a disputed fact, both Defendants have testified about the origins of ISA. Exhibit A is a document called "BIOS - KEY PERSONNEL" the paragraphs relating to Israel Polansky and Robert Polansky support this fact. This part of OSM's promotional materials that were given to potential investors. See Also. Exhibit U which is the organizational chart also part of OSM promotional materials clearly shows Israel at the top of the corporate chart as Chairman of the Board</u>

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

63.    Finally, despite his affidavit that he no longer could keep funding OSM, Israel claims to have sent wires of money to OSM as late as September 2004 <u>Exhibit T. Israel Polansky Deposition starting at Page 14 line 14 through Page 16 line 3.</u>

Defendants' Response:        This is a disputed fact, as it is not supported by admissible evidence.

FOR THE DEFEDANTS
OSM COMMUNICATIONS, INC.
And ROBERT E. POLANSKY


By: _____

           Michael P. Goldsmith, Esq.
           38 West 21st Street – 5th Floor
           New York, NY 10010-6977
           Telephone:  (212) 677-4441 ext.18
           Fed. Bar No. phv0219
           Attorney for Defendants
           OSM Communications, Inc. and
           Robert E. Polansky


## CERTIFICATE OF SERVICE


This is to certify that on this 8th day of September 2005, a copy of the foregoing

Response to Plaintiffs Local Rule 56(1) Statement was deposited in the United States

mail, first-class, postage prepaid, addressed to:

| | |
|---|---|
| Robert E. Arnold, Esq. | J. Michael Sulzbach, Esq. |
| Law Offices of Robert E. Arnold, LLC | 385 Orange Street |
| 205 Church Street, Suite 310 | New Haven, CT  06511 |
| New Haven CT 06510-1805 | |


           _____
           Michael P. Goldsmith, Esq.