UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DONALD WAINRIGHT, ET AL. | : | CIVIL ACTION NO. |
| *Plaintiffs* | : | 3:01 CV 02158 (WWE) |
| | : | |
| v. | : | |
| | : | |
| OSM COMMUNICATIONS, ET AL. | : | |
| *Defendants* | : | December 12, 2005 |

## PLAINTIFFS' JOINT MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The plaintiffs, DONALD WAINRIGHT, JANET WAINRIGHT, and DEBORAH RUSSO-WILLIAMS, jointly submit this Memorandum of Law in support of their objections to the defendants' motions for summary judgment. Each defendant -- namely, OSM COMMUNICATIONS, ROBERT POLANSKY, ISRAEL POLANSKY, and ANNE POLANSKY – has moved for summary judgment in defense of the plaintiffs' claims. Furthermore, defendant OSM Communications has moved for summary judgment on its counterclaims (as to liability) against the plaintiffs. This Memorandum of Law responds to the defendants' summary judgment motions.

In support of their objections, the plaintiffs submit that genuine issues exist as to material facts which preclude the granting of summary judgment.

## I.    FACTS

In addition to the specific facts cited herein, the plaintiffs rely upon the previously-filed affidavit of Donald Wainright [Document 70-7], the previously-filed affidavit of Deborah Russo-

Williams [Document 70-6], the exhibits and documentary proof filed in connection with their August 6, 2005 motion for summary judgment, and upon excerpts from the parties' depositions contained herein.  The plaintiffs specifically incorporate these sources as evidence in opposition to the defendants' motions.

Furthermore, in addition to those facts raised in their previously-filed submissions, the plaintiffs supply the following facts for this Court's consideration:

1.    Israel Polansky testified that he loaned money to OSM Communications.   (Depo I. Polansky at 12, 14, 15, 20, 23-24, 25, 26, attached as Exhibit A.)

2.    Israel Polansky testified that he loaned OSM Communications additional funding in 2004, and that the company remained a functioning business entity in 2004.  (Depo I. Polansky at 15-16.)

3.    Israel Polansky maintained an "open" loan for OSM, through which he wired the company additional money from his personal bank account whenever the company "ran short."  (Depo I. Polansky at 14, 20, 23-24, 26.)

4.    Defendant Robert Polansky testified that defendant Israel Polansky funded all operations of defendant OSM Communications.  (Depo R. Polansky at 19, attached as Exhibit B.)

5.    Defendant OSM Communications maintained warehouse storage for computer and business supplies in Bridgeport, Connecticut.  (Depo R. Polansky at 37)

6.    Plaintiff Donald Wainright was aware that Israel Polansky was the primary investor in OSM Communications.  (Depo R. Polansky at 39)

7.    Israel Polansky's funding was used by OSM Communications to pay employee wages and benefits.  (Depo R. Polansky at 31)

8.      Israel Polansky was copied on OSM memoranda concerning employee salary.  (See Exhibit C to defendants' September 8, 2005 motion for summary judgment)

9.      Robert Polansky testified that OSM Communications ceased to function as a business entity on December 31, 2000.  (Depo R. Polansky at 37.)

10.     Anne Polansky has disclosed joint tax returns that she filed with her husband Robert Polansky.  Those joint tax returns state the following: for tax year 1996 adjusted gross income of $11,895.10; or tax year 1997 adjusted gross income of $3,288; and for tax year 1999 adjusted gross income of negative (-) $1,810.18.  No other tax returns were disclosed to the Plaintiff's knowledge.  During these years the Polansky's maintained an apartment and family on 69th street in Manhattan, New York.  (Document 105-9 'Exhibit R').

11.     **VIDEOTAPE OF ISRAEL POLANSKY**: The defendants claim that the Deposition of Israel Polansky is not admissible, however at the time of the Deposition and the Video recording  Israel Polansky participated in the Videotaping and the Plaintiffs intend on presenting this tape at trial, as well as the transcript of the tape, each performed before a Notary Public in the State of Connecticut, neither on of whom was employed or working in any other capacity than a Notary at or since the time of the work performed. The attempt by defense counsel Michael Sulzbach to now claim this tape is inadmissible and that he does not have a copy as in his pleadings presents to the Court a dispute over a factual issue, where the Jury should be able to determine what weight the tape should carry.

II.     <u>ARGUMENT</u>

The granting of summary judgment in the defendants' favor is improper because

genuine issues exist as to the material facts underlying the defendants' claims.

The plaintiffs have pleaded five causes of action. In their first cause of action, the plaintiffs have alleged a breach of contract claim against OSM Communications, Inc., Robert Polansky, Anne Polansky and Israel Polansky. As against the Polansky's, the plaintiffs are attempting to pierce the corporate veil to hold them personally liable for the actions of defendant OSM Communications.

In their second cause of action, the plaintiffs have sued the same defendants for failure to pay wages under Connecticut General Statutes § 31-72. As against the Polansky defendants, the plaintiffs are attempting to pierce the corporate veil to hold them personally liable for the actions of defendant OSM Communications.

In their third (breach of guarantee), fourth (fraudulent inducement) and fifth (fraudulent inducement) causes of action, the plaintiffs have brought claims against defendant Israel Polansky to enforce certain guarantees and representations made by Israel Polansky to the plaintiffs.

Individually and collectively, the defendants have moved for summary judgment as to all of the plaintiffs' causes of action.

A.    Standard for Summary Judgment

A motion for summary judgment may be granted when the court determines that the moving party is entitled to judgment as a matter of law because there are no genuine issues of material fact which remain in dispute. Fed. R. Civ. Pro. 56(c), Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The burden of demonstrating that no genuine factual dispute exists rests on the moving party. Adickes v. S.H. Kress & Company, 398 U.S. 144, 157; Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992)(quoting Anderson, supra, 477 U.S. at 248). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

When deciding a summary judgment motion, the court's responsibility is not to resolve disputed issues of fact, but rather to assess whether there are any factual issues that need to be tried, while resolving all ambiguities and drawing all reasonable inferences in favor of the non-moving party and against the moving party. See Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986)(citing to Anderson, supra, 477 U.S. at 248); see also Pocchia v. NYNEX Corp., 81 F3d 275, 277 (2d Cir. 1996). "Credibility determinations, the weighing of evidence and drawing inferences from the proven facts are jury functions, not those of the judge." Anderson, supra, 477 U.S. at 255. Summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact …." Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993)(citations omitted).

B.    Choice of Law Analysis

In their briefs, each defendant addresses whether Connecticut or New York substantive law, specifically the application of the Statute of Frauds, should apply to the plaintiffs' claims. Individually (and collectively), the defendants contend that New York law – instead of Connecticut substantive law -- should apply. **In response, the plaintiffs assert that irrespective of which state's law should apply, summary judgment remains inappropriate.**

1.    Waiver

5

The plaintiffs assert that the defendants' have waived their choice of law argument by virtue of their appearances (on the merits) in the District of Connecticut to defend the case. The plaintiffs additionally assert that the defendants further waived their rights to argue choice of law by allowing a default judgment to have been originally entered against them. Under the terms of Donald Wainright's employment agreement, the defendants had the right to select their jurisdiction of choice (New York) and to ensure their forum law of choice (New York) would apply. Although the defendants have appeared in Connecticut to defend the case on the merits, they continue to assert that New York's substantive law should apply. They make such assertions despite the fact that they have also raised four counterclaims pursuant to Conn. Gen. Stat. §53a-251 et seq., thereby further invoking that this jurisdiction apply Connecticut substantive law. By appearing in the District of Connecticut and defending the case on the merits, the defendants have waived any personal jurisdiction and choice of forum claims. Arguably, they have also waived their choice of substantive law claims as well.

2.    Diversity Jurisdiction

Even if this Court applies a choice of law analysis, the defendants' arguments in favor of New York law are unavailing. This case is brought pursuant to diversity jurisdiction. A federal court sitting in diversity applies the law of its forum state. Erie R.R. Co. v. Tompkins, 304 U.S. 69 (1938). This rule controls the federal court's choice of law analysis as well. Klaxon Co. V. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). The plaintiffs have brought their lawsuit against the defendants in the United States District Court for the District of Connecticut. Thus, as this suit is being litigated in the District of Connecticut, the laws of the State of Connecticut, including Connecticut's choice of law analysis, will govern the action. Id.

3.    Contractual Choice of Law

In support of their arguments, the defendants rely on the portion of the Donald Wainright employment agreement which contains a choice of law paragraph. The defendants' confidence is misplaced. Connecticut does not necessarily honor contractual choice of law agreements. Elgar v. Elgar, 238 Conn. 839, 848, 679 A.2d 937 (1996). Connecticut's courts have held that "narrowly drawn choice of law provisions do not preclude causes of action under the laws of another state where such causes of action are not based in contract." Messler v. Barnes Group, Inc., No. CV 960560004, 24 Conn. L. Rptr. 107, 1999 WL 61034, *9 (Conn.Super. Feb. 1, 1999). Therefore, under Connecticut's choice of law rules, a tort-based claim, even if closely related to the subject matter of the contract, may be maintained even where it would be barred under the law of the state applied to similar contract claims under the contractual choice of law agreement. Id. Accordingly, the choice of law arguments raised by the defendants do not apply to the plaintiffs' Second, Fourth and Fifth Counts – all of which should be decided under Connecticut substantive law.

The traditional choice of law rule in Connecticut is lex loci delicti, which directs the court to apply the law of the state where the injury or accident occurred. O'Connor v. O'Connor, 201 Conn. 632, 637, 519 A.2d 13 (1986). The Connecticut Supreme Court has abandoned a categorical approach to this rule in favor of the Second Restatement's approach whenever a rigid application of lex loci delicti, "would produce an arbitrary, irrational result." Id. Courts applying Connecticut's choice-of-law law rules have used the Restatement approach even where lex loci would lead to the same result. Svege v. Mercedes Benz Credit Corp., 182 F.Supp.2d 226, 229 (D.Conn.2002); see, Williams v. State Farm Mutual, 229 Conn. 359, 641 A.2d 783 (1994) (Connecticut Supreme Court applied Restatement to a motor vehicle accident and held that state where accident occurred had the most significant relationship with the parties). The O'Connor

court adopted Section 145 of the Restatement (Second), which provides that "the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Section 6." 1 Restatement (Second) Conflict of Laws, Section 145. A four-pronged analysis is used to apply the principles of § 6. Courts consider: (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. 1 Restatement (Second) Conflict of Laws, Section 145(2). It is the significance of the contacts with respect to each issue, not the total number of contacts, that governs the choice of law. O'Connor, supra. The contacts present in the record, both in quantity and quality, lead convincingly to the application of Connecticut law to the plaintiffs' non-contract claims.

In the present matter, there are sufficient contacts, ties and issues to the State of Connecticut to mandate the application of Connecticut Law. Those contacts, ties and issues include but are not limited to the following: OSM warehoused most of its assets and property used in its business at Bridgeport, Connecticut (Document124-7 *page 94); Janet Wainright lives in Connecticut; Donald Wainright lives in Connecticut; Defendants knew that by refusing to pay Donald Wainright his salary on a timely basis or at all that they were creating an injury to Donald Wainright and his family occurring in the state of Connecticut.

Regardless whether this Court applies Connecticut or New York Law in its analysis, the verbal guarantees and representations are enforceable.

C.    The plaintiffs' claims are outside of Connecticut's Statute of Frauds.

Although the guarantees and other representations were made verbally, and are thus subject to the statute of frauds, the application of one of any number of exceptions removes the verbal guarantees from the application of Connecticut's Statute of Frauds.

1.    Doctrine of Part Performance under Connecticut Law

The primary purpose of the Statute of Frauds is to provide reliable evidence of the existence and the terms of a contract. Killion v. Davis, 69 Conn.App. 366, 372, cert. denied, 260 Conn. 931 (2002). There are limited exceptions to the Statute of Frauds under Connecticut law. The Connecticut Supreme Court has repeatedly recognized, "that a contract is enforceable, despite the statute, when, subsequent to the making of the contract, there has been conduct that amounts to part performance." Heyman v. CBS, Inc., 178 Conn. 215, 222 (1979). "Where one party in reliance upon the contract, has partly performed it to such an extent that a repudiation of the contract by the other party would amount to the perpetration of a fraud, equity looks upon the contract as removed from the operation of the statute of frauds …." FDIC v. Altholtz, 4 F.Supp. 2d 80, 86 (D.Conn. 1998)(Internal citations omitted.)(Internal quotation marks omitted.).

The doctrine of part performance arose from the necessity of preventing the statute of frauds from becoming an engine of fraud. Harmonie Club, Inc., v. Smirnow, 106 Conn. 243, 249 (1927). Acts of part performance generally are done by the party seeking to enforce the contract, in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge, of the other party, and effectively alter the relationship of the parties. Andrew v. Babcock, 63 Conn. 109, 120 (1893). The acts also must be of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of a contract in relation to the subject matter in dispute. Gabriele v. Brino, 85 Conn.App. 503, 510-11 (2004); H. Pearce Real Estate Co. v. Kaiser, 176 Conn. 442,

443 (1979); <u>Van Epps v. Redfield</u>, 69 Conn. 104, 110 (1897); <u>Bradley v. Loveday</u>, 98 Conn. 315, 320 (1922); <u>Harmonie Club, Inc., v. Smirnow</u>, <u>supra</u>; <u>Rienzo v. Cohen</u>, 112 Conn. 427, 430 (1930); 2 Corbin, Contracts, Section 425; Pomeroy, Specific Performance (3d Ed.) p. 262; <u>see note</u>, 101 A.L.R. 923, 960.

The part performance exception to Connecticut statute of frauds requires, as an essential element, conduct that is referable to and consistent with an oral agreement between the parties. <u>F.D.I.C. v. Altholtz</u>, <u>supra</u>.

Under Connecticut law, the determination of whether the "performance" is sufficient to remove the contract from the Statute of Frauds is a question of fact. <u>Milazzo v. Schwartz</u>, 44 Conn.App. 402, 407 (1997). Accordingly, as the issue of the plaintiff's performance presents a question of fact, summary judgment is not appropriate.

After receiving assurances by defendants Robert Polansky and Israel Polansky, plaintiffs Donald Wainright and Deborah Russo-Williams fulfilled their job commitments and obligations until their termination. They performed – whether partially or fully –in response to the defendants' verbal guarantees. Moreover, inasmuch as the guarantees were good until an investor could be found -- which could have been in one day, one month or one year – the verbal guarantees were of indefinite duration. Donald Wainright and Deborah Russo-Williams continued to perform their occupations diligently despite the fact that they oftentimes went unpaid and were otherwise paid untimely. Donald Wainright and Deborah Russo-Williams continued to perform their occupations diligently despite the fact that guaranteed bonuses were never paid and benefits were compromised. There is no evidence to the contrary excepting statements that have been made by Robert Polansky in his defense and explanation of this matter.

Thus, under Connecticut law, the plaintiffs' case falls squarely outside of the Statute of Frauds.

### 2.   Contracts of indefinite duration not within the statute of frauds

Contracts of indefinite duration are not subject to the "one year" provision of the statute of frauds. Burkle v. Superflow Mfg. Co., 137 Conn. 488, 493 (1951); see Restatement (Second), Contracts (1979) § 130, comment a; 2 A. Corbin, Contracts (1950) §§ 444 through 445; 3 S. Williston, Contracts (3d Ed. Jaeger) § 500. "Under the prevailing interpretation, the enforceability of a contract under the one year provision does not turn on the actual course of subsequent events, nor on the expectations of the parties as to the probabilities. Rather, contracts of uncertain duration are simply excluded; the statutory "one year" provision covers only those contracts whose performance cannot possibly be completed within a year." Restatement (Second), Contracts, supra; Burkle v. Superflow Mfg. Co., supra. The verbal guarantees made to the plaintiffs were of indefinite duration. The Connecticut Supreme Court has held that the proper test is whether or not a contract's "terms are drawn so that it cannot by any possibility be performed fully within one year." C.R. Klewin, Inc. v. Flagship Properties, 220 Conn. 569, 580 (1991).

The defendants do not offer any evidence that the alleged guarantees could not possibly be performed within a year. Accordingly, if Connecticut substantive law is applied, Connecticut's Statute of Frauds, namely Connecticut General Statutes Section 52-550, will not operate to bar the plaintiffs' claims.

### 3.   The Statute of Frauds will not work to support a fraud.

Under Connecticut law, the Statute of Frauds is not permitted to serve as an engine of fraud. Breen v. Phelps, 186 Conn. 86, 95 (1982); Willow Funding Co., L.P. v. Grencom

11

Associates, 63 Conn.App. 832, 848 (2001); Reed v. Copeland, 50 Conn. 472 (1883); see generally, D. Wright, J. Fitzgerald & W. Ankerman, Connecticut Law of Torts (3d Ed. 1991), p. 389.

There is evidence that ISA the former company owned and dominated by Israel Polansky and Robert Polansky was an instrument in fraud. The SEC had investigated and prosecuted ISA for having materially misstated its net income to make the company **appear** more profitable than it was prior to the forty million dollar ($40,000,000.00) Initial Public Offering in 1990. The SEC alleged that to conceal the fraud, ISA's president, chief executive officer and chairman, Robert Polansky had falsified contracts that were used to prepare financial statements presented in connection with the Initial Public Offering. Robert Polansky chose not to fight the SEC allegations and consented to an order prohibiting him from future violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5, 13b2-1 and 13b2-2 (Document 105-3 'exhibit B')

OSM is the same company as the former ISA. ISA has the same president and board member, namely Israel and Robert Polansky. OSM has the same business objectives as ISA did to sell advertising services at retail establishments by using LED monitors. In both companies Israel Polansky was the financial backer. OSM was an undercapitalized business venture under the control of Robert Polansky and Israel Polansky, both companies were very active at attempting to raise outside dollars from investors to manage all risks of the Polanskys. Israel Polansky all though apparently contributing more than a million dollars between the two ventures held himself out to be nothing more than a passive investor/board member to also minimize exposure. (Document 105-3 'exhibit A, key personnel bios') It was important for OSM to retain the services and expertise of Donald Wainright and Deborah Russo-Williams and

other employees such as Allan Jones in order to attract potential investors. To this end, OSM made promises to pay high salaries and bonuses to Deborah Russo-Williams and Donald Wainright; however, at several instances the company fell short of making payments or making payments in a timely manner and never paying bonuses. OSM also served as a conduit for Israel Polansky to give tax-free payments to his son Robert Polansky and generate tax losses on his end. This is apparent since the OSM bank records show several instances of Robert Polansky or someone else who had ATM card using the company accounts for his purely personal affairs. (Document 105-10 'exhibit N'). In Robert Polansky's affidavit he admits that he took out cash, Defendant cannot prove that the cash withdrawn ever went to pay a solitary bill of OSM. Defendant asserts that this is due to the fact that the accountant, who shared office space with Robert Polansky passed away in 2004 (Defendants were a party to this lawsuit for years before the death of OSM's accountant and therefore this is not an excuse). Plaintiffs continue to assert that they have proven that, OSM through its officers and Ann Polansky through her complicity perpetrated an on-going fraud on Donald Wainright, Deborah Russo-Williams and Janet Wainright the statute of frauds does not protect against such wrong-doings.


    D.      <u>The plaintiffs' claims are not within New York's Statute of Frauds</u>.

The plaintiffs believe that Connecticut's substantive law should govern this case. Even if the plaintiffs are incorrect, and New York's substantive law applies, the defendants' arguments fail for the same reasons.

The defendants have argued that under New York's Statute of Frauds, promises to answer for the debts of another must be in writing. <u>See</u> New York's General Obligations Law Section 5-701(a)(1) and (a)(2). The defendants assert that, even if the verbal guarantees were made, they

are unenforceable under New York's Statute of Frauds. As with their analysis of Connecticut's law, the defendants have failed to discuss the possible exceptions to the general rule. Application of these exceptions, takes the plaintiffs' claims outside New York's Statute of Frauds.

    1.    <u>Part performance</u>

As with Connecticut's Statute of Frauds, New York's statute of frauds contains a part performance exception. This exception applies when the part performance is because of the alleged verbal agreement and when the party that part performed is the party seeking enforcement. <u>Messner Vetere Berger McNamee Scmetterer EURO RSCG Inc. v. Aegis Group PLC</u>, 974 F.Supp. 270 (S.D.N.Y. 1997), <u>question certified</u>, 150 F.3d 194 (2d Cir. 1998), <u>certified question accepted</u>, 92 N.Y.2d 916, 680 N.Y.S.2d 453, 703 N.E.2d 264 (1998), <u>certified question answered</u>, 93 N.Y.2d 229, 689 N.Y.S.2d 674, 711 N.E.2d 953 (1999), <u>answer to certified question conformed to</u> 186 F.3d 135 (2d Cir. 1999). A special promise to answer for the debt of another person is subject to part performance exception. <u>Messner</u>, <u>supra</u>.

    2.    <u>Fraud or misrepresentation is an exception under New York law.</u>

In the same manner as the doctrine of part performance, New York law has an exception for fraud or misrepresentation, so that the Statute of Frauds does not become a legal shield for the underlying fraud itself. <u>Safrin v Friedman</u> (1950) 27 Misc 2d 687, 96 NYS2d 627, <u>affirmed</u>, 277 App Div 1138, 101 NYS2d 216 (defendant stated in preliminary proceedings that it was a domestic corporation, thereafter denied it, and revealed only after statute of limitations had run that it had been dissolved); <u>Re Meyrowitz' Estate</u> (1952, Sur) 114 NYS2d 541, <u>affirmed</u>, 284 App Div 801, 132 NYS2d 327, app den 284 App Div 844, 134 NYS2d 587 (one in charge of

corporate enterprise may not borrow its funds, continuously report the loans as due from him, and then avoid payment by pointing to his failure to sue himself).

        3.    <u>Contracts for indefinite term.</u>

Likewise, New York substantive law also has an exception to the Statute of Frauds for contracts with indefinite terms. As under Connecticut's law, there must be absolutely no possibility of performance under the contract within one year. <u>Louros v. Cyr</u>, 175 F.Supp. 2d 497. 511-13 (S.D.N.Y. 2001).

Similarly, in <u>Curtis v. Harry Winston, Inc.</u>, an employee who was terminated after eight years of employment claimed that he was entitled to bonuses and cost of relocation upon termination under oral employment contract. The New York Court found that the verbal agreement made to the employee, who was an at-will employee and could have been terminated at any time including within the first year, was not rendered unenforceable by New York Statute of Frauds.

Accordingly, whether the plaintiffs' claims are analyzed under Connecticut law or New York law, the verbal agreements made to the plaintiffs' will fall under one or more of several exceptions to each state's Statute of Frauds. Therefore, the oral guarantees are enforceable and the defendants' summary judgment motions should be denied.

        E.  <u>Under Connecticut law, the corporate veil should be pierced</u>.

The plaintiffs first and second causes of action (breach of contract and failure to pay wages) claim that defendants Robert Polansky, Anne Polansky and Israel Polansky are liable for defendant OSM Communication's actions because "OSM is an alter-ego and mere instrumentality" of the defendants. The plaintiffs seek to pierce OSM's corporate shield and hold the defendants personally liable. The defendants have each raised objections to piercing of

the corporate veil under New York law. However, under either Connecticut or New York substantive law, just cause exists to pierce the corporate veil and hold the defendants personally liable.

Connecticut case law provides:

> Courts will disregard the fiction of separate legal entity when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock … Under such circumstances the general rule, which recognizes the individuality of corporate entities and the independent character of each in respect to their corporate transactions, will be disregarded, where … the interests of justice and righteous dealing so demand …. The circumstance that control is exercised merely through dominating stock ownership, of course, is not enough .... There must be such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.

Zaist v. Olson, 154 Conn. 563, 573-74 (1967)(Internal citations and quotations omitted.)

Piercing the corporate veil has its roots in equity. KLM Industries, Inc. v. Tylutki, 75 Conn.App. 27, 33, cert. denied, 263 Conn. 916 (2003). Piercing the corporate veil is appropriate, "where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." DeLeonardis v. Subway Sandwich Shops, Inc., 35 Conn.App. 353, 358-59 n. 3, cert. denied, 231 Conn. 925 (1994). Under Connecticut case law, there is, "no hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case." Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc., 187 Conn. 544, 555-56 (1982).

Connecticut law provides two tests to determine whether it is proper to disregard the corporate entity and pierce the corporate veil: the instrumentality rule and the identity rule.

16

Zaist v. Olson, supra.  Under either test, the plaintiffs' have demonstrated sufficient reason to pierce the corporate veil.

With respect to the instrumentality rule,

> The instrumentality test requires proof of three elements:  (1) control, Not mere majority or complete stock control, but complete domination, not Only of finances but of policy and business practice in respect to the transaction Attacked so that the corporate entity as to this transaction had at the time no Separate mind, will or existence on its own; (2) that such control must have Been used by the defendant to commit a fraud or wrong, to perpetrate the Violation of a statutory or other positive legal duty, or a dishonest or unjust act In contravention of plaintiff's legal rights; and (3) that the aforesaid control and Breach of duty must proximately cause the injury or unjust loss complained of.

Season-All Industries, Inc. v. R.J. Grosso, Inc., 213 Conn. 486, 490 (1990).

The "key factor in any decision to disregard the separate corporate entity is the element of control or influence exercised by the individual sought to be held liable for corporate actions." Christian Bros., Inc. v. South Windsor Arena, Inc., 7 Conn.App. 648, 651 (1986).

The identity rule requires a showing that, "there was such a unity of interest and ownership that the independence of the corporation had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability …." Falcone v. Night Watchman, Inc., 11 Conn.App. 218, 221 (1987).  Although the identity or alter-ego doctrine has been primarily applied to reach beyond the veil to get to another corporation, it can be used to address individual liability.  Klopp v. Thermal-Sash, Inc., 13 Conn.App. 87, 89 n. 3 (1987).   Under either rule, Connecticut law would permit a piercing of the corporate veil to reach Robert, Israel and Anne Polansky.  The actions of the Polanskys – individually and collectively – demonstrate a complete disregard of the corporate formality.  In that: Robert Polansky and Israel Polansky maintained an "open" loan for OSM, through which he wired the company additional money from his personal

bank account whenever the company "ran short." (Depo I. Polansky at 14, 20, 23-24, 26.); Defendant Robert Polansky testified that defendant Israel Polansky funded all operations of defendant OSM Communications. (Depo R. Polansky at 19); the Polanskys treated the OSM account as a personal business account and used it for the mutual advantage of both parties; that corporate monies were used for personal reasons of both of the Polansky's without regard to there not being reserves to pay salaries and bonuses to its employees; (Robert Polansky Memorandum in Support of Summary Judgment   Israel Polansky was copied on documents purporting to be OSM memoranda concerning employee salary evidencing that he was part of the decision making for all matters of the corporation including Wainright's salary, despite assertions that he had no involvement with the corporation. (See Exhibit C)

F.    Under New York law, corporate veil should be pierced.

Even if New York's substantive law applies to the plaintiffs' claims, the

application of New York law would pierce the corporate veil and subject the defendants' to individual liability. New York's "piercing" doctrine is very similar to Connecticut's.

Under New York's substantive law, to pierce the corporate veil, a plaintiff must demonstrate: (1) the owner exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury. Morris v. N.Y. State Department of Taxation & Fin., 82 N.Y.2d 135, 623 N.E.2d 1157, 1160-61 (1993); see also, MAG Portfolio Consult, GmbH v. Merlin Biomed Group, L.L.C., 268 F.3d 58, 63 (2d Cir. 2001). Accordingly, since New York applies a substantially similar standard to that of Connecticut either system of law

should equally pierce the veil of this obvious sham that was used to fraud and breach contracts on Donald Wainright, Janet Wainright and Deborah Russo-Williams of monies owing them.

### G.    Doctrine of Payment

Robert Polansky and OSM have produced no evidence that demonstrates that Plaintiffs have been paid monies owed to them.  Respectfully, the Plaintiffs request that this Court disregard any claims to the contrary as part of the Defendants' motion.  Donald Wainright also objects to the suggestion that he was compensated for the sale of his home at a substantial loss or that he ever signed or agreed to any modification of his salary and bonus structure at any time in 1997.  As prior stated any documents purporting to be otherwise are objected to as unreliable and not true.

### I.    Claims of Janet Wainright

Janet Wainright has suffered damages as incident to the fraud that was perpetrated against her and her husband.  Janet Wainright has had conversations with Robert Polansky and was assured that OSM would pay for moving losses.  Janet Wainright has the potential to prove direct damages as a third party beneficiary to the contracts entered into between OSM and her husband, Donald Wainright.  Plaintiffs respectfully request that the matter and claims of Janet Wainright be preserved for trial since they involve questions of disputed material facts.

### III.    OBJECTIONS TO SUMMARY JUDGMENT ON OSM'S COUNTERCLAIMS.

In their March 4, 2003 Answer, Defendants raised four related counterclaims. For purposes of this Objection Plaintiffs address these counterclaims as follows. The first counterclaim alleges that the Plaintiffs were hired to raise money as part of their employment responsibilities and thus knew of the risk of the business they were entering. This is obviously in serious dispute. In testimony at deposition, in documents purporting to be employment contracts, and in affidavits there is no evidence that the Plaintiffs were hired to be either the V.P. of Operations or the Director of Production. Plaintiffs in a spirit of cooperation and to the benefit and at the request did have some minimal involvement (Document 70-5, 70-6 and Supplemental Wainright Affidavit 10/25/2005). Donald Wainright in particular has testified that he was informed that the company had a contract with NBC, which it did not, and could thus meet its financial obligations (Document 124-5)

The allegations further state that they began to seek outside opportunities and in doing so violated their duties owed to OSM as employees, in so far as those opportunities conflicted with OSM. Again there is no evidence that they did anything besides agree to come to work dutifully despite late payments, non-payments, broken agreements on bonuses, etc. (Wainright Supplemental Affidavit). A summary judgment can only proceed on those facts that are not or cannot be in dispute. There is allegation that they harassed Robert Polansky again there is nothing to substantiate this on the record. There are allegations that the Plaintiffs departures were voluntary, Plaintiffs completely contest that leaving the employ of OSM was not a voluntary act and voluntary decision.

The meat of the allegations center around alleged theft of computer software and a refusal to share passwords which the Defendants claims is in violation of Conn. Gen. Stat. § 53a-251(d) that statute reads as follows:

(d) **Interruption of computer services.** A person is guilty of the computer crime of interruption of computer services when he, without authorization, intentionally or recklessly disrupts or degrades or causes the disruption or degradation of computer services or denies or causes the denial of computer services to an authorized user of a computer system.

As a preliminary matter, plaintiff points out that this is a criminal matter and as such is not in itself a basis of liability for civil matters. This is a specific intent crime wherein a criminal defendant hacks into or otherwise illegally gains access to a computer system with the intention of shutting that system down. Donald Wainright has stated in his affidavit, that OSM had backup systems in Connecticut. Those systems included originals of all software as well as manuals and documentation. Donald Wainright does not admit that he ever took originals, his statement only goes so far as to say that "its entirely possible that during the years…I made backups for safety purposes" and took them home for "safety purposes." (Document 124-7 *page 87) Moreover, his failure to return these backups did not interrupt any business operations or spoil any business operations of the Defendants. The software was only used for the limited purpose of connecting to the phone lines to make changes to installed store signs. Since at the time that he was fired, and Deborah Russo-Williams was fired, there were no signs still hooked up anywhere to the system. (Wainright Supplemental Affidavit 10/26/2005). Accordingly, the system was without value or purpose at the time of the wrongful discharge.

Additionally, if there was ever a need for any of the software, which plaintiffs , assert there was not at the time they were fired, the Defendants still had all originals including the manuals and documents. This is a fact readily known to Robert Polansky and as such the Plaintiffs further object to this matter as vexatious and without any merit. Similarly the passwords were for computers that were not kept in private offices but maintained in a shared space environment. The passwords were designed to keep anyone walking by to gain quick

access to the system at those stations.  Donald Wainright has testified, **"all of the software, all of the data bases, all of the information dealing with the locations of the signs and their installation were contained upon the server."** (Document 124-7 *page 93) In response to whether that server was password protected, Donald Wainright further testified, **"It was the company's password. And to my knowledge that was never changed from when it was operating under Valasis…the password was process."** (Document 124-7 *page 94)  Plaintiffs again assert that Defendant has not produced any reliable or credible evidence proving that the business was harmed by the Defendant's not disclosing passwords to their former boss who fired them after not being paid for months.  Plaintiffs dispute any letter from Robert Polansky to a computer technician that purports to show otherwise as not being a legitimate and reliable document.

Again, the Defendants have failed to produce much of anything with respects to corporate documentation and records in discovery.   Since there is no real or legitimate discovery on this matter the Plaintiffs assert that Defendants cannot possibly prove their case.   Plaintiffs respectfully ask that the court dismiss these counterclaims.  These counterclaims are in essence just a tactic to attempt to harass and force the Plaintiffs to abandon their lawsuit.  At a minimum the Plaintiffs, respectfully request that this court reserve this issue for trial since there is a complete dispute over material facts surrounding these counterclaims.


V.    <u>CONCLUSION</u>

For all of the foregoing reasons, this Court should sustain the instant objections and deny the defendants' motions for summary judgment.

THE PLAINTIFFS,
DONALD WAINRIGHT, JANET WAINRIGHT
and DEBORAH RUSSO-WILLIAMS

By:

/S/_____
Robert E. Arnold III
Law Offices of Robert E. Arnold LLC
205 Church Street, Suite 310
New Haven, Connecticut 06510-1805
Tel. (203) 777-3000 Fax (203) 498-6080
arnoldlawfirm@msn.com
Fed Bar #ct18903

CERTIFICATE OF SERVICE

I hereby certify that on Monday, December 12, 2005 a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System. The parties served are as follows:

Counsel for defendants Robert E. Polansky and OSM Communications, Inc.
Michael P. Goldsmith, Esquire
38 W. 21st St., 5th Floor
New York NY 10010-6977
E-mail: michael.p.goldsmith@verizon.net

J. Michael Sulzbach
385 Orange Street
New Haven CT 06511
Telephone: (203) 781-0880
Fax: (203) 781-0861
E-mail: jms@sulzbachlaw.com

BY:

/s/

_____
Robert E. Arnold III
205 Church Street, New Haven CT 06510-1805
E-mail: arnoldlawfirm@msn.com

ORIGINAL ELECTRONICALLY FILED WITH:

United States District Court, District Of Connecticut
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CONNECTICUT 06604
phone: (203) 579-5861 attn: clerk's office