**EXHIBIT A TRANSCRIPT OF ISRAEL POLANSKY VIDEO DEPOSITION**

UNITED STATES DISTRICT COURT DISTRICT OF CONNECTICUT

------------------------------------------------------------

DONALD WAINRIGHT, JANET WAINRIGHT,   CASE NO. 3:01-CV-2158 (WWE)
AND DEBORAH A. RUSSO-WILLIAMS,

PLAINTIFFS,

-AGAINST-

OSM COMMUNICATIONS, INC., ISRAEL H.
POLANSKY, ROBERT E. POLANSKY, AND
ANNE POLANSKY,

DEFENDANTS.

------------------------------------------------------------

**TRANSCRIPT OF VIDEO DEPOSITION OF ISRAEL H. POLANSKY**
**Date of Deposition: March 29, 2004**
**Time Started: 1:48 p.m. recording began,**
** break at 2:40 pm, resumed at 2:46 pm**
**Time Ended:  2:50 p.m. recording ended**
Held before Videographer/Notary Public: Kerry A. Bartolini

**APPEARANCES: Present:**
Israel H. Polansky, Deponent/Defendant
J. Michael Sulzbach, Esq. representing Israel Polansky
Robert E. Arnold, Esq., representing Plaintiffs
Robert E. Polansky, Defendant
Donovan W. Riley, Esq., representing Plaintiffs

**Not present**:
Transcriptionist/Notary Public: Kari Payette
Date of Video Transcript request: December 26, 2004
Date Transcription completed:    January 3, 2005

*ATTACHMENTS: RE-NOTICE OF DEPOSITION AND SCHEDULE A*

Attorney Robert E. Arnold (" Q.") questioning by direct examination
the deponent/witness Israel H. Polansky ("A.") and being duly sworn responding as
follows:

Q. (By Attorney Arnold): We're here on a video deposition of Mr. Israel Polansky and a re-

notice of that deposition was handed to counsel today dated for March 26th, served on March

29th. We originally had scheduled this deposition for March 18th. Mr. Polansky, can you raise

your right hand please?

*Witness Israel H. Polansky raised his right hand.*

Q. Do you swear the evidence you are about to give is the truth, the whole truth and nothing but

the truth so help you God?

A. (By Israel Polansky): I do.

Q. Okay.

Attorney Sulzbach: Incidentally, I don't think under the federal rules you can do this?

Q. Videotape?

Attorney Sulzbach: No, you can do the videotape, but you…it has to be before a…ahh…an

appropriate officer and it can't be you.

Q. This is a notary public right here. You want to take his oath, raise your right hand?

Attorney Sulzbach: Can you raise your right hand? Mr. Polansky, Can you raise your right

hand?

*Witness Israel H. Polansky raised his right hand.*

Notary Bartolini: Do you swear to tell the truth, the whole truth and nothing but the truth so help

you God?

A. (By Israel Polansky): I do.

Q. (<u>By Attorney Arnold</u>): Mr. Polansky you received notice of this deposition from your attorney?

A. (<u>By Israel Polansky</u>): Yes. I believe I did.

Q. You did?

A. Yes.

Q. And that's why you're here today?

A. Yes.

Q. Were there any documents given to you by your attorney before you came here today?

<u>Attorney Sulzbach</u>: Actually…wait a minute…object…hold it…no because its..

Q. I'll rephrase the question. Did you receive a notice of deposition…I'm going to caution you Mr. Polansky that there's not to be any speaking by you at this deposition in any way, shape or form. Do you understand that, or I'll have you removed?

<u>Robert Polansky</u>: Yes.

Q. Do you understand that?

<u>Robert Polansky</u>: Yes. I understand that.

Q. Okay. Your presence here is merely as a spectator, and not as a participant, in any way shape or form. Do you understand that?

<u>Robert Polansky</u>: I understand.

Q. Okay.

<u>Robert Polansky</u>: I understand.

Q. Now there is a videotape…on this…

<u>Robert Polansky</u>: I understand.

Q. And I'm going to ask that you not say another word because you have counsel that you are

represented by. Understood. Thank you

Q. Mr. Polansky, Mr. Israel Polansky?

A. (return to <u>Israel Polansky</u>): Yes.

Q. Did you receive notice of this deposition?

A. Yes

Q. And did he give you the notice of deposition that was served on his office with an attached schedule which asks for information to be produced?

A. Yes.

Q. Do you have that schedule with you today?

A. No I don't.

Q. And when did you receive that, do you recall.

A. Uhh…I don't exactly recall.

Q. Do you recall reading a list of documents that you were asked to prepare?

A. Yes.

Q. Okay. So in response to " whether you had all documents between you and any other party relating to any matter asserted in the complaint and your cross complaint in this matter" you have no documents with you today?

A. No I don't.

Q. And you didn't bring any copies of checks front and back and check registers of any accounts used to pay any expenses payroll or costs of any kind of OSM Communications Inc. and any of its affiliates from 1996 to the present including any payments claimed as investments?

A. No.

Q. And you're not providing a list of all checking, savings, or any other account including investment accounts with the account numbers of which you were or are a signatory including the name and address of the banks or issuers of the accounts since 1996, you're not producing any information in response to that?

A. No, I haven't uhh…

Q. And you didn't bring any federal or state income tax returns from the years 1996 to the present with you?

A. No.

Q. And, did you acquire any interest in real property, or transferred any property, or sold any property from 1996 to the present?

A. Umm…

Attorney Sulzbach: I think you're asking him whether he has the documents or whether he did.

Q. I am asking him whether he did?

Attorney Sulzbach: Again…I am going to object…uhh…to anything after the times covered by the complaint because it's not relevant and it's not likely to lead to anything relevant unless you can show me otherwise or tell me otherwise

Q. You can answer the question.

Attorney Sulzbach: No, I am going to instruct him not to answer the question.

Q. When did you buy the house that you currently living in?

A. Ohh…about…

Attorney Sulzbach: Well…hold it…foundation.

Q. This is a deposition.

<u>Attorney Sulzbach</u>: I understand, but you asked him when he bought the house he currently lives in…and you don't know that he bought it.

Q. That's right. If you know when you bought the house you are currently living in. When did you buy it?

A. Do I know when I bought it?

Q. Yes, when did you buy it? What year

A. About 45 years ago.

Q. 45 years ago?

A. Approximately.

Q. Do you own any other homes?

A. No.

Q. Were you ever paid any money from OSM or OSM Communications Inc. or any of its affiliates?

A. Did I ever receive any?

Q. Yes.

A. No.

Q. You never received any money for salary?

A. No.

Q. Never any money for being on the board of directors?

A. No.

Q. And you did you serve on the board directors.

A. Oh yes.

Q. And when did you serve on the board?

A. What's that?

Q. What years?

A. From it's inception when it was or…uhmm…organized, and I….I served as a director because a…a….according to the laws of Delaware we a…required two people to be directors so I served.

Attorney Sulzbach: Mr. Polansky, uhmm., I know you're trying to be helpful…

A. Of course…

Attorney Sulzbach: …but you've…you've actually done more than answer the question that was asked. And …and…in the future, I'll… I'll call that to your attention when it starts to happen, I don't want you to think I am being impolite.

A. Okay.

Q. When you asked about …ah…when you stated that…you said "we" it required two directors and we organized in Delaware or something who are you referring to when you say "we"?

A. Robert.

Q. That's your son?

A. Yes.

Q. And did you give Robert…any… or...withdrawn. Did you give any money towards the creation of the company that you were on the board of directors?

A. Yes, I have…

Q. Okay. What was the name of the company first organized

A. Uh…OSM

Q. And what…do you recall what year it was first organized

A. Not really.

Q. Do you recall approximately?

A. Oh…uhmm…6...7…8 years ago I'm not sure

Q. And when you lent OSM money what were the terms and provisions?

Attorney Sulzbach: If any?

A. I was investing in the company.

Q. What does that mean investing?

A. Well…oh…just about what it…I said…I invested the money, I advanced the money to the company, I purchased the stock in the company.

Q. How much stock did you own?

A. I beg your pardon?

Q. How much stock did you buy?

A. 93%

Q. And who were the other shareholders in the company?

A. Robert Polansky.

Q. He owned the other 17 percent, I mean the other 7%?

A. Robert Polansky.

Q. And did you ever loan the company any money?

A. As a matter of fact I think part of it was as a loan.

Q. How much did you pay for the 93% ownership of the stock

A. I don't really remember what the first payment was.

Q. Do you remember any of the payments, how much they were?

A. Well…yes I advanced money to the company from time to time?

Q. And what would you advance money to the company for?

A. Well I invested in the company and I assumed that they were going to use it for the functions necessary to maintain the corporation

Q. Okay. And what are some of the functions that are necessary to run the corporation, as you understood them?

A. Ah…I understood that they were to ahh…install signs and sell advertising on the signs and hopefully make a success of it

Q. Would you consider payroll one of the functions necessary to run the company?

A. I imagine any company must have payrolls.

Q. Okay, but the question to you is "is payroll one of the functions that you understood that was necessary to run the company"?

A. I didn't understand any of the functions of the company.

Q. Well you just told me about two functions installing signs and selling advertising, correct?

A. Yes.

Q. Okay. What other functions were necessary to run the company, in using your own words?

A. I suppose it depends on the company, they uh…they umm…

Q. Okay…let's…let's…let's be specific to just OSM

A. On OSM.

Q. The money you lent to the company?

A. Well I understood the company would be similar to ISA and would function in approximately the same manner.

Q. Okay. Did ISA have employees?

A. Oh yes.

Q. Okay. So ISA paid their employees?

A. I imagine so.

Q. Okay. Have you read the complaint in this case; do you understand why you are being named as a party in the lawsuit today?

A. Not really, I don't know why I am being named as a party.

Q. Okay, have you ever read the complaint that was served on you? Did you …Did you…

A. Yes I read the complaint….

Q. Okay. And were you familiar with a Mr. Donald Wainright? Have you ever heard his name before?

A. Certainly, it was in the complaint.

Q. Prior to being served on the complaint have you ever heard the name Donald Wainright in reference to OSM?

A. Yes.

Q. And what was your understanding of who Donald Wainright was?

A. An employee of the company.

Q. Okay. And how about the name Deborah A. Russo or Deborah A. Russo-Williams?

A. An employee of the company.

Q. So you understood that both Donald Wainright and Deborah A. Russo-Williams were employees of OSM?

A. Employees of OSM?

Q. Yes.

A. Yes

Q. Okay.

<u>Attorney Sulzbach</u>: When?

A. Huh…?

Attorney Sulzbach: I'm sorry …yes….th…th…the question is…when...

Q. Well… you'll have an opportunity to… and I'll certainly get there

A. Were Donald Wainright and Deborah Russo-Williams were they employees of ISA at any point in time?

A. Uhm…I think they were.

Q. So you understand that in the complaint that there's a claim that as employees of OSM during some time period they weren't paid as their payroll or their salaries? Do you understand?

A. I paid no attention to any of the…any of…the operations of the company.

Q. But, the lawsuit that's pending in federal court against you, as you are a named defendant…

A. Yes

Q. It's…It's basically a lawsuit…Is it your understanding that it's basically a lawsuit by Donald Wainright and Deborah Russo-Williams for money that they weren't paid as employees of OSM?

A. I've been told that that's probably so.

Q. Okay.

A. Or possibly so…I…I really don't know.

Q. You testified that both Donald…Donald Wainright was an employee of OSM and you were aware of that, correct

Attorney Sulzbach: That's not what he testified to…his testimony was that he understood that they were employees of OSM.

Q. What time period…when did you first meet Donald Wainright or become aware of who

Donald Wainright was?

A. Uhm…. several years ago.

Q. When you first became aware of who Donald Wainright was, was he an employee of OSM?

A. Uhm…Yes.

Q. Did you have any ever discussions that you can recall with Donald Wainright?

A. I never had any conversations with him as such.

Q. You said that you invested in OSM, and you also loaned money to OSM, where did you take the money, from what bank, to loan to OSM?

A. Uhm…I don't know if I can give an estimate…particularly…as I uh…

Attorney Sulzbach: You can give them the name…

A. The banks?

Attorney Sulzbach: The name of the bank…

A Bank?

Attorney Sulzbach: From which you took funds to advance to OSM

A. Umm… Citizens Bank.

Q. In what state was Citizens Bank located in when you took the money out of it to loan money?

A. In Massachusetts.

Q. Was that the first time that you loaned money…was that the first bank that you used to withdraw funds to loan…

Attorney Sulzbach: To who?

Q. or to …

Q. If I could finish my question Attorney Sulzbach…

A. To OSM?

Q. To loan money to either OSM or to Robert Polansky for running OSM?

A. I never extended any loans to Robert Polansky, solely to OSM

Q. So Citizens Bank in Massachusetts was one of the banks that you used to withdraw funds from to loan to OSM? Correct?

A. Citizens Bank.

Q. Okay. What year was that?

A. Oh…19…19…ah…97…8…I'm not quite sure

Q. And was that when you first invested in the stock …was that the investment bank that you used…withdrawn…was that the bank that you used to purchase the 93% of the stock?

A. Uhm…I don't recall…probably.

Q. What other banks did you use or what other bank accounts did you use to withdraw money from to invest or loan…extend loans to OSM?

Attorney Sulzbach: You can answer that.

A. What was the question again?

Q. What other banks did you use or bank accounts?

A. Uhm…I'm not sure I used any other banks…as a matter of fact…

Q. And the account that you used at citizens bank was that an account that you hold in your name solely or is there somebody else on that account

A. Uhm…It started solely

Q. So, your wife's name is not on it?

A. Huh?

Q. Your wife's name is not part of that account?

A. I put my wife's name on it subsequently.

Q. And from 1997 to 1998 from that time period to today, it's your testimony that you've made no loans to Robert Polansky?

A. I never made loans to Robert Polansky.

Q. Did you ever tell Mr. Polansky that you would lend him money whenever he needed it for OSM?

A. I never lent him money…I never told him I would lend him the money.

Q. Did you loan…but…but did you tell Robert that if OSM needed money you had money to loan him to help get the company started?

A. No…I…I don't understand the question.

Q. Okay I'll rephrase it.

A. If you could please.

Q. You made an investment in OSM…

A. Yes

Q. And Robert Polansky was running OSM, correct?

A. Yes.

Q. And if OSM needed money, because they were running short on money, would you have lent them more money or did you lend them more money?

Attorney Sulzbach: Why don't we do one question at a time?

Q. Did you lend them money?

A. From time to time I would lend them money, the bank, not…not him but to the company

Q. When was the last time you lent OSM money?

A. Uhm...now I don't understand that question...is it supposed to be to 2000 or what… or does it go to yesterday…

Q. To today?

<u>Attorney Sulzbach</u>: When was the last time you lent OSM money

A. I would think four months ago.

Q. And how much did you lend?

A. 3 or 4,000 dollars perhaps.

Q. 3 to 4,000…?

A. Not to him…

Q. I understand…

A. Not to him…but the company I sent 3 or 4,000 dollars.

Q. And what was the reason you sent that money to OSM?

A. Because I was…just…the reason I sent the 3,000… apparently he asked for money, he was running short, I sent the company money, he was running short, and I sent him only three because I was done with him, I didn't want to lend any more.

Q. And what was the reason …

Attorney Sulzbach:  (inaudible)

A. (Inaudible)

Q. What was the reason that…ahh…who contacted you to send the money?

A. It had to be Robert Polansky.

Q. Okay. And in the conversation you had with Robert Polansky…

A. Yes…

Q. …he asked you to lend him some money…or lend the company some money.

A. No. He said he needed more money and he was running out of money and I told him that was it.

Q. And what did he tell you the reason that he needed more money for…was for?

A. I guess he said he didn't…that the company didn't have any at that point.

Q. And is the company still operating today?

A. The company is still alive today.

Q. And are you on the board of directors.

A. I am still on the board of directors

Q. Do you recall a time period where OSM was being advertised for sale?

A. Uhm…I don't think it was ever advertised for sale.

Q. Did you ever attend any board of directors meetings?

A. We a…there was so little…we attended board meet…meetings over the telephone. We held them over the telephone

Q. And who would participate in those board meetings?

A. In the ahh…meetings?

Q. In the meetings.

A. Robert and I, we were the only two directors.

Q. How often did those board meetings occur?

A. Once a month…excuse me…once a year.

Q. And who was the secretary for the board of directors?

A. Robert was the secretary, I believe.

Q. And were you ever asked to look at and approve minutes of the last board meeting or was there not that formality?

A. Not really …there was no real formality about it.

Q. And you also…you said before…you started one sentence with you said "so little"…so was there…what type of formalities were there being on the board of directors, what were you asked to do?

A. Simply to confirm the fact that Robert was still president, treasurer and secretary.

Q. Did you ever discuss what OSM…the company…operated as, you testified earlier that installed…that the functions were that they installed signs and sold advertising, but did you…did you ever discuss during the board of directors meetings what the company was doing?

A. The ah…

Attorney Sulzbach:  That's a yes or no question.

A. (Inaudible)

A. Repeat the question I didn't understand it.

Q. Did you ever discuss during you annual board meetings, what the company was doing?

A. Oh, yes.

Q. And what were…

A. Well…I've got to qualify that yes…because basically

Attorney Sulzbach:  No…

Q. He can explain.

Attorney Sulzbach:  No…The question is yes or no…

Q. Attorney Sulzbach…Attorney…

Attorney Sulzbach:  …until you ask another question then his answer is yes or no…

Q. Attorney Sulzbach…This is not a running dialogue… after I am done …then you can counsel him.

<u>Attorney Sulzbach</u>:  …he can't answer beyond yes or no.

A. Yes.

Q. And what were those discussions.

A. The discussions consisted of a sentence, things are the same and will continue, we'll do the best and Robert said I'll do the best I can.

Q. When was the last time you had an annual board meeting?

A. Last year, I guess, I think it was last year.

Q. So at some point for things to be the same, you would have had to have a discussion about what things were, correct?

A. No we didn't discuss what things were, I simply left this up to Robert, he was running the company, and I let it go at that.

Q. Okay, the company when you invested in it, what was your understanding of the money that you invested, what was going to happen to all that money?

A. Used for the functions of the company.

Q. And what were…the functions of the company that you said…were to install signs and sell advertising?

A. Uhm…hopefully.

Q. And. were you aware whether Robert was going to go out and hire employees to work for the company?

A. Robert never asked me, and what he did, was what he did.

Q. So at none of the board meetings were you asked to approve employment contracts?

A. Approve what?

Q. Employment contracts?

A. No, I was not.

Q. Were you asked to approve salaries for any of the officers of the company?

A. No.

Q. Were you asked to approve any advertising material promoting the company?

A. No.

Q. So when you…do you recall…now…now that we've spoken about it for a few minutes, do you recall the amount of money that you first invested in OSM?

A. No. Not really at the moment. Ahh…What was the question again?

Q. Do you recall the amount of money that you first invested in OSM?

A. No, I don't.

Q. Sir, if you need a break or if you need water just…

A. I beg your pardon.

Q. …if you need a break or need to take some…a drink of water or use the restroom at any time..feel free.

A. No…I'm… thank you I'll just sit here.

Q. Did you ever sign any documents in reference to the money that you loaned OSM?

A. No.

Q. And when you invested and purchased the 93% of stock, did you …

A.  Oh (inaudible)…uh

Q.  …receive any stock certificates back?

A. The stock certificates I believe are held in the lawyer's office but I didn't, Ididn't take them.

Q. And what lawyer, do you recall what his name was?

A. That was sometime…I don't recall.

Q. And you test…you said that you don't have any documents relating to any loans that you made to the company?

<u>Attorney Sulzbach</u>:  He didn't say that. Is the question does he have documents?

Q.  Do you want me to replay the videotape?

<u>Attorney Sulzbach</u>. No…Uh… (inaudible)

Q. I asked him if he signed any documents for any loans he clearly said  "No."

<u>Attorney Sulzbach</u>: That's what he signed.

Q. That's what I'm asking.

A.That I signed documents?

Q. Yes.

A. No.

Q.  Okay.  Do you have any loan documents that were signed by OSM?

A. The stock certificates, I believe, were signed by OSM.

Q. Okay. So you have stock certificates. Do you have any loan, other loan documents, promissory notes, or anything of any nature, for money that you gave, that you lent to OSM?

A.Yes there are some notes outstanding.

Q. And who keeps track of the notes that are outstanding?

A.They are at the lawyers office too.

Q. Okay, so three or four weeks ago when you loaned them three thousand dollars, what type of loan document did you sign…or did…was signed on behalf of  OSM?

A. Uhh…I…it's sort of an open loan up there, I believe, I'm not quite sure I think…I don't recall signing documents that time.

Q. Okay. Is it fair to say that you just wrote a check and sent  it to OSM?

A. No. I didn't write a check.

Q. How was the money transferred?

A. A wire.

Q. And that was wired out of your Citizens account?

A. Yes.

Q. And is that the same citizens account that you lent the money in 1997 and '98?

A. Yes.

Q. Okay. And prior to that three thousand dollar loan, when was the last time before that that you lent OSM money?

A. I don't remember the dates.

Q. Was it within the last year?

A. I'm so (inaudible) not necessarily the year 2000, right?

Attorney Sulzbach. Any year.

A. Ya…Yes, there were other occasions.

Q. Okay. Can we go off the record for one moment please? Unless you want to continue to tell me. You can go off unless you're…

Q. Mr. Polansky, do you have your bank account number at Citizens bank on you? Do you have a bankcard or any records with you that will give us the bank account number for Citizens bank?

A. No I don't.

Q. Okay. And when can you produce records associated with those amounts of monies wired or checks written to OSM from 1996 to the present? How long will it take you to produce those records?

A. Uhmmm. I am not sure, a week or two I suppose, more or less.

Q.  And do you have any objection as to providing checking account statements which reflect…

<u>Attorney Sulzbach</u>. That…wait a minute.  That…that's a decision you will make through

counsel.

 Q. Do you…do you have checking account statements that you maintain at your house?

A. What's…what's…

Q. Do you have checking account statements…do you get statements every month from

Citizens bank?

A. Yes.

Q. Okay. And in those statements will be reflected the amount of money that was lent to OSM?

A. Yes.

Q. And how far back do your statements go that you have at your house, do you recall?

A. Well, since the inception of the account as far as that goes, but uh…I'm not sure.

Q. Okay, and was that that before1996, did you open that account?

A. I don't really recall that..uhh…

Q.  Well, you testi…it was open in 1997 and '98, correct?

A. Well, I think so I'm not sure.

Q.  Well you said earlier that's the bank that you used to, to lend money or to buy stock in 1997

and'98…

A.Yes, yea, yea.

 Q. So, the account was open at that point, correct?

A. Uh, probably, I'd have to check that.  I'd have to go back and look.

Q. Okay. Was there another bank…

A. As a matter of fact, I don't know if I…I don't know if I kept the original statements anyhow, that goes a long ways back and I think about three years is about that…otherwise you get really cluttered up with it.

Q. Do you have a record keeping system for the amount of money in total you lent to OSM?

A. I have a very informal system.

Q. Okay, when you say it's very informal, what is that, your memory?

A. My memory and just copies of the statements which I'd have to start digging out.

Q. Okay. As you sit here today, do you have any idea how much money is owed to you by OSM?

A. Umm. Several hundred thousand.

Q. Do you recall… and you don't…that's wrong …do you recall signing a promissory note on March 7, 1994?

A. I signed a promissory note?

Q. Do you recall signing a promissory note with OSM Communications?

A. No.

Q.  Okay.  Do you recall lending OSM Communications $365,800 in 1997?

A. I don't recall the amount.

Q. Do you recall lending OSM Communications $221,225 during the time period from 1993 to 1996?

A. I don't recall these amounts.

Q. Does that seem like too much money to have lent OSM Communications?

A. Uh…More or less in the ballpark.

Q. Okay.

A. I'm not sure.

Q. So that's… those numbers I just read to you total $587,025.

A. Well…

Q. Okay.  And I ask you if you sat here today if you rec…if you, if you had an idea how much money was owed and you said several hundred thousand.  Do you recall giving that answer?

A. Well, it turns out good.

Q. Okay.  So 587 thousand is… means the same to you as several hundred thousand?

A. Not necessarily.

Q. Okay.  Umm…and you sent …you testified you sent, the last money you sent to OSM was a wire. Correct?

A. Yea.

Q. Okay. Was your normal course of lending money to OSM by sending wires?

A.  Usually.  Always. Usually.

Q. And though the amount of those wires is reflected on your statements, correct?…checking account statements?

A. Probably.

Q. And you don't have another set of books or any other type of record keeping where you've written down and totaled up the amount of money you've lent?

A. No.

Q. Okay. When money was asked to be lent to OSM by Robert to you, was that done by telephone or by writing?

A. Uhh…telephone.

Q.  Was it always done by telephone or was it always done by writing.

A. Possibly.

Q.  Okay. What's the percentage of times that you loaned money that he just called you? What would you say the percentage was?

A. The majority.

Q. Ninety-five percent?

A.  I couldn't say exactly.

Q. Okay. Could you give an estimate?

A. It would be vague..

Q. And, what was the procedure?  You would call your bank and then wire money?  How would the wire work?

A. Yea…They… I would call the bank or I'd go down there at times.

Q. And was there a local branch that you would you use for Citizens bank in Massachusetts?

A. Yes…yes.

Q. What's the address of that branch?

A. The what?

Q. The address…the address… the physical address of the local branch?

A. Um…it's just I don't know the exact number.  It was at Newtown Center.

Q. And is there a bank officer that you would speak with there.

A. Uhh…  Several of them.

Q. Okay.  What's one of the names of any of the officers that you dealt with at the bank?

A. Uhh….one was Mark.

Q. Do you know Mark's last name?

A. No I don't.

Q. Do you know any of the last names of any of the bank officers that you dealt with?

A. I can't recall at the moment off hand.

Q. That's fine. We asked you before about, that you lent the $3,000…When was the last time before that $3,000 that you lent OSM money?

A. I don't recall exactly.

Q. So between 1997 and '98, to three months ago, when you lent them $3,000, there were occasions where you lent OSM money?

A. Yes.

Q. Okay. And how often would you lend OSM money?

A. Whenever the company ran short.

Q. Was it once a year…

A. Because there was no other money which we uhh….which Robert was trying to get.  I beg your pardon…

Q. Was it once a year, twice a year, how often would you estimate?

A.  Oh…frequently.

Robert Polansky: Excuse me. We have to come back…

Q. If you'd like to break, we…

Robert Polansky: Would you mind taking a break?

Q. Absolutely.

**OFF THE RECORD 2:40 P.M.**

**ON THE RECORD 2:46 P.M.**

Attorney Sulzbach: Since we're going to make the production that we've agreed to produce and continue this deposition…um…things are getting urgent back in Massachusetts and my client is

very tired having been really ready to start this thing uh…in mid day and uh…so I think what we ought to do is adjourn this to the next period we'll make our production and, and uh… will get it down…and I'm hoping that we can do it here rather than Boston.

Q. The location is… is whatever's suitable for Mr. Polansky.

A. Well…

Q. I have no objection to…to being in Boston or here.

A. My wife uh…is not well…is a…and a…

Attorney Sulzbach: But…but we'll work that out …so let's…

Q. We'll work that out…we'll work that out through the attorneys.

Attorney Sulzbach: Yes. So, we'll agree on our production and we'll make that.

A. And I barely got away today, it's just that I had (inaudible)…

Q. Ca…can we, can we obviate the need for court intervention , and, and it's whatever statements he has the last three years…or, or, or…

Attorney Sulzbach: Well, any statement that relates to OSM.

Q. To any monies lent from Citizens Bank to OSM.

Attorney Sulzbach:  to OSM.

Q. Correct. And any wires.

Attorney Sulzbach:  Yes, yes.

Q. Okay.  Fair enough. And we'll try to do that uh…within the next few weeks, whenever it's arranged through counsel.

Attorney Sulzbach: Yea, exactly, yea.

Q. Okay.  This concludes uh… this portion of deposition to be continued to a date that's agreed upon by both attorneys.

<u>Attorney Sulzbach</u>: And to that end, I think we're going to need a continuance on our summary judgment period once again.

Q. Um…Yea, well, we can speak about that off the record…I mean that's…I'm not sure even what the date was for the summary judgment.

<u>Attorney Sulzbach</u>: What it was before?  Uh…the beginning of April.

Q. Beginning of April…Maybe we should uh…agree…

<u>Attorney Sulzbach</u>: Push back to the end of April?

Q. Uh…well…if, if…

<u>Attorney Sulzbach</u>: I mean, I'll do it as fast as I can.

Q. If you're going to provide me with the statements…

<u>Attorney Sulzbach</u>: Yep.

Q. Um…and he's made record, statements on the record uh, so, if you're going to limit to OSM I want to make sure there's no payments to Robert or Anne Polansky either of the …uh…defense.

Attorney Sulzbach: Those I really…I, I, I will go to the judge on those because he…

Q. Okay.  So go to the judge on that we'll just have a conversation and we'll ask him the necessity of those records and…

<u>Attorney Sulzbach</u>: If you tell me how they're relevant.  I mean he's, he's, he's Robert's father and Anne's father-in-law.

Q. They're defendants, they're all defendants in a federal lawsuit.

<u>Attorney Sulzbach</u>: Correct, but the lawsuit has a subject matter and tell me how this relates to that subject matter or is likely to lead to anything that's relevant.

Q. Piercing the corporate veil because there's no formality…uh…I'm, I'm not even going to

recite that.  I'll talk about this, uh, off the record and with counsel and if it needs to go to, uh,

motion work, I'd be more than happy to do that, so…

<u>Attorney Sulzbach</u>: Okay.

Q. So…uh, so we're going to continue this to a date to be set within the next two weeks plus or

minus a few days, uh, what can be arranged through counsel.  And that concludes this portion

of the deposition.

**OFF THE RECORD TIME: 2:50 P.M. END OF RECORDING**

**CERTIFICATE**

STATE OF CONNECTICUT          }

COUNTY OF MIDDLESEX          }

I, Kari Payette, a notary public in and for the Sate of Connecticut, do hereby certify that the foregoing record is a correct and verbatim computer aided transcription of the proceeding here and before set forth.

I further certify that I am neither counsel for, nor related to, or employed by, any of the parties in the action in which this proceeding is taken; and further certify that I am not related to, nor an employee of, any attorney or representative employed by the parties thereto, nor am I financially interested in this action.

In witness whereof, I have hereunto set my hand and affixed a notarial seal this date January 3, 2005.

_____/s/

Kari Payette

Notary Public

My commission expires:

## EXHIBIT B TRANSCRIPT OF ROBERT POLANSKY DEPOSITION

1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF CONNECTICUT

3

4

5       * * * * * * * * * * * * * *  *
        DONALD WAINRIGHT, ET AL        *
6                      Plaintiffs      *   Civil Action No.
                                       *   3:01CV2158 (WWE)
7            VS.                       *
                                       *   December 14, 2004
8       O.S.M. COMMUNICATIONS, INC.,  *
        ET AL,                         *
9                      Defendants      *

        * * * * * * * * * * * * * *  *
10

11                    DEPOSITION OF ROBERT E. POLANSKY
12

13
        Appearances:
14
                FOR THE PLAINTIFFS:
15
                        LAW OFFICES OF ROBERT E. ARNOLD, LLC
16                      295 Bassett Street
                        New Britain, Connecticut 06051
17                          By:  ROBERT E. ARNOLD, ESQ.

18                      LAW OFFICES OF KAREN HALEY &
                        ASSOCIATES, LLC
19                      419 Whalley Avenue, Suite 105
                        New Haven, Connecticut 06510
20                          By:  KAREN E. HALEY, ESQ.

21              FOR THE DEFENDANTS, ISRAEL POLANSKY
                and ANNE POLANSKY:
22
                        J. MICHAEL SULZBACH, ESQ.
23                      385 Orange Street
                        New Haven, Connecticut 06511
24


                        POST REPORTING SERVICE
                    HAMDEN, CT  (800) 262-4102

2

1    Appearances Continued:

2            FOR THE DEFENDANT, ROBERT E. POLANSKY:

3                ROBERT E. POLANSKY, PRO SE
                 3 East 69th Street
4                New York, NY 10021

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

3

1                    . . .  Deposition of ROBERT

2     E. POLANSKY, taken on behalf of the Plaintiffs in

3     the above-entitled cause, before Lisa Graziano, a

4     Licensed Shorthand Reporter and a Notary Public in

5     and for the State of Connecticut, County of

6     Hartford, held on December 14, 2004, at 11:20 a.m.,

7     at the Law Offices of J. Michael Sulzbach, 385

8     Orange Street, New Haven,, Connecticut, at which

9     time the parties were represented as hereinbefore

10    set forth. . .

11

12

13

14

15

16                    STIPULATIONS

17

18

19                    All objections, except as to form, are

20    reserved until the time of trial.

21                    Formalities as to notice and proof of

22    the authority of the Notary Public are waived.

23                    The reading and signing of the

24    deposition are not waived.

4

```
 1                    ROBERT E. POLANSKY

 2     Having been called as a witness, was first duly

 3     sworn and testified on his oath as follows:

 4

 5

 6                    MR. ARNOLD:  Let's pre-mark these

 7     as exhibits.

 8                    (Whereupon, the documents were

 9     received and marked as Plaintiff's Exhibits A

10     through Y for identification.)

11

12

13                    DIRECT EXAMINATION

14     BY MR. ARNOLD:

15        Q     Good morning, Mr. Polansky.

16        A     Good morning.

17        Q     Where do you actually reside?

18        A     I reside at 3 East 69th Street in New York

19     City, Apartment 2-A.

20        Q     Zip code?

21        A     10021.

22        Q     You filed an appearance in federal court in

23     this case with a Weston, Connecticut address?

24        A     Yes.
```

5

```
1     Q      Who lives at that Weston, Connecticut
2     address?
3     A      Robert Ruben is cousin Robert.  He
4     consented to take delivery of my Connecticut
5     documents.
6     Q      Have you, in fact, received any mail that's
7     delivered to that address?
8     A      No.  The fact is, Robert right now is
9     having a triple bypass in New York City, so anything
10    you sent in the last week would not have gotten to
11    me yet.
12    Q      Have you changed your address with the
13    court to 3 East 69th Street?
14    A      No.
15    Q      Okay.
16    A      Not as 9 Aspertuck Lane, Weston,
17    Connecticut.
18    Q      Is it your intention to change your address
19    with the court so you can receive important notices
20    from the court?
21    A      It depends.  I will talk to Robert in the
22    next day or two.  I see no reason.  He has a
23    complete staff that's there of people.  His wife
24    lives up there with him, and I don't know why I
```

6

```
 1    wouldn't be getting everything on a timely basis.

 2                    MS. HALEY:  Because it keeps

 3    getting returned.

 4                    THE WITNESS:  Does it?

 5                    MS. HALEY:  Yeah.

 6                    THE WITNESS:  Maybe I'll have to

 7    put, "In care of Robert Ruben" on it because we were

 8    just using the address, which is what he said to

 9    do.  And he had said that he had --

10    BY MR. ARNOLD:

11       Q      Who do you reside with in the 3 East 69th

12    Street address?

13       A      My wife of thirty-two years, Anne Polansky.

14       Q      You currently represent yourself, is that

15    correct?

16       A      I do.

17       Q      You have made a representation to the court

18    that you were going to be hiring an attorney.  Have

19    you, in fact, endeavored to hire an attorney?

20       A      I'm in negotiations with an attorney.

21       Q      What is that attorney's name?

22       A      Mike Tagliatela.  Let me give you the

23    precise spelling.  It's Mike Tagliatela.

24       Q      Where is he located?
```

7

1     A       In this building here.

2     Q       Does he work with Attorney Michael

3    Sulzbach?

4     A       No.  He's an independent.  There are two

5    partners in the firm, I understand.  I'm not

6    familiar with the details of the firm.

7     Q       Who's the other partner in the firm?

8     A       It's Mike Tagliatela and Mark Tagliatela.

9             MS. HALEY:  Did you say Mark?

10            THE WITNESS:  It is an with an R,

11    yes.  It's Mark Tagliatela.

12    BY MR. ARNOLD:

13    Q       So it's Mike and Mark, correct?

14    A       Yes, Mark and Mike.

15    Q       And do you anticipate them filing an

16    appearance in your case?

17    A       We're talking about it.  In the near term

18    we will have a decision on it.

19    Q       Have you given them any retainer funds?

20    A       No.

21    Q       You're a defendant in the action which

22    brings you here today.  You're aware of that,

23    obviously?

24    A       Yes.  I'm aware, yes.

8

1     Q     Okay.  And you know who Donald Wainright

2   and Deborah Russo-Williams are, correct?

3     A     Yes.

4     Q     I'm going to start with Donald Wainright

5   and discuss his case against you.  When did you

6   first meet Donald Wainright?

7     A     Approximately 1989.

8     Q     What were the circumstances surrounding

9   your meeting him?

10    A     He was hired by one of my people to work in

11  the software development area.

12    Q     And that was for what company?

13    A     In-Store Advertising.

14    Q     I'm going to show you what's been marked

15  Plaintiff's Exhibit C and ask that you take a look

16  at that, please.

17              MR. SULZBACH:  Do you have copies

18  of these new documents?

19              MR. ARNOLD:  New documents?

20              MR. SULZBACH:  Yeah.  In other

21  words, this is not one I've seen, not one that's

22  been produced before.  I don't believe that Mr.

23  Polansky produced it.

24              THE WITNESS:  Mr. Wainright should

9

1    have produced it at his deposition.

2                    MR. ARNOLD:  Prior to --

3                    MR. SULZBACH:  I just want to get a

4    copy.

5                    MR. ARNOLD:  Prior to us leaving,

6    you can have copies made.  This is your office.

7    With your allowance, you can have copies of all of

8    these exhibits which will be attached to the

9    transcript.  But it's your office.  As long as your

10   copying machine is available, you're certainly

11   welcome to have that.

12                    THE WITNESS:  Answer it, right?

13                    MR. SULZBACH:  What's the

14   question?

15   BY MR. ARNOLD:

16   Q     You're familiar with this employment

17   agreement for Donald Wainright?

18   A     Yes.  It appears to be a Xerox copy of the

19   employment agreement, yes.

20   Q     Okay.  Do you have a signed original

21   somewhere in your files?

22   A     Probably.  I don't know.

23   Q     Well, in looking over that agreement, do

24   you think that this has been altered from the

10

1   original or --

2   A       It's hard for me to say.  It looks right,

3   but -- it looks right.  I don't have the original in

4   front of me, but it appears to be the document.

5   Q       And that's your signature that appears at

6   the end of the document, correct?

7   A       Appears to be my signature, yes.

8   Q       Well, either it's an exact replica of your

9   signature or not.

10              MR. SULZBACH:  Wait a minute!  If

11  he doesn't know or if he does know, it's up to him.

12  He's the only one that can know the answer.

13              MR. ARNOLD:  I'm sorry, you're not

14  representing him.

15              MR. SULZBACH:  I represent a party

16  and I have rights to have the questions asked and

17  answered properly.

18              MR. ARNOLD:  According to your

19  style?  I'll ask the questions the way I want to ask

20  the questions without any interference or direction

21  from you, Attorney Sulzbach, and we'll get through

22  this a lot quicker.  So, every time that I make a

23  comment, you are going to object to my questions,

24  this is going to take all day.

         1              MR. SULZBACH:  Fine.

         2              THE WITNESS:  Mr. Arnold, can we

         3    proceed, please?  I will depend on Mr. Sulzbach and

         4    I will listen to him, but I expect it to go on

         5    smoothly.  It appears to be an accurate copy of the

         6    employment agreement with my signature, yes.

         7    BY MR. ARNOLD:

         8       Q      And the date next to your signature is

         9    October 4, 1996?

        10       A      Yes.

        11       Q      Okay.  So, you met Donald Wainright in 1989

        12    and the employment agreement is dated 1996 with OSM?

        13       A      Yes.

        14       Q      When Donald Wainright was hired in 1989,

        15    what company did he work for?

        16       A      In-Store Advertising.

        17       Q      And what was your capacity at In-Store

        18    Advertising in 1989?

        19       A      Founder and CEO.

        20       Q      Who else was on the Board of Directors of

        21    In-Store Advertising?

        22       A      Merrill-Lynch Capital Markets, Steve

        23    McCormick; Jeff Walker, head of Capital Ventures,

        24    now head of Chase Ventures; Kurt Johnson, the son of

```
 1    Sam Johnson of S.E. Johnson family; Kouzi (phonetic

 2    spelling) Wadia, W-A-D-I-A, of Technology Funding;

 3    and Bruce Maggin of ABC Cap Cities, M-A-G-G-I-N.

 4        Q        Was Israel --

 5        A        I'm sorry, and Israel Polansky, yes.

 6        Q        As well as yourself, correct?

 7        A        Yes.

 8        Q        And who are the major shareholders?

 9        A        Major shareholders were the Venture

10    Capitalists.

11        Q        And what was the percentage of ownership

12    that you had in terms of share?

13        A        Four percent.

14        Q        How about Israel Polansky?

15        A        Four percent.

16        Q        And what was Israel's role on the Board of

17    Directors?

18        A        He was a member of the board.  He was on no

19    committee.

20        Q        Was he an officer of the company at any

21    point?

22        A        No.

23        Q        At some point, In-Store Advertising -- and

24    if I may for the duration of this deposition refer
```

13

1    to it as ISA.

2        A       It's ISA.

3        Q       ISA, okay.  Ceased to exist, is that

4    correct?

5        A       At some point, yes.

6        Q       Okay.  And what were the circumstances that

7    led to ISA ceasing to exist?

8        A       In-Store Advertising ceased to exist in

9    1994.  You have to be a little more precise with

10   your question.  What do you mean "ceased to exist"?

11       Q       Well, was there any type of Security and

12   Exchange Commission investigation into ISA?

13       A       Yes, there was.

14       Q       Okay.  When did that occur?

15       A       19 -- to the best of my recollection, 1992

16   to '93.

17       Q       Okay.  And what was the reason for the

18   investigation?

19       A       Alleged improprieties with the public

20   offering.

21       Q       And was that in reference to the

22   advertising for sale of ISA?

23       A       No.  What do you mean "advertising"?  I'm

24   sorry --

14

```
 1     Q       Was the company trying to be sold?

 2     A       No.

 3     Q       So, what was the underlying background of

 4   that investigation?

 5     A       I'm confused as to where you're going.  Why

 6   don't you be a little more precise?

 7     Q       I want you to be specific about what the

 8   charges were against ISA.

 9     A       Charges were that some of the numbers in

10   the public offering weren't precise.

11     Q       Who prepared the public offering?

12     A       The CFO and his group.

13     Q       Who was the CFO?

14     A       John Capps.

15     Q       Capps?

16     A       C-A-P-P-S.

17     Q       As the founder and CEO, where were the

18   funds obtained to invest in ISA?

19     A       At what stage?

20     Q       At the initial stage.

21     A       Israel Polansky.

22     Q       In exchange for the four percent of stock

23   ownership, he invested a certain amount of money?

24     A       Yes.
```

15

1     Q     In exchange for your four percent stock

2     ownership, did you put money or was that in the

3     working?

4     A     It was a combination of both.

5     Q     Did you work on the public offering at all

6     for ISA?

7     A     No.

8     Q     Did you ever consent to the entry of a

9     permanent injunction prohibiting you, Robert

10    Polansky, from any further violations of the

11    anti-fraud and record keeping provisions of the

12    Securities Act of 1933?

13    A     There is no such -- say that again.

14    Q     In September of '96, did you consent --

15    A     No, I did not consent.

16    Q     Okay.  Was an entry made of a permanent

17    injunction against you in 1996 by the SCC?

18    A     No.

19    Q     There was no action taken against you at

20    all by the SCC in 1996?

21    A     There was a consent order which was

22    signed.  It's not an injunction.  It carries no

23    prohibitions in any way, shape or form.

24    Q     And what was the consent order?  Tell me

16

1    what the specifics of it were, if you can recall.

2    A    It says that, "We don't know if you did

3    anything wrong, but if you did, don't do it again."

4    It is what is called a no proof, no substance, no

5    reality to allegation kind of document.

6    Q    And shortly thereafter -- withdrawn.

7         ISA filed for bankruptcy at some point?

8    A    You're saying the date was 1996 on that?  I

9    think I would research that date a little.

10   Q    Was it 1993?

11   A    I don't know the date.

12   Q    Okay.  Did ISA file for bankruptcy?

13   A    No.  Well, it was a -- no, it didn't file

14   for bankruptcy.

15   Q    At some point they were taken over,

16   acquired by another group called Electronic

17   Marketing and Retail Communications, is that

18   correct?

19   A    Yes.

20   Q    And who owned that company?

21   A    The board, the same board owned that

22   company.

23   Q    And then eventually that business was taken

24   over by Valassis Communications, Inc.?

17

```
 1      A      Yes.

 2      Q      And what was your relationship with

 3   Valassis?

 4      A      None.

 5      Q      Was it sold to Valassis?

 6      A      Yes.

 7      Q      And then at some point OSM bought Valassis?

 8      A      Yes.

 9              MR. SULZBACH:  Bought Valassis?

10              THE WITNESS:  No, no.  Thank you.

11   We bought what remained of ISA from Valassis.  Thank

12   you.  I didn't buy Valassis.

13   BY MR. ARNOLD:

14      Q      And in 1996, who comprised OSM, principals?

15              MR. SULZBACH:  You mean officers or

16   directors?

17              MR. ARNOLD:  Yes, officers and

18   directors.

19              THE WITNESS:  Robert Polansky and

20   Israel Polansky.

21   BY MR. ARNOLD:

22      Q      And as a condition of the acquisition of

23   Valassis In-Store Marketing, who required you to

24   obtain a $250,000 line of credit?
```

18

1    A    Valassis.

2    Q    And how was that line of credit obtained?

3    A    It was obtained from Ameristar and included

4    in the purchase and sale agreement.

5    Q    And who was Ameristar?

6    A    It was a financial organization.

7    Q    Who owned Ameristar?

8    A    Joe Messina and another man.  I don't

9    recollect his name.

10    Q    Where were they located at the time that

11    business operations --

12    A    They were located in the same building that

13    I was in in the Newsweek Building on Madison Avenue.

14    Q    And do you have any records or memoranda or

15    notes or any files that reference Ameristar and the

16    $250,000 line of credit?

17    A    No.

18    Q    Are there any --

19    A    The proposal is in the purchase and sale

20    agreement, which I gave you.

21        MR. ARNOLD:  Can we go off the

22    record for a second?

23        (Off-the-record discussion.)

24        MR. ARNOLD:  Back on the record.

19

1    You can mark that.

2                    (Whereupon, the document was

3    received and marked as Plaintiff's Exhibit Z for

4    identification.)

5    BY MR. ARNOLD:

6        Q    You've handed me what's been marked as

7    Plaintiff's Exhibit Z.  Can you show me in this

8    exhibit where there's a reference to the line of

9    credit?

10       A    (Witness so doing.)

11       Q    Did you ever draw any funds from Ameristar

12   to operate OSM?

13       A    No.

14       Q    In relation to the funding to operate OSM

15   at that time, who was funding all of the operations?

16       A    Israel Polansky invested the funds to do

17   so.

18       Q    I'm going to show you what's been marked as

19   Exhibit T and ask if you recognize that?

20       A    Where did you obtain this, if you don't

21   mind my asking?

22       Q    Do you recognize that document?

23       A    I won't answer until you tell me where you

24   obtained this document.

20

1    Q      Is that your signature on the document?

2    A      It's a highly confidential document which

3    is not public.  How did you obtain this document?

4    Q      Mr. Polansky, is that your signature at the

5    bottom of that page?

6    A      It appears to be, but this is a Xerox copy.

7    Q      Let me explain how a deposition works.

8    A      Let me explain to you --

9    Q      I will get the federal judge on the line

10   right now.

11   A      You may do that.  Your threats --

12   Q      It's not a threat.

13   A      I asked you a question.

14   Q      You do not have a right to ask any

15   questions.

16   A      You don't have a right to use confidential

17   documents which are not privy to you and you should

18   not have this.

19   Q      Is that your signature at the bottom of

20   that document?

21   A      Where did you get that?

22   Q      Are you going to answer the question or

23   not?

24   A      It appears to be.  It's a Xerox copy.  It

1    appears to be.  Where did you get that?

2    Q    I'm going to show you what's been marked

3    Exhibit U.  Is that your signature that appears on

4    the document?

5    A    Once again, this is from a minute book,

6    which was not made public, and how did Mr. Wainright

7    or you get ahold of this?

8    Q    Do you have these documents in your

9    possession?

10   A    Not now, I don't.  I don't know where they

11   are.  I don't have these documents in my possession.

12   Q    Is that your representation of your

13   father's signature on that Exhibit U?

14   A    Yes.

15   Q    I'd like to show you what's been marked as

16   Exhibit R.

17   A    Wait a second, please.  This one was

18   produced in the minute book, yeah.

19           MR. SULZBACH:  You did have it.

20           THE WITNESS:  But not the first

21   page.  The first page was -- I'm sorry, next

22   question, sir?

23   BY MR. ARNOLD:

24   Q    Are you ready, Mr. Polansky?

22

1      A      I'm ready.

2      Q      I'm going to show you what's been marked as

3   Exhibit R.  That's the Board of Directors and

4   organizational chart for OSM?

5      A      Yes.

6      Q      And it shows that Israel Polansky is

7   involved in the operations?

8      A      This was a document for investor pitch to

9   GE Capital.  This was a proforma document and it was

10  taken from that proforma as a possibility for the

11  future.  May I ask where you obtained this, too?

12     Q      Mr. Polansky, you're not allowed to ask any

13  questions.  It will go a lot easier --

14     A      Okay, go.  I think I produced that, too.

15     Q      I'd like to show you what's been marked as

16  Exhibit S.

17     A      This is the first page of three pages that

18  I have submitted to you as well.  This was part of

19  the same meeting for GE Capital, where they were

20  asking if they provided money who would potentially

21  be the organizational structure.  I have produced

22  that document as well, except mine is a three pager,

23  not just the front page.

24     Q      So, in the first paragraph, where it

23

 1   mentions some language in reference to Israel

 2   Polansky, can you read the second paragraph and the

 3   third paragraph to me, please?

 4      A       "Recognizing the potential of the company,

 5   he moved rapidly to purchase Valassis In-Store

 6   Advertising from Valassis in April, 1996."

 7      Q       And the last paragraph is?

 8      A       "A knowledgeable and senior statesman, he

 9   brings a wealth of experience to the company."  Yes,

10   he was a director of OSM.

11      Q       So, he actually participated with the

12   operation --

13      A       No, he never participated with the

14   operation.

15      Q       Let me finish my question.  Of Valassis?

16      A       Don't put words in my mouth.  No.  What?

17      Q       Did he actively participate in the

18   operations of Valassis In-Store Advertising?

19      A       No.  In no way, shape or form.

20                      MR. SULZBACH:  Answer the

21   question.

22   BY MR. ARNOLD:

23      Q       So, he served as president of the Atlantic

24   Paper Box Company?

24

```
 1      A      Yes.

 2      Q      And it says he put up the original $500,000

 3      to start In-Store Advertising, ISA?

 4      A      Yes.

 5      Q      And he served as a member of the Board of

 6      Directors from 1986 to 1991, correct?

 7      A      Yes.

 8      Q      Okay.  Did he invest other money other than

 9      the original $500,000?

10      A      No.  "Committed to restaging of the venture

11      which did close to $20,000,000 under his leadership,

12      he has aggressively put together a mixture of the

13      old team and new to drive the business."

14      Q      So, back to Exhibits T and U, I'm showing

15      you Exhibit T.

16      A      Yes.

17      Q      What is your understanding of what that

18      exhibit means?

19      A      It's just the record of the investment

20      dollars that Mr. Polansky put into the company.

21      Q      Mr. Polansky pointed several times to

22      something on the document, correct, Mr. Polansky?

23      A      Yes.  The 12/31/97, in terms of an overlap

24      that I provided to you.
```

25

1    Q      Okay.  And since 12/31/97, he's given other

2    money to OSM as well?

3    A      Yes.

4    Q      All right.  And what records do you have

5    that show the amount of money that he's invested

6    since 1997?

7              MR. SULZBACH:  If it's something

8    you produced, you should go to the documents that

9    you gave them.

10              THE WITNESS:  I produced that for

11    you.

12   BY MR. ARNOLD:

13    Q      You have a stack of papers in front of

14    you.

15    A      I produced it for you.

16    Q      Here's the pile of documents.

17    A      You're on your own.  You can find your own

18    this time.  Should I find it for him?

19              MR. SULZBACH:  Off the record.

20              (Off-the-record discussion.)

21              MR. SULZBACH:  Back on the record.

22    What's the question?

23              THE WITNESS:  Each year it details

24    how much money was put in.  It was probably -- see,

HAMDEN, CT  (800) 262-4102

1    this was -- I think this was done, yeah.  See that's

2    '97.  At the end of each minute meeting, you know,

3    it's the topic, yeah.  So, the structure is such.

4    You have that one.  That's what you just showed me.

5    I'll produce everything.

6    BY MR. ARNOLD:

7        Q      When's the last time that you had a Board

8    of Directors meeting for OSM?

9        A      2000.  I think in 2000.

10       Q      Did you ever sign your father's name to any

11   of the shareholder meeting records?

12       A      No.

13       Q      I'm going to show you the June 10, 2000

14   waiver of notice of the meeting of shareholders of

15   OSM Communications, and at the bottom of that page

16   there's two signatures, one for Robert Polansky, one

17   for Israel Polansky?

18       A      Right.

19       Q      Did you sign your father's name on that

20   line?

21       A      I don't need to, no.

22       Q      Was he present in June 2000 to sign that

23   document?

24       A      Of course.  Well, I don't know if he was

1    present the exact day.  When the notes were

2    produced, he was asked to put his signature on it.

3    I don't know if it was produced the exact same day.

4    Israel Polansky was the investor and I did once in a

5    while see him.

6        Q    Do you recall the testimony of Israel

7    Polansky that the Board of Directors meetings all

8    occurred by the phone?

9        A    I don't recall that at all.

10       Q    Did any Board of Directors meetings occur

11   over the phone?

12       A    I don't think so.  I think he actually came

13   into the city and we had a meeting right at the

14   company offices, which was once a year.  I mean,

15   after -- I think they were all at the office.  I can

16   go through that myself, but I think they were all at

17   corporate offices.

18       Q    Would you like to look at the minute book,

19   Mr. Polansky?

20       A    Is that what they say?  Okay, yeah.

21   Office, yeah.

22       Q    So, it's your testimony that he came into

23   New York in June of 2000 for a meeting?

24       A    Yes.

HAMDEN, CT  (800) 262-4102

28

1   Q      And it's also your testimony that none of

2   the annual shareholder meetings occurred over the

3   phone?

4   A      No.  Not to my recollection.  I can't --

5   it's really what's stated there.  We're talking five

6   to ten years ago, to the best of my recollection at

7   this time.

8   Q      Okay.  Let's focus back on Mr. Wainright.

9   I'd like to show you what's been marked as a group,

10  Plaintiff's Exhibit B, which is a copy of checks and

11  bank statements, and ask you to look through that

12  and see if you recognize any of those checks?

13  A      These seem to be copies of checks that I

14  wrote.  And these bank statements, these were sent

15  to Donald Wainright.  I don't know how I would have

16  ever seen them.  I don't recollect those.  But let

17  me see.  This was 1997.  Let me just check

18  something.  I'm sorry, bear with me.  See, in 1997

19  these were several returned checks.  In that year,

20  Mr. Wainright got $106,000 that did clear.  Yes,

21  this didn't, but in 1998, here's a check that didn't

22  clear.

23            MR. SULZBACH:  Wait!  I think the

24  only question was whether you could identify the

1    checks and the bank statements.

2                    THE WITNESS:  These are Xerox

3    copies.  They appear to be checks that I've

4    written.  But they appear to be copies of checks

5    that I had written, but I don't have the originals.

6                    MR. SULZBACH:  Can I see those?

7                    THE WITNESS:  Yes, sir.

8                    MR. SULZBACH:  Why don't you split

9    these since he can't identify?

10                   MR. ARNOLD:  Well, there's copies

11   of checks.  There's photocopies of the checks

12   attached to each page.

13                   THE WITNESS:  That Mr. Wainright

14   received, correct?

15                   MR. ARNOLD:  That's correct.

16                   MR. SULZBACH:  But he said he

17   doesn't know.

18                   MR. ARNOLD:  You're flipping each

19   page.  No, that's fine.

20                   MR. SULZBACH:  So far the only

21   checks that I found are at the beginning and at the

22   very end.

23                   THE WITNESS:  There were seven

24   checks in total over the course of the four years,

30

1    five years he worked.

2                    MR. ARNOLD:  We can separate it.  I

3    have no objection to that.

4                    THE WITNESS:  There's seven checks

5    over the course of five years.

6                    MR. SULZBACH:  Wait until you're

7    asked a question.

8                    THE WITNESS:  Yes, sir.

9                    MR. ARNOLD:  I'm just waiting for

10   the exhibit back.

11                   MR. SULZBACH:  For the record, I am

12   removing now from Exhibit B certain Chase Manhattan

13   Bank statements that appear to belong to Donald

14   Wainright, since Mr. Polansky can't identify those,

15   and I'm leaving behind photocopies of what appear to

16   be OSM checks, 1324, 1446, 1366, 1319, 1085, 1099

17   and 1275.

18                   THE WITNESS:  May I see those?

19                   MR. SULZBACH:  But wait for Mr.

20   Arnold to ask you a question.

21   BY MR. ARNOLD:

22     Q     So, at some point checks that you wrote on

23   behalf of OSM in favor of Donald Wainright were

24   presented for payment and returned by your bank for

1    having insufficient funds?

2    A    It appears so.

3    Q    Where did you obtain the funds with which

4    to cover these checks?

5    A    The funds to cover the operations, of which

6    personnel was one, came from investor Israel

7    Polansky.

8    Q    So, is it fair to say that when you needed

9    money to fund OSM for whatever reason, Israel

10    Polansky would fund that?

11    A    Yes.

12    Q    And did you ever have any conversations --

13                MR. SULZBACH:  Wait!  Can we clean

14    that up?  With regard to what time period?

15                THE WITNESS:  Periodically.

16    BY MR. ARNOLD:

17    Q    From what date to what date?

18    A    OSM, from 1996 through 2000, to the end of

19    2000.

20    Q    Well, isn't it true that you received money

21    as recently as this year?

22    A    Not to OSM.  Yes, I received money.

23    Q    From Israel Polansky?

24    A    Yes.

32

1    Q    To assist you with funding your legal

2    defense in this case, correct, is one of the areas

3    that you needed funding for?

4    A    Not necessarily.  Israel Polansky is my

5    father and if he sent me money this year, I don't

6    remember what it was for one way or another.

7    Q    Who paid the lawyers to represent OSM in

8    this action?

9    A    Robert Polansky paid them.  All checks were

10   written from OSM Communications.

11   Q    And where did you obtain the money with

12   which to write a check to OSM?

13   A    Israel Polansky, as investor, would

14   periodically provide funds for the company.

15   Q    And he has provided money for OSM's defense

16   in this case, correct?

17   A    Money for OSM's defense in this case?  You

18   mean like right now?  Is that what you're talking

19   about?  I guess I'm a little confused.

20   Q    I'll rephrase the question.  You have a

21   lawsuit filed in 2001 against OSM, yourself, your

22   father and Anne Polansky?

23   A    Yes.

24   Q    Attorney Sulzbach represents Anne and

HAMDEN, CT  (800) 262-4102

1     Israel Polansky, okay?

2         A       (Nodding.)

3         Q       There were lawyers involved in this case

4     who have withdrawn and there was money paid to those

5     lawyers.

6         A       I understand.  All funding for legal

7     defense is coming from Robert Polansky, who has

8     written all checks for the defense of OSM period.

9     Robert Polansky has written all the checks for the

10    defense.

11        Q       Where did you get the money to pay for

12    that?

13        A       From my own resources and from -- Mr.

14    Polansky no longer invests in OSM Communications.

15    He is sued personally, so people defend themselves

16    personally and write checks to defend themselves

17    personally.

18        Q       You were here when Israel Polansky gave a

19    deposition?

20        A       Right.

21        Q       And in that deposition do you recall that

22    Israel Polansky said that he had just recently given

23    you money to assist you with legal fees?

24        A       No.  I didn't hear anything of the sort.

34

1    Mr. Polansky was quite tired at that point in time.

2      Q      Have you taken any money from Israel

3    Polansky, either personally or through OSM, from the

4    date the year 2000 to today?

5      A      No money has been given to OSM since 2000.

6    I've taken money personally, yes.

7      Q      Okay.  And is that money that you took

8    personally the money that you used to help pay for

9    lawyers?

10     A      Some of it, yes.

11     Q      What other sources of funding -- what were

12   your other sources of funding that you referenced

13   earlier?  You said you used your own resources.

14   What are your resources?

15     A      My own family resources.

16     Q      What are those family resources?

17     A      I really don't have very much what I have.

18     Q      What is it that you have?  Do you have

19   stocks?

20     A      I don't see how this is appropriate to this

21   conversation.

22     Q      Mr. Polansky, what company do you

23   maintain --

24     A      This is -- these are personal comments

HAMDEN, CT  (800) 262-4102

35

1    beyond the year 2000, which are inappropriate and

2    are just fishing expeditions.  I don't understand

3    the purpose.  If you will tell me the rationale and

4    purpose for these questions and give me a greater

5    understanding, maybe I can answer them better.

6        Q      Because you represent yourself, I will

7    endeavor to give you the basis.  However, let me

8    explain to you that a fishing expedition -- this is

9    a deposition.  It's a fact-finding tool, a discovery

10   tool.  Should a judgment be retained against you,

11   execution of that judgment will be on current

12   assets, holdings, real estate, records, investments,

13   bank accounts.  So, I am entitled to discover what

14   your personal accounts are.

15              MR. SULZBACH:  I don't think that's

16   correct.  Once you have a judgment, you have a right

17   to do that.  But right now all you have the right to

18   is evidence that is either relevant or likely to

19   lead to evidence that is relevant to this cause of

20   action.  And all of the events involved in this

21   cause of action occurred in 2000 and before.

22              And so, if Mr. Polansky chose to object on

23   the ground that you're post 2000 questions are

24   neither relevant or likely to lead to relevant

1    information, he might choose to do that.

2                    MR. ARNOLD:  I need to know where

3    the funds that were paid by Israel Polansky went.

4                    MR. SULZBACH:  During what time

5    period?

6                    MR. ARNOLD:  From 1996 to the year

7    2004.

8                    THE WITNESS:  The money for --

9                    MR. SULZBACH:  Wait a minute!

10                   THE WITNESS:  2004 --

11                   MR. SULZBACH:  Wait a minute,

12   please.

13                   THE WITNESS:  Yes, sir.

14                   MR. ARNOLD:  It's an ongoing

15   consent.

16                   MR. SULZBACH:  Well, one moment,

17   please.  If Mr. Polansky chooses to object to

18   answering questions beyond 2000, as being neither

19   relevant nor likely to lead to relevant information,

20   he might choose to do that.  If he does, at that

21   point you've got to confine your questions to the

22   period 2000 and before.  Or we'll be here all day

23   having this circular discussion.

24                   THE WITNESS:  There will be no

37

1      information provided after November 2000.  OSM is

2      not an ongoing company.

3      BY MR. ARNOLD:

4          Q      Okay.  Let's start there.  Why isn't OSM an

5      ongoing concern?

6          A      Why is it?

7          Q      You said it's not an going concern?

8          A      It isn't functioning as a concern.

9          Q      When did it cease to function?

10         A      In the year 2000.

11         Q      November of 2000?

12         A      Year end.  It's a calendar year.

13         Q      When you say, "year end," what?  December

14     31st?

15         A      Yes.  Thank you, December 31st.

16         Q      So, it's your testimony that there was no

17     operation of any form?  No letters written?  What

18     happened to all the inventory?

19         A      The inventory is in a warehouse in

20     Bridgeport.

21         Q      What is the value of that inventory?

22         A      Zero.

23         Q      When did that --

24         A      Oh, I'm sorry.  I shouldn't speak so

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

38

1     quickly.  Whatever salvage could be gotten by the

2     warehouse people who are in the process of attaching

3     it and dumping it.

4         Q      Is there a storage fee paid for that

5     housing?

6         A      The storage fee has not been paid.

7         Q      Has that not been paid since December of

8     2000?

9         A      I don't know since when.

10        Q      What's the name of the storage facility?

11        A      I don't recollect.

12        Q      Do you remember what street it's on?

13        A      No.

14        Q      Is it a self storage type or is it a

15    warehouse?

16        A      I don't know.  I've never -- I'm not

17    familiar with any of the details.

18        Q      Who made arrangements for the inventory to

19    be delivered there and stored there?

20        A      Valassis.

21        Q      Did you ever have any conversations with

22    Donald Wainright in reference to Israel Polansky and

23    his availability to fund OSM should funding be

24    needed?

1    A    No.

2    Q    At any time from 1996 to the time when he

3    signed his employment agreement, specifically on

4    10/4/96, it's your testimony you've had no

5    conversations with Donald Wainright in reference to

6    your father?

7    A    Donald Wainright was aware that Israel

8    Polansky was the primary investor of the company.

9    Q    How did he become aware of that?

10    A    I did tell him that.

11    Q    So now you did have conversations?

12    A    Yes.

13    Q    And that was before he was hired, correct?

14    A    I don't recollect that.  Maybe yes, maybe

15    no.

16    Q    Well --

17    A    It was nine years ago.

18    Q    If Mr. Wainright were to say that he was

19    told before, would you agree with that statement or

20    disagree with that statement?

21    A    I don't know.  I mean, he was aware that

22    Mr. Polansky, Israel Polansky, was the primary

23    investor in the company.

24    Q    And in June of '97 -- withdrawn.

1          When you hired Donald Wainright, it was

2     part of the agreement that you would pay his moving

3     expenses.  Do you recall that?

4      A     Vaguely.

5      Q     I'd like to show you what's been marked as

6     Plaintiff's Exhibit F.

7      A     I don't recollect this at all.

8      Q     Is that your signature that appears at the

9     bottom of that first page?

10     A     It appears to be.  But once again, this is

11    a Xerox.  I don't recollect this.

12     Q     I'm going to show you what's been marked as

13    Plaintiff's Exhibit E.  Do you recognize that?

14     A     Yes.

15     Q     Okay.  And that references money that was

16    going to be paid for moving expenses?

17     A     That's what it says, yes.

18     Q     Okay.  So, at some point were the moving

19    expenses ever paid by you?

20     A     It was paid over time when his salary was

21    increased so that he took home $124,000 in 1998.

22    The $2,000 a month, the raise was to payoff the

23    moving expenses.

24     Q     I'd like to show you what's been marked as

41

1    Plaintiff's Exhibit D.  Does that pretty much

2    memorialize --

3        A       These were done together.  Although, I

4    think Don did this one and I added this one.  I'm

5    not certain.

6        Q       But those are your signatures --

7        A       Yes.

8        Q       -- that appear at the bottom of both

9    Exhibits D and F?

10       A       Yes.  I wanted to make certain there was no

11   confusion as to why a raise was being given.

12       Q       At some point you had a conversation with

13   Donald Wainright to determine an amount and then you

14   divided it up at $2,000 a month?

15       A       Yes.

16       Q       So, the fact that you don't recognize this,

17   Plaintiff's Exhibit F, do you recall how you came up

18   with the amount?

19       A       He gave it to me.

20       Q       I'd like to show you what's been marked as

21   Plaintiff's Exhibit J and ask if you recognize what

22   that exhibit is?

23       A       No, I don't recognize this.  This document

24   is a falsehood.  It's an absolute falsehood.

42

```
 1      Q      Okay.  Now, there's two pages to that
 2   document.  Would it be appropriate to separate those
 3   pages where you recognize part of it and you don't
 4   the other?
 5      A      No.  I would never have looked at this
 6   anyway.  The accountant would look at this.  This
 7   document is a falsehood.
 8                      MR. SULZBACH:  Now, just so the
 9   record is clear --
10                      MR. ARNOLD:  We're going to
11   separate it.
12                      MR. SULZBACH:  -- the document he
13   said that the accountant would prepare is the one
14   bearing the exhibit sticker Exhibit J, and the
15   document described as a falsehood, which I presume
16   you will mark differently, is a memorandum dated
17   August 21, 1997, reportedly to Bob Polansky from
18   Donald Wainright.
19                      MR. ARNOLD:  I'm not going to ask
20   that this be marked.
21                      MR. SULZBACH:  Well, I will because
22   there's testimony to that.
23                      MR. ARNOLD:  There's no testimony
24   about this.
```

1                    MR. SULZBACH:  He just testified to

2       it through the deposition.  I would like it marked.

3                    MR. ARNOLD:  Marked for

4       identification.  You're not going to receive a copy

5       of this.  That's the end of it.  If you'd like a

6       copy of it, you can request it.

7                    MR. SULZBACH:  It's been produced

8       at the deposition and the witness has testified with

9       respect to it.  It was marked as an exhibit and you

10      took it --

11                   MR. ARNOLD:  I don't have an

12      objection to it, but it's not going to be marked as

13      an exhibit for this deposition.

14                   MR. SULZBACH:  It is.  He's

15      testified to it.

16                   MR. ARNOLD:  He hasn't testified to

17      it.  It's marked for ID only.

18                   MR. SULZBACH:  Staple it back to

19      Exhibit J where it came from.

20                   MR. ARNOLD:  No.  I refuse to.  You

21      want to call the judge, call the judge.

22                   THE WITNESS:  It's a falsehood.

23                   MR. ARNOLD:  I'm not objecting to

24      giving you a copy it.  It doesn't need to be part of

44

1    this record.

2                    THE WITNESS:  This --

3                    MR. SULZBACH:  Please.

4                    MR. ARNOLD:  I am using these

5    exhibits as attachments.

6                    MR. SULZBACH:  Then mark it

7    separately and it will be part of this.

8                    MR. ARNOLD:  I want to mark it

9    separately.  That's fine.  From now on I will

10    control my deposition, and when it's your turn, you

11    can control it.

12                    MR. SULZBACH:  Can we go off the

13    record and mark the exhibit, please?

14                    (Whereupon, the document was

15    received and marked as Plaintiff's Exhibit AA for

16    identification.)

17                    (Off-the-record discussion.)

18                    MR. ARNOLD:  Back on the record.

19    BY MR. ARNOLD:

20      Q     I'm going to show you what's been marked as

21    Plaintiff's AA.  Did you ever see that memorandum

22    from Donald Wainright?

23      A     No.

24      Q     Who is it written by, apparently?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

45

1   A      It says it was written by Don Wainright.

2   Q      Okay.  I'll take back the document.

3               THE WITNESS:  I --

4               MR. SULZBACH:  There are no

5   questions pending.

6               THE WITNESS:  I would like a copy,

7   please.

8   BY MR. ARNOLD:

9   Q      For the third time, you will receive copies

10  of all of these exhibits attached to the deposition

11  transcript.

12  A      Thank you.  You may proceed.

13  Q      Now, Plaintiff's Exhibit J, you said that

14  your accountant would prepare that.  Who is your

15  accountant?

16  A      Herbert Padob.

17  Q      P-A-Y-D-U-F-F?

18  A      P-A-D-O-B.

19  Q      Now, was that form consistent with the work

20  product that he produced for you?

21  A      No.  Don Wainright produced that.

22  Q      Is that your signature that appears on the

23  bottom of that page?

24  A      Yes.  It appears to be my signature.  I

46

1    don't know that it really is.  It's a Xerox copy,

2    but it does appear, yes.

3        Q      Is that format something that you've

4    recognized from something in the past that Donald

5    Wainright would have produced and you would have

6    signed?  Mr. Polansky, I appreciate you not flipping

7    through your various notes.  I'd like to have that

8    marked for ID.  Actually, I already have that.

9        A      You already have it.

10       Q      I'd like to show you what's been marked as

11   Plaintiff's Exhibit W.  Mr. Polansky, please listen

12   to me.  Put your papers down and put your papers

13   away.

14       A      Okay.

15       Q      Please.  You can put them on the floor, you

16   can put them somewhere else, otherwise, I'm going to

17   ask that they all be marked as exhibits.  I'm going

18   to give to you what's been marked as Plaintiff's

19   Exhibit W, those are W-2 forms, and compare that

20   with Plaintiff's Exhibit J.

21       A      What year is that?  '97, right?  I don't

22   know.  I don't understand.  But my accountant

23   might.  Frankly, I don't recollect ever seeing that

24   document.

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

47

1     Q       Okay.  And that document to you --

2     withdrawn.

3               In flipping through Plaintiff's Exhibit W,

4     this is something that you produced and that's your

5     handwriting on all of those W-2 statements?

6     A       No, they're not.  That's Mr. Padob's

7     writing.  I wrote none of these.

8     Q       These are documents that you maintained

9     that you produced for this deposition?

10    A       The documents I found -- in an effort to

11    try to get everything here properly, I found these

12    in a folder, so I just produced them.

13    Q       Okay.  Is there anything in this -- where

14    is that folder?

15    A       That folder was -- you want the exact

16    actual folder?

17    Q       No.  Did you bring the entire contents of

18    that folder?

19    A       That was the entire contents.  I would have

20    just -- Mr. Sulzbach encouraged me to just provide

21    what I can provide.  So, that's what I'm doing.

22    Q       And you provided no tax returns, have you?

23    A       No.

24    Q       Where are the tax returns?

1    A    Mr. Padob did my personal tax returns, my

2    company, and he expired last April or March, I'm not

3    certain.

4    Q    And who did the OSM tax returns?

5    A    Mr. Padob.

6    Q    So, he did your personal and OSM?

7    A    Yeah.  Well, he didn't always do my

8    personal.  One year Isner did my personal and one

9    year someone else did.

10    Q    So, you have no tax return records for

11    OSM?  You have to answer.

12    A    Correct at this point.  At this stage.  At

13    this stage.

14    Q    What does that mean, "at this stage"?  Are

15    the documents in existence that you're aware of?

16    A    No.  Not to the best of my knowledge.  I

17    don't have them.

18    Q    Okay.  Are you willing to sign an IRS tax

19    form allowing us to request those documents directly

20    from the IRS?

21    A    I'd like to talk to several people, but on

22    the surface of it, I don't see why not.

23    Q    When you say you want to talk to several

24    people, what does that mean?  You represent yourself

HAMDEN, CT  (800) 262-4102

1    in this action, correct?

2      A      I am uncertain as to whether you have a

3    right to those tax returns.  I would like to get an

4    opinion if you are entitled to those.  If indeed you

5    are entitled, I will cooperate in every way, shape

6    and form to get it to you.

7      Q      You were in court two weeks ago --

8      A      Yes.

9      Q      -- when the judge ordered you to comply

10   with the entire schedule of information that was

11   required?

12     A      I don't think we were at the same hearing

13   if you heard that.  She didn't say I had to comply

14   with everything on that and just blanket.  She was

15   very precise in terms of what she wanted from the

16   people involved in the case.

17     Q      Okay.  Was it your understanding you were

18   supposed to produce tax returns for today's

19   deposition?

20     A      I'm uncertain.  If I had them, chances are

21   I probably would have brought them, yes.  They were

22   part of the request and I am trying to adhere to

23   that request to the best of my ability.  Is he

24   allowed?

HAMDEN, CT  (800) 262-4102

1    Q    And you didn't produce any check registers

2  or bank statements or copies --

3    A    No.  I have none of that.

4    Q    Where are the corporate records for OSM?

5    A    Mr. Padob had them all.  He had space in my

6  offices.  He rented space near me and I had no

7  need.  I had him right there, so if I needed

8  something, I would get it.

9    Q    Did he work just by himself?

10    A    Yeah.  He had plenty of -- he had a number

11  of very important clients.

12    Q    Mr. Polansky, we're not trying to be

13  difficult.  I want to know where your tax returns

14  are and I want copies.

15    A    I don't have the tax returns or those

16  financial records.  Mr. Padob kept them, and I

17  searched high and low and I wound up with those

18  W-2's, which I produced today.

19    Q    So, it's your testimony that these

20  handwritten W-2's are the only corporate records you

21  have for any financial transactions and tax returns

22  for OSM?  That's your testimony?

23    A    Yes.

24    Q    Okay.  And you don't remember where you

1    have checking or savings accounts?

2      A      Why don't you ask the question?  Ask the

3    question, I will tell you.

4      Q      Okay.

5      A      Have you asked the question?

6                    MR. ARNOLD:  I'm going to mark this

7    as Plaintiff's Exhibit BB.

8                    (Whereupon, the document was

9    received and marked as Plaintiff's Exhibit BB for

10   identification.)

11   BY MR. ARNOLD:

12     Q      Let me show you what's been marked as

13   Plaintiff's Exhibit BB.  Do you recognize that

14   document?

15                   MR. SULZBACH:  I've never seen

16   that.  We've been proceeding actually with no notice

17   but simply on the basis of a court order.  Just a

18   note of interest.

19                   THE WITNESS:  I don't think I ever

20   saw this.  Certainly not that Schedule A.

21                   MR. ARNOLD:  I'll withdraw that

22   exhibit.  For the record, that's the content of a

23   Federal Express document that was returned as having

24   an insufficient address of 9 Aspertuck Lane in

52

1    Weston, Connecticut, 06883.

2                    MR. ARNOLD:  Off the record for a

3    minute.

4                    (Off-the-record discussion.)

5                    MR. ARNOLD:  Back on the record.

6                    MR. SULZBACH:  With regard to

7    Exhibit BB, I simply want to state for the record

8    that a copy of that was not delivered to me as the

9    certificate of service states.

10   BY MR. ARNOLD:

11       Q    Mr. Polansky, you were in federal court a

12   couple weeks ago when the judge ordered you to

13   produce information?

14       A    Yes.

15       Q    Okay.  And at that point, you had a

16   schedule of information that you were going to

17   comply with, correct?

18       A    Yes.

19       Q    Okay.  So, at some point you received a

20   notice of deposition?

21       A    I did receive it, for the record.

22       Q    Okay.  And that schedule attached to the

23   notice of deposition --

24       A    Not that one.

1              MR. ARNOLD:  Let's mark this one.

2              (Whereupon, the document was

3    received and marked as Plaintiff's Exhibit No. CC

4    for identification.)

5    BY MR. ARNOLD:

6        Q      You've looked at the document.  Is that the

7    notice of deposition and according schedule that you

8    received?

9        A      I don't recollect getting that.  I do

10   recollect the fact that I was informed that there's

11   a deposition today and I do recognize the content of

12   the exhibit, in terms of what was requested.

13       Q      Okay.  We're going to go over this because

14   your failure to produce the items on this schedule

15   are a serious problem with myself and it will be

16   addressed by the court.  So, we need to make very

17   clear what you're refusing to produce.

18             MR. SULZBACH:  You're

19   characterizing it as refusal as opposed to ability.

20             MR. ARNOLD:  You can characterize

21   it any way you'd like, Mr. Sulzbach.

22   BY MR. ARNOLD:

23       Q      We're going to read through each one, read

24   it for the record.  What's No. 1?

54

1    A      "All documents between you and any other

2    party relating to any matter asserted in the

3    complaint and your cross complaint."  I don't

4    understand that.  The broadness of that makes it --

5    Q      Well, do you recall having a cross

6    complaint for destruction of business property or

7    lack of return or holding of software?

8    A      Yes.  And I did give that to you.

9    Q      And you produced no letters or documents as

10   a result of that request, have you?

11   A      I guess I still don't get it.

12   Q      Is there any correspondence or records or

13   notes, memorandum that you intend to use as evidence

14   in a trial in reference to No. 1?

15   A      The original letters, yes, I have submitted

16   what I have.

17   Q      Okay.  And that was the letter that you

18   brought today, correct?

19   A      Plus the original letters that Mr.

20   Wainright got requesting time after time after time

21   that he provide the software and the manuals which

22   Valassis gave him, which he never provided to my

23   company, never, despite three and a half years of

24   requests.  Mr. Wainright frankly told me that when I

HAMDEN, CT  (800) 262-4102

1   paid the last amount, he would supply and give back

2   the software, which was the property of the company

3   in which he appropriated.

4       Q     I'm going to show you what's been marked as

5   Exhibit X.

6       A     I'm familiar with it.

7       Q     Okay.  These are the three letters you

8   produced today, correct?

9       A     Those are the letters.  Weren't they

10  produced by Mr. Wainright at his deposition?  Those

11  were the letters he got.  He and Debbie were sent

12  those registered mail.

13      Q     Well, the top page of Exhibit X is unsigned

14  and dated November 2000.

15      A     Yes.  This is from James King, who came in

16  and examined the computers and has the computer that

17  Debbie worked on, which she failed in her own

18  deposition to tell us that she refused to give us

19  the password.

20      Q     Is that a letter to James or from James?

21      A     This is a report of the conversation that

22  James and I had together.  These were his numbers

23  that he gave me in conversation.

24      Q     And when was that report prepared?

1    A    2000.  About five years ago when I

2   understood that they had -- Don had wiped out all my

3   computers and information and Debbie had done the

4   same.  So, I called James King, who was a computer

5   expert in every way, shape, and form, to examine the

6   computers because I am no expert, which he did do.

7    Q    And what is James King's address?

8    A    I don't have it right now.  James King, at

9   that point, was living in Connecticut.  He works for

10  AOL.  AOL had an office up in White Plains, which is

11  where I delivered the computer to him.

12   Q    When's the last time you spoke to James

13  King?

14   A    Oh, not in a while.  About six, seven

15  months ago.

16   Q    Where was he living six or seven months

17  ago?

18   A    He's in Virginia.  He works for AOL, their

19  headquarters in Virginia.

20   Q    What's the contact information for James

21  King?

22   A    I can get it to you.  I don't mind.  I'll

23  get to you.  I would just call AOL in Virginia.

24   Q    So, in your office, your home, you have an

57

1    address for James King?

2    A    Yeah, I do.

3    Q    And you can produce that?

4    A    Yeah, I'll get it for you.

5    Q    Other than those three letters, in

6    reference to No. 1, these are the only documents

7    that you intend to introduce as evidence that you

8    have for your counterclaim, correct?

9    A    You mean the counterclaim where I talk

10   about how the Venture Capital deal that he -- off

11   the record, please.

12              MR. SULZBACH:  No.

13              MR. ARNOLD:  No.

14              THE WITNESS:  Well, I produced for

15   you in this an employment agreement and a letter of

16   intent from Venture Marketing Group, VMG, who is

17   providing $4 to $5 million, who Debbie and Don

18   interviewed with, and one of the last things they

19   did at the company.

20   BY MR. ARNOLD:

21   Q    Anything else besides those documents and

22   the three letters?

23   A    Not that I can remember.

24   Q    Okay.  Let's move on to No. 2.

58

```
 1                    MR. SULZBACH:  I will state for the
 2      record, because we received a set of documents from
 3      Mr. Polansky, which is the same set that was
 4      delivered to you, and I don't want to stay here for
 5      an hour while he goes through that page by page,
 6      that if there are other documents in there that
 7      comply with your request, then they're there.
 8                    MR. ARNOLD:  Are you done?
 9                    MR. SULZBACH:  Yeah.
10      BY MR. ARNOLD:
11      Q       No. 2, can you read No. 2, please?
12      A       "Copies of checks, front and back, and
13      check registers of any accounts used to pay any
14      expenses, payroll or costs of any kind of OSM
15      Communications, Inc. and any of its affiliates from
16      1996 to the present, including any payments claimed
17      as investments."
18      Q       And you've produced absolutely not one
19      piece of evidence or statements or checks?
20      A       That's true, yes.
21      Q       Okay.  And you don't have any idea where
22      these check registers or your bank records are,

23      except that they're in the office of Herb Padob, who
24      died in March or April 2004?
```

HAMDEN, CT  (800) 262-4102

59

1    A    Yes.

2    Q    Where is Herb Padob's office?

3    A    It was an office in my office where they

4    had just moved.  He passed away and all his stuff

5    was packed up and shipped out to --

6    Q    To where?

7    A    I don't know.

8    Q    So, you packed up -- who packed it up?

9    A    The guys in the room and his daughter, they

10   came and they packed everything up and slapped

11   labels on it and it was shipped out UPS, all his

12   records.

13   Q    So, you allowed them --

14   A    I wasn't there when it happened.  I didn't

15   quite understand.  I would have tried to hold on to

16   my own documents.  I'm not crazy.

17   Q    So, what was the address of this office

18   where they came?

19   A    It was at 100 Park Avenue.

20   Q    And that's where your office is right now?

21   A    Yes.

22   Q    What business is operating out of 100 Park

23   Avenue?

24   A    Well, we are not incorporated, but we plan

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

60

1    to incorporate a new company.

2        Q       Who's "we"?

3        A       Me.  I plan to incorporate a new company.

4        Q       What's the zip code of 100 Park Avenue?

5        A       10017.

6        Q       Is there a suite or apartment or office

7    number?

8        A       5th floor.

9        Q       You have the whole 5th floor?

10       A       No.  I rent from a company called Interep.

11   I sublet an office.  It's I-N-T-E-R-E-P.

12       Q       And under what name is the lease?

13       A       I'm doing it under a mutual accommodation.

14   They've asked me to help them with some consulting

15   work.  And I don't -- it's a -- I don't know what

16   kind of --

17                    MS. HALEY:  There's no lease?

18                    THE WITNESS:  There's no lease.

19   They have extra space and they accommodated me.

20                    MS. HALEY:   Is it a barter?

21                    THE WITNESS:  Thank you.  I guess

22   you'd call it a barter, a potential barter

23   situation.

24

1    BY MR. ARNOLD:

2        Q       So, you don't pay any money for this office

3    space?

4        A       No.

5        Q       Did Herb Padob have an office at 100 Park

6    Avenue?

7        A       Yes.

8        Q       Was it on the 5th floor?

9        A       Yes.

10       Q       Was it in the same room as your office?

11       A       Yes.

12       Q       Can you contact anybody in Herb Padob's

13   family to obtain copies of the files?

14       A       Can I?

15       Q       Yes.

16       A       I've tried.  I haven't gotten anyone.  But,

17   yes, I will try to get ahold of someone, yes.

18       Q       Okay.  So, when can you be expected to

19   receive the information requested in No. 2?

20       A       I don't know.  Assuming that they can get

21   ahold of it and that it exists, I don't know what

22   they did.  Herb was eighty-four, eighty-three.  I

23   don't know.  I don't know what they did with it.

24   But I will make the call next week --

1    Q    Okay.  Let's go to --

2    A    -- and get back to you.

3    Q    Let's go to No. 3.  Mr. Polansky, just let

4    me explain so that you understand what we're doing

5    here.

6    A    I do understand.  I'm not trying to stop

7    you from obtaining it.

8    Q    We're going to get a court order to obtain

9    it.

10   A    I will agree with that.

11   Q    You had an order to produce that a week ago

12   and you failed to comply with the initial court

13   order.

14              MR. SULZBACH:  He's already said he

15   didn't have it.

16              MR. ARNOLD:  Attorney Sulzbach,

17   you're not representing Mr. Polansky.

18              MR. SULZBACH:  That doesn't

19   matter.

20              THE WITNESS:  No. 3 says, "A list

21   of all checking, savings, or any other account,

22   including investment accounts, with the account

23   numbers, of which you were or are a signatory,

24   including the name and address of the banks or

63

1    issuers of the accounts, since 1996."

2    BY MR. ARNOLD:

3        Q       Okay.  And you've produced no list of any

4    accounts?

5        A       It's very simple.  U.S. Trust and First

6    Union.

7        Q       What's the address for U.S. Trust?

8        A       I don't know.  You have checks.

9        Q       New York City?

10       A       Yeah, I think in New York City.  I'll get

11   you the address.  You have it right there.

12       Q       Okay, that's fair enough.

13       A       And First Union of Lemoyne Avenue, New

14   Jersey.

15       Q       Are either of those accounts still active?

16       A       No.

17       Q       When were they closed?

18       A       The end of 2000 for OSM Communications.

19       Q       That's with U.S. Trust?

20       A       No.  U.S. Trust was closed earlier.  I

21   think 1997.  Maybe 1998.  1998, '99, 2000, I think.

22   I recollect, to the best of knowledge, First Union.

23       Q       Okay.  And those are the only two bank

24   accounts that you used?

HAMDEN, CT  (800) 262-4102

64

1     A      Yes.

2     Q      When funds wired to you from Israel

3    Polansky, were they wired into one of those

4    accounts?

5     A      There might have been a third one for a

6    short period of time.  Doral, D-O-R-A-L, Bank.  A

7    very short period of time.

8     Q      In reference to the wire of any funds from

9    Israel Polansky, they would have gone into either

10   the U.S. Trust or the First Union account, most

11   likely?

12    A      Yes.

13    Q      I'm going to show you what's been marked as

14   Plaintiff's Exhibit H.  We're moving on to Debbie

15   Polansky.

16             MR. SULZBACH:  Actually, for the

17   record, it's Debbie Russo.

18             THE WITNESS:  For the record --

19             MR. SULZBACH:  Wait a minute!

20   Assuming that Mr. Polansky has never seen the bank

21   records of Deborah Russo, we're in the same

22   situation that we were with regard to Mr.

23   Wainright's checks.

24

HAMDEN, CT  (800) 262-4102

65

1    BY MR. ARNOLD:

2    Q      In reference to the relevant portions of

3    those exhibits that you recognize, do you recognize

4    your signature on a facsimile copy of the checks

5    from the different banks?

6    A      Yes.

7    Q      Okay.  And there were several checks

8    throughout Deborah Russo-Williams employment with

9    you that were returned for insufficient funds,

10    correct?

11    A      How many were there?  Four?  There were

12    four checks over the five years that were returned

13    for insufficient funds.

14    Q      For the record, I'm pulling off four pages,

15    which -- six pages, which don't have copies of

16    checks on them.  I'm not offering them as part of

17    the exhibit.

18    A      Those are her bank account numbers?

19    Q      That's correct.  Those are her statements.

20    I'm going to show you that attached to this Exhibit

21    A are one, two, three, four, five checks.

22    A      I'm sorry, there were five.  I stand

23    corrected.  Sorry.

24    Q      Okay.  And those checks were all paid to

66

1    her as a result of her employment with OSM, correct?

2    A    Yes.

3    Q    Did you have a contract of employment for

4    Deborah Russo-Williams?

5    A    No.

6    Q    I'm going to show you what's been marked as

7    Plaintiff's Exhibit N.  Do you recognize that?

8    A    Yes.

9    Q    Okay.  And is that --

10    A    Once again, it's a Xerox, but I think it's

11    it.

12    Q    And that memorializes your understanding of

13    what her salary was?

14    A    It's a copy, but it is my understanding.

15    Q    Well, was her salary $60,000 a year when

16    she first started for you?

17    A    It sounds right.  I don't know.

18    Q    Okay.  And was she guaranteed a minimum

19    bonus of 20 percent per year?

20    A    Only if the company could afford it.

21    Q    Where in Exhibit N does it say, "Only if

22    the company could afford it"?

23    A    This was envisioned as a term sheet, not a

24    contract, and we shook hands.  She was an at-will

67

```
 1    employee.  She was an at-will employee.  The company

 2    that's losing -- it's understood that if a company

 3    is losing money it doesn't provide bonuses.

 4        Q     If you'll just focus on the questions I'm

 5    asking, instead of providing other information,

 6    we'll get through this quickly.  Plaintiff's Exhibit

 7    O I'm showing you.  That is something that was

 8    prepared by you or a copy of something that was

 9    prepared by you, correct?

10        A     I don't know.  It appears right.  I don't

11    know.

12        Q     At the bottom of that, can you read the

13    last sentence for the record?

14        A     "The above does not go into effect if you

15    are no longer employed by OSM."

16        Q     How could you comport that, that you just

17    said she was an at-will employee?

18        A     These are terms of an arrangement, not a

19    contract.  At least that's how I envisioned it.

20        Q     Let me show you what's been marked as

21    Plaintiff's Exhibit P.  Do you recognize that?

22        A     No, I don't.

23        Q     Do you recognize your signature on that

24    signature card on page 3?  Isn't that in fact your
```

HAMDEN, CT  (800) 262-4102

68

1   signature card for the U.S. Trust bank account that

2   was opened?

3       A       I don't recognize it and I don't know

4   anything about that.

5       Q       In the U.S. Trust account that you had

6   opened for OSM, did your father have signing

7   authority as well?

8       A       No.  He had no signing authority for --

9       Q       It's your testimony that that --

10      A       I don't recognize his signature.

11      Q       Mr. Polansky, answer the question.

12      A       He never wrote a check for this company,

13  never had the authority to do so, as far as I

14  understood.  I've never seen that card.

15      Q       You can't just go running off and have a

16  conversation and say whatever you'd like.  Just

17  focus on the questions and answer my questions,

18  please.  Did Israel Polansky have signing authority

19  for the U.S. Trust account?

20      A       No.  As far as I knew, no.  He wrote no

21  checks at any time, no.

22      Q       So, you're saying --

23      A       I don't recognize that.  Frankly, this is

24  the first --

69

1     Q     Mr. Polansky, please don't speak over me.

2     Only one person at a time can speak.  That's the

3     rules of the deposition.  Let's try to get through

4     this.  If you want to take a break and come back

5     here at 4:00 o'clock, we can do that.

6     A     That's okay.  I'm here.

7                     MR. SULZBACH:  I'm not here.

8     BY MR. ARNOLD:

9     Q     There's two signatures on it.  Are you

10    saying that that is not an accurate representation

11    of the signature card for the U.S. Trust account?

12    A     Can I see the checks, please?  I have no

13    comment in regard to it.  All I know --

14    Q     Is it your testimony that that's not an

15    accurate representation of the signature card for

16    the U.S. Trust account?  Yes or no?

17                    MR. SULZBACH:  For which U.S. Trust

18    account?

19                    MR. ARNOLD:  For OSM.

20                    THE WITNESS:  I have no knowledge

21    of this.  And I don't understand that.  Mr. Polansky

22    is not signing checks.

23    BY MR. ARNOLD:

24    Q     I'd like to show you what's been marked as

1      Plaintiff's Exhibit Q.  Just answer the questions,

2      please.  Do you recall receiving that?

3        A      I don't recollect receiving it, but --

4      okay.

5        Q      Let me show you --

6                    MR. SULZBACH:  If you don't

7      remember seeing it, then --

8                    THE WITNESS:  I don't remember

9      seeing it or reading it.

10                    MR. SULZBACH:  What was that

11     exhibit, by the way?

12                    MR. ARNOLD:  That was Q.

13     BY MR. ARNOLD:

14       Q      I'm going to show you what's been marked as

15     Plaintiff's Exhibit Y, payroll records for Debbie

16     Russo-Williams.  Do you recognize that?

17       A      Yes.  I submitted the same thing to you.

18       Q      Okay.  Plaintiff's Exhibit G, do you

19     recognize that?

20       A      What about this?

21       Q      What is that document?

22       A      You have it in the book.  I produced it.

23       Q      Okay.

24       A      It's Thompson and Craven.  This was a

HAMDEN, CT  (800) 262-4102

1    letter of intent that they made an offer for the

2    company.  That was in 1997.

3        Q       Showing you what's been marked as

4    Plaintiff's Exhibit H --

5        A       Yeah.  You have it.

6        Q       -- do you recognize that as well?

7        A       You have it in the book.

8        Q       Okay.  That was submitted by you, correct,

9    for this proceeding?

10       A       Yeah.

11       Q       And in those, particularly Plaintiff's

12   Exhibit H, reference that a sale of the company and

13   a term sheet was being put together for the benefit

14   of Robert and Israel Polansky, correct?

15       A       The owners of the company, yes.

16       Q       And did you discuss the terms and

17   conditions of a sale and the draft of the term sheet

18   with Israel Polansky during that time period in

19   1997?

20       A       Typically not.  Typically, he would come in

21   at the last minute when they would want to meet him

22   because he owned a piece of equity.  At that point,

23   dad was eighty-eight, eighty-nine-years-old and he

24   was not interested in being involved in any of this

72

1     at that point.

2        Q       But he did participate in those meetings

3     and discussions?

4        A       No.  Typically, he would come in at the

5     last stage.  I don't know that we ever -- I don't

6     think he ever met Thompson and Craven, no.  He never

7     met them.

8        Q       So, it's your testimony that you

9     represented the sale of a hundred percent of the

10    shareholders?

11       A       Yes.

12       Q       And you had no discussions in terms --

13       A       I would discuss it with my father over the

14    phone.  The question you asked me was did he ever

15    meet them and what was his level of participation.

16    The level was conversation over the phone.

17       Q       He did participate in phone conversations

18    discussing the terms of a sale of the company?

19       A       Yes.

20       Q       Correct?

21       A       Yes.

22       Q       I'm going to show you what's been marked as

23    Plaintiff's Exhibit I.  You submitted that as a

24    response to request for documents in response to

73

1    this deposition, correct?

2        A       I don't have this, no.  Yeah, it says

3    Robert Polansky entered into a consulting

4    agreement.  This was my efforts to raise money.  I

5    got this one.

6        Q       Okay.  This is something that was produced

7    by you?

8        A       Yes.

9        Q       And I'd like to show you Plaintiff's

10   Exhibit K, and in particular, draw your attention to

11   the last page of that exhibit, which is an

12   attachment.

13       A       Yup.

14       Q       That's something that was prepared by you?

15       A       No.

16       Q       Is that something that you're familiar

17   with?

18       A       I'm sorry, this last page?  Philip Morris

19   prepared this.

20       Q       And Philip Morris, how did they prepare

21   it?  Based on what information?

22       A       Information that I provided them, the

23   company provided them.

24       Q       Okay.  I'd like to show you lastly two

74

1    documents, Plaintiff's Exhibit L -- actually, I

2    believe we --

3    A    We already did this.

4    Q    We discussed L and M.  Back to our

5    schedule, if you could read number -- I believe we

6    were on No. 4.

7    A    "Federal and state income tax returns for

8    the years 1996 to the present."

9    Q    And so, it's your testimony that you don't

10   have in your possession any tax returns for OSM from

11   1996 to today, correct?

12   A    No.  Not in my possession today, no.

13   Q    Okay.  And you don't know where those tax

14   returns are, correct?

15   A    They're either with the federal government

16   or somewhere with the person that prepared them, I

17   would think.

18   Q    And that's the estate of Herb Padob?

19   A    Yeah.

20   Q    And you don't know how to get in touch with

21   them?

22   A    I didn't say that.  I said I would attempt

23   to get in touch with them as soon as -- I'm sorry.

24   Go ahead.  I'm sorry.

1    Q       And in reference to that --

2    A       And I protest anything after 2000 as

3    inappropriate for us and I agreed to make --

4    Q       You can make whatever protective order

5    you'd like to in front of the federal court.  The

6    request is there.  From 1996 to today, it's your

7    testimony that you don't have in your possession any

8    of your personal income tax returns?

9    A       No, I don't.  Mr. Padob is the one who had

10   the complete record of everything.

11   Q       Except for maybe one here that you had your

12   personal returns done with another accountant and

13   you're not sure who that is?  What's your testimony

14   on that?

15   A       No.  Look, I will make -- as I said in the

16   letter, I will make my best efforts to get them.

17   Q       Okay.  By when?  Give me a date, please.

18   A       I won't know until I've made calls.  I

19   don't know what dates I'll get them, so I can't

20   commit to dates.  But we can have a conversation

21   about it next week or the week after, right,

22   Michael?  And I will give you dates as soon as I get

23   dates.

24   Q       Seven days from today, Mr. Polansky --

76

1     A     No.

2     Q     For the record, seven days from today I

3   will be filing the appropriate motions with the

4   federal court if I do not hear from you.

5     A     Then you will.

6     Q     Okay.

7                    MR. ARNOLD:  Attorney Haley, is

8   there anything that you'd like to pose as

9   questions?

10                    MS. HALEY:  I just have one

11  question.

12

13

14                    CROSS-EXAMINATION

15  BY MS. HALEY:

16    Q     I don't mean to belabor the point.  When

17  Mr. Padob completed the returns, did he give you

18  copies?

19    A     Yeah.  There was always -- yeah, there was

20  always a file copy.

21    Q     Because my accountant always gives me a

22  copy and he keeps a copy.

23    A     Yeah.  What happened was, I would sign that

24  and I'd sign a file copy, but he kept both.  He kept

HAMDEN, CT  (800) 262-4102

1    the file copy.  You must remember, he was --

2       Q      He was right in your office?

3       A      Yeah.  So, when I needed something, I'm not

4    the most whatever, I would go to Herb for anything I

5    needed; any forms that came in, he would just take

6    the mail.

7       Q      But they were filed with the federal

8    government?

9       A      Oh, yeah.  Yes, they were filed with the

10   federal government.

11      Q      And you don't have objections to us

12   requesting copies that way?

13      A      I'll help.  I don't think I should.

14      Q      You don't think you should?

15      A      I don't think I should have objections, but

16   I will think it through.  I do have an objection for

17   anything after the year 2000.  I will not cooperate

18   with that.  I will cooperate with the years of this

19   case, which was 1996 to 2000, yes.

20                    MS. HALEY:  Thank you.

21                    THE WITNESS:  I'll cooperate in

22   every way.

23

24

78

1                    REDIRECT EXAMINATION

2    BY MR. ARNOLD:

3        Q       In reference to the schedule, No. 5, can

4    you please read that as well for the record?

5    Sorry.

6        A       "All documents related to any interest in

7    real property you either acquired, transferred or

8    sold for the years 1996 to the present."  It's very

9    simple, there was no real property.

10       Q       Do you own the home or apartment where you

11   live presently?

12       A       No, I don't even own it.

13       Q       Who owns it?

14       A       I don't own it.  It's not in my name.

15       Q       Who owns it, Mr. Polansky?

16       A       It's in my wife's name.  She owns it.

17       Q       When was it transferred to her name?

18       A       It was never transferred to her.  She

19   signed the original rental lease.  She bought it

20   with her money.

21       Q       In what year?

22       A       Gee, 1982.  No, 1977, somewhere in there.

23   We've been in the apartment for twenty-six years.

24                    MR. ARNOLD:  Fair enough.  Thank

1    you very much.  I have no further questions.

2                        MR. SULZBACH:  Can I borrow your

3    complaint?

4                        MR. ARNOLD:  Sure.

5                        MR. SULZBACH:  Thank you.

6

7

8                        CROSS-EXAMINATION

9    BY MR. SULZBACH:

10    Q      I'm going to ask you some questions.

11    A      Yes, sir.

12    Q      With respect to the production request,

13    first of all, "All documents relating to matters

14    asserted in the complaint and cross complaint," have

15    you produced for the plaintiffs everything that you

16    have right now that complies with it, that you have

17    in your possession or control that complies with it?

18    A      Yes, I have.

19    Q      And likewise, you've given all the checks

20    and bank statements that you have in your possession

21    or control for the periods 1996 to 2000, with

22    respect to either you or OSM, have you not?

23    A      Yes, I have.

24                        MR. ARNOLD:  There was no

80

1    submission of any documents.

2              MR. SULZBACH:  I'm just asking

3    whether he'd given all he's got.  That's all I'm

4    asking and he's answering.

5              THE WITNESS:  Yes, I have.

6    BY MR. SULZBACH:

7    Q     And you, in fact, submitted a list of

8    checking and savings accounts, did you not?

9    A     I gave them, yes, the accounts of the

10   company.

11             MR. ARNOLD:  I'm going to object

12   for the record.  There was no submission.  He

13   answered a question.  He didn't submit a list,

14   Attorney Sulzbach.

15             MR. SULZBACH:  I got a list from

16   him.

17             MR. ARNOLD:  I didn't see a list.

18   Attorney Sulzbach, if you have a list, please pose

19   it and offer it as an exhibit in reference to your

20   questions.  You're asking questions about a list.

21             MR. SULZBACH:  I don't have a

22   list.  I didn't ask him questions about a list.

23             MR. ARNOLD:  You're in your office,

24   Mr. Sulzbach, what do you mean you don't have a

1    list?

2    BY MR. SULZBACH:

3      Q      And you've identified all checking and

4    savings accounts, have you not?

5      A      Yes.

6      Q      That you know of?

7      A      Yes.  Yes, I have.

8      Q      Okay.  And you've given whatever federal,

9    state and income tax returns you have from 1996 to

10   2000, is that right?

11     A      Yes.

12     Q      And you've told us there are no documents

13   relating to an interest in real property acquired,

14   transferred or sold because there was no such

15   property, is that correct?

16     A      Yes.

17     Q      Thank you.  With respect to Plaintiff's

18   Exhibit Y, which appears to be Debbie Russo's 1998

19   payroll records, did you prepare that?

20     A      No.

21     Q      Did OSM prepare that?

22     A      No.

23     Q      Do you know whether it's accurate?

24     A      No.

82

```
1       Q       With respect to checks written for OSM on

2   OSM accounts, who signed those checks?

3       A       I did.

4       Q       Anyone else ever sign one?

5       A       No.

6       Q       Who controlled the checkbooks?

7       A       I did.

8       Q       Where were they kept?

9       A       In my office or occasionally with Mr.

10  Padob.

11      Q       Did your father ever sign a check for OSM?

12      A       No.

13      Q       Did he ever have control of a check or

14  checkbook?

15      A       No.

16      Q       To your knowledge, did your father ever

17  personally guarantee that OSM would meet its

18  obligations to Ms. Russo-Williams?

19      A       No.

20      Q       Did you ever tell her that your father

21  would personally guarantee to do that?

22      A       Absolutely not.

23      Q       Was OSM funded surreptitiously by your

24  father for his personal benefit?  That's a yes or
```

HAMDEN, CT  (800) 262-4102

83

1    no.

2        A        No.

3        Q        And in fact, other than whatever tax

4    deductions he might have achieved, has he gained any

5    benefit from OSM?

6        A        No.  It was a bad investment where

7    tremendous sums were lost.

8        Q        So, he hasn't personally reeked the

9    financial benefits of OSM's activity?

10       A        The contrary is true.

11       Q        Has there been any financial benefits?

12       A        No.

13       Q        Now, was any money drained from OSM for the

14   purchase of property to be placed in your wife's

15   name?

16       A        No.

17       Q        Did your wife ever receive anything from

18   OSM?

19       A        No.  No check was ever written to her,

20   nothing.

21       Q        And going back to your father, did he play

22   any role whatsoever in the operations of OSM?

23       A        No.

24       Q        Did he have anything to do with any

84

1     decision as to whether or not to pay Mr. Wainright

2     or Ms. Russo-Williams?

3       A       No.

4       Q       And did your wife have anything at all to

5     do with OSM?

6       A       Nothing.  Mr. Polansky was eighty-six when

7     he invested and ninety-one when we bellied up.

8       Q       And does OSM hold any property in Anne

9     Polansky's name?

10      A       No.

11      Q       Did it ever?

12      A       No.

13      Q       With respect to --

14        (Off-the-record discussion by Mr. Polansky.)

15                    MR. SULZBACH:  I would like to be

16    on the record and continue my examination, please.

17                    MR. ARNOLD:  I want everything on

18    the record with this man.  Mr. Polansky, sit down,

19    please.

20    BY MR. SULZBACH:

21      Q       Now, in fact, in connection with the

22    purchase by OSM of assets from Valassis, did OSM

23    secure --

24                    MR. ARNOLD:  Mr. Polansky, hang

85

1    your phone up.

2    BY MR. SULZBACH:

3        Q        Did OSM secure a line of credit of up to

4    $250,000?

5        A        Yes.

6        Q        Did you ever draw that down?

7        A        No.

8        Q        Is that because it was too expensive?

9        A        Too expensive.

10        Q        And at the time, did OSM not receive

11    adequate capital through the investments of Israel

12    Polansky?

13        A        Yes, it did.

14        Q        In fact, it was on the basis of those

15    investments that OSM operated through 1999?

16        A        Yes.  That's true.

17        Q        Now, when you hired both Mr. Wainright,

18    when "you," meaning, OSM, hired Mr. Wainright and

19    Ms. Russo, OSM was really in a start-up situation,

20    was it not?

21        A        Yes.

22        Q        All right.  And did you make it clear to

23    them at that time that you expected and hoped to

24    raise capital from outside investors?

1      A      Yes.

2      Q      And part of the purpose of having them on

3  board was to make OSM attractive to outside

4  investors, was that right?

5      A      To demonstrate that it could run the

6  system, yes.

7      Q      And in fact, did deals -- were there one or

8  more proposed deals with regard to outside

9  investment in OSM?

10     A      Yes.

11     Q      And you provided the plaintiffs with copies

12 of what you have with respect to those deals, have

13 you not?

14     A      Yes, I have.

15     Q      And some of those indicated that your

16 father, Israel Polansky, would have a role as a

17 director of the corporation, is that right?

18     A      Only a director, yes.

19     Q      But in fact, he never had any day-to-day

20 role --

21     A      Yes.  That is true.

22     Q      He never had any day-to-day role?

23     A      No.

24     Q      Did he have anything to do with any policy

87

1     or any substantial decision made by OSM?

2     A     No.

3     Q     Did he have anything to do with any

4     decision by OSM or by you with respect to paying or

5     not paying Mr. Wainright or Ms. Russo-Williams?

6     A     None whatsoever, no.

7     Q     In 1997, did you tell Mr. Wainright that

8     your father was giving up on his search for an

9     investor in OSM and would fund the company

10    personally and directly?

11    A     No, absolutely not.

12    Q     In fact, OSM continued to seek funding from

13    outside, did it not?

14    A     Absolutely.

15    Q     And that was with the participation of

16    Ms. Russo-Williams and Mr. Wainright, was that not

17    correct?

18    A     Yes.

19    Q     In fact, they would communicate with

20    potential investors, would they not?

21    A     Yes.

22    Q     And at some point, did their communications

23    with those potential investors cause any harm to

24    OSM?

88

1     A       Yes.

2     Q       And specifically, in what instances did

3  that occur?

4     A       In several instances they described to the

5  Venture capitalists that the deal should be made

6  with them; Mr. Polansky was not in control of the

7  company; could not run anything; and that Venture

8  Capitals should invest in them and sign them before

9  they made any investment in the company.

10    Q       Incidently, did you ever tell either Mr.

11 Wainright or Ms. Russo-Williams that, as long as

12 they worked with the company, that your father would

13 guarantee that their wages, salaries and benefits

14 would be paid?

15    A       Absolutely not.

16                    MR. SULZBACH:  That's all I have.

17                    MR. ARNOLD:  I just have a few

18 follow-up questions.

19

20

21                    REDIRECT EXAMINATION

22 BY MR. ARNOLD:

23    Q       Did you use the OSM checking account to pay

24 for any of your living expenses in New York City?

HAMDEN, CT  (800) 262-4102

89

1    A        Occasionally, yes.

2    Q        Okay.  What living expenses were there that

3    you used OSM funds to pay for?

4    A        I don't recollect any of them offhand, but

5    everything was carefully documented by Mr. Padob.

6    They were done in the form of -- I don't really know

7    how he did it, but all records were kept precisely

8    of the few advances.  I don't know how he booked it,

9    advances or loans to the company, one or the other.

10    Q        How about payments for your mortgage for

11    the apartment?

12    A        I have no mortgage.

13    Q        You live with your wife in an apartment in

14    New York?

15    A        That's right.

16    Q        Does that apartment have a mortgage in your

17    wife's name?

18    A        No, it doesn't.

19    Q        It's owned outright?

20    A        Yes.

21    Q        The monthly common charges, did you ever

22    use OSM funds to pay for your monthly common

23    charges?

24    A        No.  You mean the maintenance, no.

HAMDEN, CT  (800) 262-4102

90

1      Q      Yes, maintenance.

2      A      No.

3      Q      Where did the money come from to pay the

4  maintenance?

5      A      My wife.

6      Q      Okay.  Was your wife employed during the

7  period from '96 to 2000?

8      A      As a volunteer at Columbia, running the

9  parent fund.

10     Q      Where did she get the money to pay for the

11  maintenance funds?

12     A      Family money that she inherited.

13     Q      And when was that inheritance?  During '96

14  to 2000 or before that period?

15     A      No, no.  Long before.

16     Q      Okay.  So, she maintains her own checking

17  account or do you have a joint checking account?

18     A      No.  Her own checking account.

19     Q      Did you have a car in the city?

20     A      Yes.

21     Q      Who paid for the car during 1996 to today?

22  Who pays for the car?

23     A      Company.

24     Q      And you still have that car?

HAMDEN, CT  (800) 262-4102

91

```
 1     A     Yes.  No.  Same one?  Yes.

 2     Q     Okay.  And what is that car?

 3     A     It's a 1992 Lexus.

 4     Q     Was that paid for by the company?

 5     A     No, it was not paid for by the company.

 6     Q     And so, the living expenses that we spoke

 7  about, you're not sure about what those expenses

 8  are, but there's some records somewhere?

 9     A     Somewhere.

10     Q     And those are the same records that you're

11  going to search for at Padob's?

12     A     Yes.

13     Q     Okay.

14                 MR. ARNOLD:  I have nothing further

15  at this point.

16                 MR. SULZBACH:  Actually, can we

17  confer just for one moment?

18                 (Recess was taken.)

19

20                 MR. SULZBACH:  Back on the record.

21  We're all set.

22

23                 (Whereupon, the deposition was

24  concluded at 1:26 p.m.)
```

92

```
 1                    INDEX OF WITNESSES

 2

 3

 4                                                Page

 5

 6    ROBERT POLANSKY

 7

 8    Direct Examination by Mr. Arnold             4

 9    Cross-Examination by Ms. Haley              76

10    Redirect Examination by Mr. Arnold       78,88

11    Cross-Examination by Mr. Sulzbach           79

12

13              INDEX OF PLAINTIFF'S EXHIBITS

14    Description                      No.    Page

15    Copies of Debbie Russo's checks    A      4

16    Copies of Donald Wainright's checks  B    4

17    Donald Wainright Employment Agreement  C  4

18    Donald Wainright Salary Memo         D     4

19    Memo for moving expenses             E     4

20    OSM Moving Expenses                  F     4

21    OSM Fax dated August 5, 1997         G     4

22    Fax dated August 14, 1997            H     4

23    CTC Fax dated October 3, 1997        I     4

24    Donald Wainright Employment Pay Chart  J   4
```

93

1              INDEX OF PLAINTIFF'S EXHIBITS CONTINUED

2        Description                          No.    Page

3        Philip Morris Contract of March 9, 2000    K      4

4        OSM letter dated July 23, 1996             L      4

5        OSM Memo dated Jun 2, 1997                 M      4

6        OSM letter dated August 3, 1996            N      4

7        OSM letter dated July 15, 1998             O      4

8        Fax dated 1/22/97                          P      4

9        OSM letter December 1, 1997                Q      4

10       OSM Board of Directors Chart               R      4

11       OSM BIOS                                   S      4

12       OSM Promissory Note dated 3/7/94           T      4

13       OSM Indemnification Agreement              U      4

14       Minute Book, Certificate Book and Stock
         Ledger of OSM                              V      4
15
         1996 to 2000 W-2's                         W      4
16
         Three letters by Robert Polansky,          X      4
17
         1998-89 Payroll Records of Deborah Russo   Y      4
18
         Asset Purchase Agreement dated
19       April 18, 1996                             Z      19

20       Memorandum dated August 21, 1997           AA     44

21       Notice of Deposition dated
         November 15, 2004                          BB     51
22
         Notice of Deposition dated March 2, 2004 CC       53
23

24

94

```
 1                C E R T I F I C A T E

 2

 3    STATE OF CONNECTICUT)

 4                        ) ss.

 5    COUNTY OF HARTFORD  )

 6            I, LISA GRAZIANO, a Notary Public in and

 7    for the State of Connecticut, do hereby certify that

 8    the foregoing record is a correct and verbatim

 9    computer-aided transcription of the proceeding

10    hereinbefore set forth.

11            I further certify that I am neither counsel

12    for, nor related to, nor employed by any of the

13    parties to the action in which this proceeding is

14    taken; and further certify that I am not related to,

15    nor an employee of any attorney or representative

16    employed by the parties thereto, nor am I

17    financially interested in this action.

18            In witness whereof, I have hereunto set my

19    hand and affixed my notarial seal this

20    date, December 14, 2004.

21

22                        LISA GRAZIANO

23                        NOTARY PUBLIC

24    My commission expires June 30, 2006.
```